Kira Howell
1046 S. Cleveland St. #37
Oceanside, CA 92054
Kira.howell8@yahoo.com
612-412-3472
In Pro Per



FILED
CLERK, U.S. DISTRICT COURT

7/24/24

CENTRAL DISTRICT OF CALIFORNIA
BY: ___mz___ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

KIRA HOWELL

          Plaintiff,

vs.

PEPPERDINE UNIVERSITY

          Defendant

Case No.:  2:24-cv-06332-FWS-E

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff, Kira Howell, brings this suit to recover for federal statute violations and state law claims, as follows:

## JURISDICTION AND VENUE

1. Jurisdiction in this Court is asserted under the provisions of 28 U.S.C. §1331. This action arises under the provisions of Title IX of the Education Amendments of 1972. This Court has supplemental jurisdiction over the state claims asserted herein pursuant to 28 U.S.C. §1367.

2. Venue is appropriately laid in the Court pursuant to 28 U.S.C. §1391(b) in that the actions complained of took place in Malibu, which is within the bounds of the Central District, and Defendant carries on business within the Central District.

## PARTIES

3. Plaintiff, Kira Howell is a resident of 1406 S Cleveland St. #37 Oceanside, California.

4. On information and belief, Defendant Pepperdine University owns, operates, manages, directs, and controls Pepperdine Caruso School of Law, and which employs all of the persons named as non-parties herein.

5. At all times relevant to this action, the University acted through its employees as listed below.

## NON-PARTIES

6. Jim Gash ("Gash") was at all time President of Pepperdine University.

7. Sharon Beard ("Beard") was at all relevant times the Dean of Students at Pepperdine University.

8. Jeffrey Baker ("Baker") was at all relevant times the Assistant Dean of Clinical Education at Pepperdine University.

9. Jay Brewster ("Brewster") was at all relevant times the Provost of Pepperdine University.

10. Chalak Richards ("Richards") was at all relevant times the Assistant Dean of Student Life at Pepperdine Caruso School of Law.

11. Jason Jarvis ("Jarvis") was at all relevant times the Associate Dean of Strategic Initiatives and Projects at Pepperdine University.

12. Tom Stipanowich ("Stipanowich") was at all relevant times the Chair in Dispute Resolution at Pepperdine University.

13. Barry McDonald ("McDonald") was at all relevant times the Professor of Law at Pepperdine Caruso School of Law.

14. Alexis Joyce ("Joyce") was at all relevant times the Director of Career Development Office at Pepperdine Caruso School of Law.

COMPLAINT

15. Suzanne Freyer ("Freyer") was at all relevant times the Assistant Director of Academic Excellence Professor at Pepperdine Caruso School of Law.

16. Stephanie Williams ("Williams") was at all relevant times the Assistant Professor at Pepperdine Caruso School of Law.

17. Connie Horton ("Horton") was at all relevant times the Dean of Student Affairs at Pepperdine University.

18. John Doe I ("Proctor") was at all relevant times a Proctor at Pepperdine University.

19. Arnold Barba ("Barba") was at all relevant times the Chief of Staff of Pepperdine Caruso School of Law.

20. Colleen Graffy ("Graffy") was at all relevant times a Professor at Pepperdine Caruso School of Law.

21. Ed Larsen ("Larsen") was at all relevant times a Professor at Pepperdine Caruso School of Law.

22. Doug Hurley ("Hurley") was at all relevant times an Associate Dean of Student Affairs at Pepperdine University.

23. Naomi Goodno ("Goodno") was at all relevant times an employee at Pepperdine University.

24. Jacob Charles ("Charles") was at all relevant times an Associate Professor at Pepperdine Caruso School of Law.

25. Peter Neumann ("Neumann") was as all times an Adjunct Professor at Pepperdine Caruso School of Law, Straus Institute for Dispute Resolution.

26. Jack Coe ("Coe") was at all times a Professor at Pepperdine Caruso School of Law, Straus Institute of Dispute Resolution.

27. Matthew Dunn ("Dunn") was at all relevant times an Investigator with Pepperdine University Department of Public Safety.

---

COMPLAINT

## FACTUAL ALLEGATIONS ON THE MERITS

28. Plaintiff is a law student at Pepperdine Caruso School of Law.

29. At Summer orientation, Richards made a derogatory, disparaging joke about Plaintiff being "still in school" at her age.

30. Title IX Office contacted Plaintiff via email offering support after a male student repeatedly acted sexually inappropriately towards her in and out of class and Plaintiff called him "weird."

31. One week later, student Blanche Doe, a voting member of the Student Disciplinary Committee, grabbed her butt to emphasize it in front of several male students during Issues In Dispute Resolution class, including Jonathan Abraham, and, on information and belief, Noah Werksman and Michael Moss, and she made one other reference to her butt while making a presentation.

32. On July 20, 2023, during the first lecture of International Commercial Arbitration, Coe kicked at Plaintiff's back side towards a group of male students as her back was to him and when she saw him, he subsequently got angry and embarrassed and gave middle fingers with both hands, witnessed by the entire class, including students Jacob Yadegar and Jonathan Abraham.

33. During the International Commercial Arbitration course, Neumann made repeated licking gestures directed at Plaintiff during class.

34. After Plaintiff and other students were heard mentioning sexual harassment, Neumann stood by Plaintiff and passed gas loudly, paused and stared at her while smiling.

35. Student Alicia Purnell approached Plaintiff as they were leaving class and asked her to go out to dinner. Plaintiff thanked her for the offer but declined.

**Orientation Week**

36. During Orientation week, August 14-18, 2023, Gash made a gun with his hand

and "shot" it at an unidentified female student sitting in the auditorium.

37. Gash looked directly at Plaintiff during his speech, once while making a comment about being "a little gassy."

38. During Orientation week, several non-parties and faculty introduced themselves at the podium to the entire 180 students of the Class of 2026.

39. While speaking at the podium, Goodno and Graffy made homophobic gestures at Plaintiff and then made guns with their hands.

40. Stipanowich stood at the podium to introduce himself, looked at Plaintiff, kicked, laughed, and said, "how about this gay?"

41. Jarvis sat near Plaintiff after an orientation session and said he would contact the Bar if she recorded lectures without permission.

42. Joyce approached and sat down at Plaintiff's Orientation table during the week of August 14-18, 2023.

43. Joyce addressed Plaintiff and other students, including Conor Fairtlough, Ian Kitts, unidentified blonde female student in Section B, and an unidentified Asian female student, and said she was sent to replace the group's Mentor, Professor Shelly Saxer, who was unavailable to have lunch that day.

44. Joyce introduced herself as Director of CDO, and after speaking informally about her role, she fielded questions.

45. Plaintiff asked her about the importance and availability of internships at a District Attorney's office if a student was in the Accelerated Program and Plaintiff spoke about the level of difficulty entering Los Angeles County District Attorney's Office as a new graduate, and Joyce and Plaintiff engaged in conversation back and forth for several minutes.

46. After Plaintiff finished asking questions and speaking, Joyce looked at her as Plaintiff checked email on her phone, pointed at her and said, "that's weird."

47. Plaintiff then received multiple homophobic comments and gestures presuming Plaintiff's sexual orientation from Ian Kitts and other unidentified students sitting nearby.

48. During a Section B lecture led by Richards, Richards stood in front of Plaintiff and screamed at her and jumped at her as if threatening her, and a male student immediately told her "no" by shaking his head, and began talking to Plaintiff about being Armenian.

**Defendant's Sex-Based Discrimination**

49. On July 6, 2023, Schneider stood outside classroom where Plaintiff sat reading and her and a male voice said, "I know."

50. At the end of a class session that week, Plaintiff smiled and said goodbye to Schneider and she refused to speak to her.

51. Schneider made a homophobic gesture at student Alicia Purnell and then nodded her head as if to assert Ms. Purnell's sexual orientation, and Ms. Purnell looked uncomfortable and, on belief, she did not respond.

52. After CDO Assistant Director Rachel Levine glared at Plaintiff and kicked repeatedly, and Joyce singled Plaintiff out during a Professional Formation lecture, Plaintiff sent an email to Joyce telling her to refrain from further disparaging comments and removing consent from Joyce over any aspect of Plaintiff's professional life.

53. Minutes after Plaintiff sent Joyce the email, an unidentified woman stood outside her classroom and angrily yelled, "butt."

54. In August 2023, student Elias Guanunu stood behind Plaintiff as she waited to sign the Professional Formation attendance sheet, and kicked at her towards Freyer, who then kicked at Plaintiff from two feet away.

55. On August 24, 2023, Mr. Guanunu stood behind Plaintiff's seat during Legal Research and Writing (LRW) class, looked at Williams, kicked at Plaintiff while making a homophobic gesture.

56. Williams looked at Mr. Guanunu and laughed, never telling him to stop.

57. During the same class, Williams told a joke while looking at the clock, then at Plaintiff, and saying sarcastically to the class, "and [this] starts right at 40."

58. Williams told a joke about the size of Plaintiff's rear end as Plaintiff was turning to walk away from her in front of the class by saying, "and we don't know what that is."

59. Student Kyle Gillick then stared at and referenced Plaintiff's butt on two occasions, once shortly after Williams' joke and once in January 2024 when he laughed and said, "it's huge," as if to indicate someone told him about Stipanowich's sexual harassment.

60. Mr. Guanunu then made disparaging jokes about Plaintiff being old to the entire class in subsequent sessions as a means to prevent her from speaking in class.

61. During a Professional Formation class in September 2023, Freyer made a homophobic gesture at Plaintiff as she sat in her seat and then made a gun with her hand.

62. Student Bryan Weitzman immediately jumped out of his seat laughing.

63. In a subsequent class, Plaintiff said, "so you can feel free to shoot me if I'm gay…[I do have a problem with that]" while stating her fear and opposition to this discriminatory threat, and Barba acknowledged the incident with Freyer and Mr. Weitzman by pointing at him.

64. Williams looked directly at Plaintiff during LRW class in October 2023 and said disparagingly, "you don't know the law" and "[you aren't doing a good job]" even though no means of assessment had been made, and these disparaging

comments were followed up with praise and references to another female student being marriage material and "beautiful."

65. Williams then later called another minority female student "ugly" by indicating student Kyle Gillick would not find her attractive.

66. Williams inserted the word "ugly" while staring at Plaintiff, including one occasion in November 2023 where Williams looked at student Kyle Gillick and said, "so ugly," as if to ask him to call someone in class ugly, to which Mr. Gillick looked at the class and said, "ha!"

67. In January 2024, Williams said to the entire LRW class, "so this is really pretty" and then looked at Plaintiff and said, "cute" while shrugging her shoulders, one or two days after Professor Larsen did the same thing to Plaintiff and student Taylor Hitchan in Property class a few days earlier.

68. During Professor Larsen's class, an unidentified female student, stood in front of Larsen and made a homophobic gesture with her hand, and he stared at her but did not say anything.

69. Throughout the Fall semester, Baker participated in four acts of discrimination against Plaintiff, including once in October 2023 when he walked into the law school by walking past a large group of students seated outside the café, he saw Plaintiff standing at the door and gave her a dirty look while watching the students follow his actions.

70. As soon as he entered the school, Baker then began to go back outside while making a face and mumbling to himself as if he felt bad for ostracizing and mistreating Plaintiff, but then saw her and changed his mind.

71. Baker once shunned Plaintiff as he saw her in the hallway, refusing to smile back at her while running towards a group of male students and laughing and joking with them.

72. Baker refused to say hello or smile at Plaintiff as they passed each other in the hallway weeks later in October 2023.

73. Baker stood outside his office as Plaintiff was walking at the other end of the hallway and he stared at her and made a homophobic gesture.

**Serial Illegal Book Defacements and Stalking**

74. During successive Monday morning announcement sessions, Richards made homophobic gestures at Plaintiff in front of the class and made one comment "we'll guess what you are" while making discriminatory homophobic gestures at her.

75. In September 2023, an unidentified male approached Plaintiff's car as she sat in it across from the law school, he pressed his face against the window of the rear driver's side seat, looked inside, saw Plaintiff sitting in the driver's seat, got angry, and ran away shaking his arms as if to say leave him alone or get off his back.

76. Later, the same man appeared outside Plaintiff's class as she went to the bathroom, and he was seen on two other occasions walking around campus staring at her, and three of the four times Plaintiff saw him, he was coming from or heading to faculty housing.

77. In September 2023, Plaintiff reported to Department of Public Safety's Dunn that Stipanowich had harassed her and was making unwanted comments about her butt, leading student Bryan Weitzman to appear to make a gun with his hand and "shoot" it at her head during a Contracts class.

78. On September 14, 2023, Plaintiff saw her new Criminal Law book was defaced when she turned to page 236 and saw all of the answers were filled in.

79. Plaintiff reported the illegal defacement to Richards via email and stated she wasn't sure if it was someone at the school or her landlady, the only other person who had access to her property.

---

80. Weeks later, Plaintiff saw her book was defaced again and in another color ink.

81. Plaintiff reported the defacement to Graffy, Richards, and Jarvis.

82. Plaintiff told Williams she was unmarried and voiced opposition and offense to being defamed about her sexuality but being morally opposed to homophobia.

83. Williams stated Plaintiff seemed friendly with a "50-year-old man" during a fire drill.

84. During a meeting with Jarvis and Richards on October 13, 2023, Plaintiff reported that she was being inundated with violent homophobia, stating this was the apparent cause of the defacements, and Jarvis immediately rolled his eyes and got frustrated.

85. During the meeting, Richards focused on Plaintiff not being able to prove stalking, to which Plaintiff replied, "this is a strict liability misdemeanor" which doesn't require proof of intent.

86. Plaintiff saw her book was defaced on a third page, 899-900, in the weeks after the meeting with Richards and Jarvis.

87. Richards asked Plaintiff about her email telling Joyce to leave her alone, and Plaintiff said she had handled it to advocate for herself, she thought Joyce appeared friendly to her during a Professional Formation lecture and that her actions did not seem discriminatory at that time, and Richards insisted on a reconciliation in which she was present, a meeting Plaintiff said she would do "if" Richards really wanted to.

88. On February 24, 2024, Graffy confirmed via email that she had met or conferred with Plaintiff numerous times about the serial book defacements, Plaintiff reported the defacements were "creepy" and seemed to show a pattern of stalking and she feared her safety, and both Plaintiff and Graffy had expressed prolonged concern for Plaintiff's safety.

**Stipanowich's Contracts Class**

89. In September 2023, Stipanowich looked at Plaintiff while she sat in her seat and said, "[then you] come to my office and [I will tell you]" after saying something to the class about how to do well on his final exam.

90. Stipanowich told a joke about "eating at Cougars" before pausing, laughing, looking at Plaintiff, and then looking around the room to elicit laughter.

91. Stipanowich made numerous, repeated unwanted comments about Plaintiff's rear end, including saying the word, "butt" as soon as Plaintiff and student Jonny Yadegar began sharing a book, saying "butt" as Plaintiff walked out of the classroom to use the restroom, saying "it's huge" while laughing, and laughing and saying, "because you don't have one" on another day as Plaintiff took her seat after turning around while standing and after staring at her.

92. On one occasion, a male student told Stipanowich to stop, and Stipanowich gave him an angry look and chastised him.

93. Stipanowich looked at Plaintiff before making sexual licking gestures with his lips and mouth towards a female student sitting one row in front of Plaintiff and to her left.

94. Plaintiff looked scared and opposed of Stipanowich's actions, and Stipanowich got angry.

95. In the next class, a male student sat in the female's assigned seat, Stipanowich paused and stared but did not say anything.

96. In October 2023, Stipanowich stood in front of the class and angrily made a homophobic gesture at Plaintiff.

97. In November 2023, Stipanowich stood in front of student Grace Brandt and made the same licking gestures at her.

98. Ms. Brandt began sniffling to indicate she was hurt and she, too, did not want the gestures.

99. In November 2023, Stipanowich made a hand gesture by holding his hands up parallel to each other as if to indicate size while smirking, as a female student walked to her seat.

100. Student Jonny Yadegar indicated to Plaintiff that this was a joke about her butt between male students and Stipanowich.

101. In November 2023, Stipanowich used sexual innuendo while lecturing when he paused, inserted the phrase, "erection of a building," as he pulled a chair in front of his groin and held his hand there while smirking and looked at Plaintiff directly.

102. Mr. Weitzman began laughing and the class understood Stipanowich was again using sexual innuendo to accost students.

103. Plaintiff opposed his harassment by shaking her head no repeatedly.

104. Stipanowich then made a comment to Plaintiff about his disdain for her opposition to his repeated sexual innuendo and overt comments, including saying towards Grace Brandt and the class, "I like that" as if to make Plaintiff seem like a bad person for opposing his sex-based harassment.

105. Stipanowich then said to Grace Brandt, "yes, okay" while smirking, as if to tell Ms. Brandt he was attracted to her.

106. On a subsequent day, Grace Brandt walked into class through the Atrium and told someone loudly, "I'm a slut," then stopped talking and looked down at the ground when she saw Plaintiff.

107. During a Professional Formation lecture where Stipanowich was a guest speaker, he stared at a female student's butt as she stood in front of him at the podium, the video was then minimized as picture-in-picture on Courses and the video was edited to remove this portion of the lecture.

108. Plaintiff spoke in Contracts class 1-2 times for approximately 1 minute throughout the entire Fall 2023 semester.

109.    Stipanowich stated in class that he knew Plaintiff was not gay by saying while looking at her, "you know, [she's] not."

**Goodno's Civil Procedure Class**

110.    At the beginning of Civil Procedure class in September 2023, Goodno stood in front of Plaintiff's seat from the bottom of the auditorium and said, "[and] Kira, you know . . . you have [a disease]."

111.    Plaintiff responded that Goodno was lying and this was a violation.

112.    Over the next few days to weeks, Goodno made at least three more references directed at Plaintiff about "lying," as if to place her in a position of fear for repeatedly asserting herself in class and to allude to the class that her false statement was true.

113.    On information and belief as to identity, male student Caden Cutter walked deliberately in front of Plaintiff's seat and made a homophobic hand gesture at her.

114.    As Plaintiff left the classroom, an unidentified male student said, "sick" as she walked by.

115.    During class, Goodno said to the class and towards student Grace Brandt, "[so] I *know*," as if to further propagate the lie she told.

116.    At the beginning of a lecture on October 6, 2023, Plaintiff walked down to the podium to tell Goodno she thought she made a mistake on the assignment she had just turned in.

117.    As Plaintiff was turning to walk back to her seat, Goodno looked at the top of her head, stared for a second, then said, "yup, and those gray hairs. [Good luck getting hired somewhere]."

118. Grace Brandt began following Plaintiff around campus and intimidating her through heckles, screams, and unwanted comments about Plaintiff's butt prior

to a final exam, and on February 2, 2024, during our Property midterm exam, she told a harassing, discriminatory and disparaging joke about Plaintiff's age and Plaintiff being "her mother" and then said, "because I *know*" as Plaintiff sat silently in her seat preparing to take the exam.

119. In October 2023, Goodno made a reference to Plaintiff about Plaintiff's students in her class at Pierce College.

120. During class in October 2023, while the class was answering questions on iClicker through our phones, Plaintiff could not see the question or answer it on her phone.

121. Plaintiff expressed desire to participate in class by saying she did not have access to the question, and Goodno began laughing and pretended to be controlling Plaintiff's access from her computer.

122. Goodno continued to laugh at Plaintiff, playing on her computer and showing she was controlling answers from her computer.

123. Student Michelle Yao began smirking and laughing at Plaintiff as Goodno made fun of her.

124. In November 2023, student Conor Fairtlough turned towards Plaintiff and several female students during class and said, "blood" to which Stipanowich stopped, looked at him, and responded.

125. On November 9, 2023, Goodno hosted a lunch lecture and as Plaintiff was cleaning the Subway food trays off her desk, Goodno laughed, hugged a female student and was extremely kind to her before giving Plaintiff dirty looks and saying, "oh, you don't have to clean that...," in an exaggerated manner and as if she was holding back the rest of the comment.

126. Throughout the semester, Goodno made several dirty looks, including smirking at Plaintiff or calling her "weird" without cause and while Plaintiff was seated in the back row, and Caden Cutter, on information and belief as to identity,

walked to Plaintiff at her seat, stared down at Goodno, indicated he knew she was referencing her and he indicated it was about sexual orientation.

127. In class on November 28, 2023, student Caden Cutter, on information and belief as to identity, made a statement to Goodno about her statement about Plaintiff having a disease months earlier.

128. Goodno stopped and appeared nervous, not responding except to say, "uhh" and nod her head "yes" as if convicted.

129. Goodno never said her statement was retracted or untrue even when Plaintiff was being harassed and humiliated by other students.

130. Goodno made a comment during lecture where she paused, stared up at Plaintiff in her seat, and said repeatedly, "they're just so old, so old."

131. Goodno gave an untrue, biased written statement to Pepperdine University which said Plaintiff used an "unprofessional tone" and said, "I pay for this and you have to answer me," when Plaintiff actually said, "This is what I'm going to be doing for a living" and "I care about [doing a good job]."

132. Unidentified male student who taunted Plaintiff about being "sick" then stood by her seat and gave Goodno a look as if he would "handle" Plaintiff and students were following faculty lead.

133. Plaintiff spoke 2-3 times for approximately 5 minutes total throughout the entire Fall 2023 semester.

**McDonald's Constitutional Structure Class**

134. McDonald was the Professor for a Constitutional Structure class during the Spring 2024 semester.

135. Plaintiff was a student in McDonald's class during the Spring 2024 semester.

136. The normal practice at Pepperdine Caruso School of Law is to video record all lectures and make them available on Courses, the school's internal website.

137. Defendant refused to record his lectures and prohibited students from using their own devices to record them.

138. On January 9, 2024, McDonald stared at Plaintiff on and off for approximately five minutes prior to beginning the first lecture class.

139. During the first class, McDonald stood in front of a group of male students, including Conor Fairtlough, Jonny Yadegar, Jacob Yadegar, on information and belief Caden Cutter, William Steele, and several others easily identified from the assigned seating chart for the class.

140. While McDonald stood in front of these male students, he grabbed the skin under his neck and said, "this used to be looser."

141. Student Conor Fairtlough smirked and began laughing.

142. McDonald then laughed minutes later and joked to the same group of male students, "so she's old" while looking at me, and then minutes after that stopped mid-sentence to stare at me again and ask if I was okay.

143. In late January 2024, McDonald gave the Plaintiff a middle finger with his right hand while Plaintiff sat in her seat adjusting her top.

144. In a subsequent Constitutional Structure class, Ms. Aswani looked back towards Plaintiff and shook her head "no" as class was beginning.

145. McDonald then got upset at Ms. Aswani and a female student to her left easily identified by the assigned seating chart, whom he thought were making fun of him, and he looked at Plaintiff, shook his head "no" while making a motion with his hand as if to say, "no, no, I'll take care of it."

146. Plaintiff then shook her head no and made a gesture to indicate he was mistaken about the female students.

147. McDonald refused to accept this as a mistake, and made another middle finger as he was writing on the board.

148. In the next class, McDonald said to the entire class, "I like that."

149. Charles repeated this phrase, "I like that" before pausing and looking to the class during his Torts class the next day.

150. McDonald was seen outside Plaintiff's other classes, staring at her for prolonged periods each time, on three occasions, once signaling her to stop and talk with him, telling her to come by his office and saying he was disappointed she didn't stay after class to speak with him privately, and another time where he stared at her as she pretended to look for someone else as she walked by him.

151. McDonald stared at Plaintiff repeatedly in multiple classes, and as she took notes on a case, he looked at her and said, "tsk" as if to say pay more attention to him while other students actively took notes.

152. Plaintiff wrote on a piece of paper, "are you obsessed with me?" and showed it to Michelle Yao after McDonald repeatedly stopped class to stare at her.

153. On February 6, 2024, McDonald shook his hand at Plaintiff as if wagging his finger at her and called her a name as she walked out of class.

154. Student Marcello Jones said, "[you have] pretty eyes" to Plaintiff as soon as they got in the hallway, after saying loudly in Property class on January 8, 2024 to Dean Al Sturgeon, "I'll never go against you [all] again."

155. Plaintiff wrote an email to McDonald telling him to stop making disparaging comments about her in class or she would call the police.

156. Plaintiff wrote a written response to the school that McDonald was "extremely aggressive towards me on day one" and he "then told a cruel joke about me to a group of male students about me being old or ugly."

157. McDonald wrote an email response to Beard stating, "the bit about a cruel joke is patently false. I have no idea what she is talking about."

158. McDonald's words, "so she's old" while laughing and after saying, "this used to be looser" are overt acts done, in part, directly to Plaintiff as she sat silently in her seat.

159. McDonald's actions, circling back around to Plaintiff again minutes later, pausing class to indicate he wanted to see if she was okay, are overt acts made towards a passive student who wanted to be left alone.

160. McDonald lied about his words and actions again when he said, "I certainly never told her I liked her" and "I have no idea what she's talking about re 'middle finger.'"

**Discipline For Reporting Title IX Violations**

161. On February 6, 2024, Plaintiff sent an email telling McDonald to refrain from making disparaging, discriminatory comments about her in class.

162. Hours later on February 7, 2024, Plaintiff received a letter from Horton stating that she had restricted Plaintiff from classes, was initiating an investigation, and Plaintiff needed to appear at a hearing once information was known.

163. Plaintiff wrote a letter to Brewster stating her opposition to this action, and stating she is a professional woman, she did not know why this happened, and she did not do anything wrong, to which Brewster replied the restriction was due to "public disruptive behavior" on February 14, 2024.

164. While on a telephone conversation on February 23, 2024, Horton said in response to Plaintiff's complaint of being given a middle finger in class, that she didn't believe any faculty at Pepperdine would ever do something like

that.

165. Beard immediately agreed by saying she takes dishonesty "very seriously," and implied she was certain Plaintiff was not being truthful.

166. Plaintiff said she didn't do anything wrong and didn't understand why she was being restricted, to which Horton said, "[umm, well,] I don't know, Kira, something's been going on with you," and neither Beard nor Horton could give a single example of something disruptive or otherwise that Plaintiff did to warrant their actions.

167. Beard then cited McDonald's comments and Plaintiff stated repeatedly that she was reporting his discrimination.

168. Beard stated in email on February 24, 2024, that she wanted Plaintiff to be "aware" that Defendant University was calling named faculty as witnesses, and she reiterated orally that she would determine whether or not they appeared at the hearing.

169. On February 26, 2024, Plaintiff was asked to give an opening statement, and she began speaking by saying she alone uses the term "V100" because she used that list when applying to and researching law firms, and that Goodno's comments about her age were more specific.

170. Plaintiff then stated that Goodno made a derogatory comment while Plaintiff was wearing a tweed skirt and orange sweater, and after she approached Goodno at the podium about her homework assignment, Goodno looked at her head and said, "yup. And that gray hair. [Good luck getting hired.]"

171. Plaintiff stated to Defendant, Beard, and Baker at the start of the hearing, "you mentioned that [everyone involved] was going to be present [for cross-examination]" and then asked when that would occur.

172. Beard responded by saying, "the [voting committee members determined] that was not necessary" and she was disallowing their appearance, even after Plaintiff stated multiple times both orally and in writing that she wanted them present and their cross-examination was critical to fact-finding.

173. McDonald wrote a defamatory false statement, "they also indicated to me that she is delusional" while denying he made factual statements to the entire class about Plaintiff, and when Plaintiff asked about this during the hearing, Beard denied her an answer or due process to cross-examine McDonald.

174. When Plaintiff began reporting McDonald's repeated incidences of staring at her outside her other classes in such a pronounced manner as to force Plaintiff to pretend to be looking for someone else as she walked by him, Beard and Baker intimidated her with angry stares and gestures.

175. Ms. Brandt followed Plaintiff around campus on multiple occasions, including once where she screamed at Plaintiff as she walked into the law school, once when making unwanted comments about Plaintiff's butt before a final exam, once when she harassed and intimidated her during a Property midterm by calling her old and saying, "because I know," once appearing at Plaintiff's LRW class while Williams said, "so she's entitled [to stalk and harass you]", and then Ms. Brandt made a false statement when she said in regards to Plaintiff's behavior, "the entire class quite literally reacts" and there are "groans, exasperated sighs, many wide-eyed stares" and "[she] has given me so much anxiety" in an email to Beard, when in fact she was the instigator and aggressor each time, and Plaintiff has never interacted with her.

## COUNT I – TITLE IX DISCRIMINATION – QUID PRO QUO AND DELIBERATE INDIFFERENCE TO STIPANOWICH'S DISCRIMINATION

176. Plaintiff adopts and incorporates by reference paragraphs 1 through 175 above as fully set forth herein.

177. Title IX prohibits sex-based discrimination and harassment based on sex or gender, and interference with any right or privilege secured by Title IX, in schools receiving federal funding.

178. At all relevant times, Defendant was a recipient of federal funds from the U.S. Department of Education, and all named non-parties were subject to Title IX regulations.

179. Sexual harassment includes unwelcome conduct that is severe and pervasive and effectively denies a person equal access to her education or activity, and/or conditions the provision of a recipient's aid, benefit, or service on her participation in unwelcome sex-based conduct.

180. Sexual harassment includes overt acts that may, but are not required, to have created an environment and effect such that the student suffers emotional distress or fears her safety, and the school is required to provide supportive measures that protect the student's equal access to education when she opposes discrimination.

181. Defendant had knowledge of the harassment Plaintiff alleges because she repeatedly reported to Department of Public Safety, Jarvis, and Richards that Stipanowich was making unwanted remarks about Plaintiff's rear end during numerous Contracts classes, including saying, "because you don't have one," "it's huge," and "butt," and Defendant showed deliberate indifference to Title IX discrimination when refusing to investigate Plaintiff's allegations for months and intimidating her directly by telling her not to report continued harassment from Stipanowich.

182. Defendants effectively denied Plaintiff equal access to her education when Stipanowich told her she had to "come to his office" to learn how to perform well on the final exam, she was not welcome at a class picnic after opposing discriminatory comments and licking gestures, Defendant and Stipanowich

forced her to endure months of unwanted harassing comments and refused to investigate numerous reports of his repeated unwanted comments about her butt, and Stipanowch gave a male student an angry, threatening look for sticking up for her.

183. Student Grace Brandt was an additional female student Stipanowich made licking gestures at during Contracts class, and Ms. Brandt began sniffling in response, and the continued use of the same unwanted sexual licking gestures made during class by multiple non-party employees, including Neumann and McDonald, and after being told "no" and being intimidated by Horton and Beard who stated they don't believe any Pepperdine faculty would do such a thing, shows deliberate indifference to Plaintiff's assertion of her rights protected by Title IX and intention to cause harm and intimidate.

184. Defendant's actions were unwelcome as evidenced by Plaintiff's repeated reports and attempts to report Stipanowich's comments and acts, and they were objectively severe and pervasive because they occurred nonstop for the duration of the Fall 2023 semester and in educational settings where Plaintiff was not permitted to be excused or appear remotely, and Stipanowich predicated Plaintiff's grade on meeting with him privately in his office.

## COUNT II – TITLE IX DISCRIMINATION - DELIBERATE INDIFFERENCE TO PERVASIVE DISCRIMINATION, STALKING, AND PROTECTED OPPOSITION TO SEXUAL HARASSMENT

185. Plaintiff adopts and incorporates by reference paragraphs 1 through 184 above as fully set forth herein.

186. Sexual harassment includes unwelcome conduct that is severe and pervasive and effectively denies a person equal access to her education or activity, and/or

conditions the provision of a recipient's aid, benefit, or service on her participation in unwelcome sex-based conduct.

187.    Sexual harassment includes overt acts that may, but are not required, to have created an environment and effect such that the student suffers emotional distress or fears her safety, and the school is required to provide supportive measures that protect the student's equal access to education when she opposes discrimination.

188. Title IX defines stalking as a course of conduct directed at a particular person which causes fear for her own safety and/or her suffering substantial emotional distress.

189. Title IX prohibits schools from using punitive measures in retaliation for reporting sex-based harassment.

190. 34 C.F.R. §106.44 requires that Title IX office contact complainant to offer supportive measures in response to reports of sex-based discrimination regardless of whether or not a formal complaint is filed.

**Deliberate Indifference And Protected Opposition To McDonald**

191. McDonald's actions were objectively pervasive and denied Plaintiff equal access to her education because he made an "aggressive" gesture at her when she inadvertently glanced at the camera in the classroom after telling her he refused to record his lectures and denied access to record on her own device, and while making multiple unwanted sex-based comments, such as "this used to be looser" and "so she's old," gestures such as middle fingers as

Plaintiff adjusted her clothing, multiple sexual licking gestures directed only at Plaintiff during class, and waiting for Plaintiff outside her other classes on three occasions, staring at her, and causing her to pretend to be looking for someone else to walk to her car, and prompting her to write "are you

obsessed with me" on a paper and show it to a classmate as he repeatedly stared at her.

192. Defendant had knowledge of Plaintiff's email to McDonald telling him to stop making disparaging comments about her in class when they cited the email as a reason for reprimanding Plaintiff, and Defendant knew of McDonald's unwanted appearances at her other classes because she reported it to them and intimidated her for reporting it by cutting her off, getting angry and refusing to investigate.

193. Horton acted with deliberate indifference and intimidated Plaintiff during a phone conversation with Horton and Beard when she said, in response to Plaintiff reporting faculty giving middle fingers to students and to discourage Plaintiff's reporting, that she doesn't believe any faculty at Pepperdine University would ever do something like that, when in fact, Coe and McDonald made these gestures, and this represents a pattern and practice of denying faculty acts violative of Title IX.

194. Beard acted with deliberate indifference and coerced and intimidated Plaintiff when she also stated in response to Horton's denial of male faculty actions that she takes dishonesty "very seriously," insisted she reconsider reporting, and failed to abide § 106.44 by refusing to initiate Title IX support.

195. Defendant, Horton, and Beard discriminated against Plaintiff, acted with deliberate indifference, and denied her equal access to education by stating their conclusions about male faculty conduct even before investigating reports, using threatening stares, heckles, and comments while silencing her while she was reporting McDonald's repeated stares and his behavior outside her other classes, and removing her from classes without probable cause in response to reports of discrimination and without abiding by Title IX requirements to offer

supportive measures.

**Deliberate Indifference And Protected Opposition To Joyce**

196. Defendants' actions, including all unwanted sex-based comments, homophobic gestures followed by making guns with their hands, jokes, and acts, effectively denied Plaintiff equal access to her education in violation of Title IX because Joyce's derogatory comment, "that's weird" was an abuse of her authority as CDO Director, was discriminatory, defamatory, retaliatory, and inflammatory in nature, encouraged violence and discrimination, and denied Plaintiff equal access to mandatory law school curriculum requirements coordinated by CDO.

197. Defendant showed deliberate indifference to Joyce's discrimination when Jarvis rolled his eyes while fielding reports of continued violent homophobia and illegal serial book defacements, Richards insisted on a reconciliation with Joyce after she made numerous homophobic gestures at Plaintiff in class over months, and Defendant sought to punish Plaintiff for stating that Joyce's actions immediately subsequent to Plaintiff's opposition to discrimination no longer appeared to be discriminatory and actually seemed friendly when Beard made the false statement "you reported to Dean Chalak Richards that you 'reconciled' with Alexis when you had not had any further interactions with her," and Richards' indifference led to Joyce's further and continued unwanted sexual discrimination by saying publicly in a Professional Formation class that Plaintiff "just came out" after being told to leave Plaintiff alone.

198. Richards' repeated public gestures and comments like "we'll guess what you are" were defamatory, discriminatory, retaliatory, and inflammatory in nature, and with intent to spread untruths about Plaintiff or require Plaintiff to be complicit in unlawful discrimination she opposes.

**Freyer And Baker**

199. Defendant had direct knowledge of the harassment Plaintiff alleges because Freyer's conduct included the act of making homophobic gestures followed by threats of violence by making a gun with her hand directed at Plaintiff as she sat in her seat.

200. Freyer's act of discrimination was witnessed by 180 students, including student Bryan Weitzman, who immediately jumped out of his seat laughing, and Barba, who acknowledged her acts on two separate occasions.

201. Defendant acted with deliberate indifference when Joyce, Stipanowich, and Richards ignored Freyer's acts and continued to use class time to make homophobic gestures and references directed towards Plaintiff and while Plaintiff was being stalked, as evidenced by three incidents of defacement of her personal property, peering into her car and heckling her in the law school parking lot.

202. Defendant's actions, including all unwanted sex-based comments, gestures, jokes, and acts, effectively denied Plaintiff equal access to her education in violation of Title IX because Freyer's, Joyce's, and Richards' overt homophobic and violent gestures and comments furthered tension, contributed to student harassment and illegal defacement of personal property, and caused fear of Plaintiff's safety.

203. At all relevant times, Defendant, Gash, Baker, Beard, and Hurley knew of the unlawful harassment, acted unconscionably and through overt coercion by using threat of punishment for asserting Plaintiff's protected rights to oppose unwanted sex-based comments and actions amounting to discrimination as described herein, including all unwanted comments and acts from Stipanowich, McDonald, Joyce, Freyer, Williams, Baker, and Richards.

204. Baker's pervasive discrimination on four separate occasions where he publicly encouraged student harassment, gave her dirty looks and refused to be inclusive by speaking to her, and his use of homophobic gestures towards her prior to using his authority as Dean to sanction her and intimidate her for reporting sexual harassment shows deliberate indifference to discrimination that ultimately denied Plaintiff equal access to her education.

205. Defendants showed deliberate indifference to Title IX discrimination being reported when they coerced Plaintiff during the hearing through repeated angry stares, comments, intimidating heckles, and threats of punishment for reporting violations and directly asserting her protected rights, as well as conducting coercive interrogations where false statements were inserted repeatedly while giving Plaintiff angry stares and making noises at her, simultaneously punishing her and intimidating her for asserting herself.

206. Hurley discriminated against Plaintiff, showing deliberate indifference, when he ignored reports of coercion, did not contact or allow Title IX Coordinator involvement, as required by law, to include providing supportive measures and protecting equal access to education, he ignored reports of discrimination from Baker, dishonestly restating the facts without actually addressing or properly reporting Baker's discriminatory acts, and he ignored repeated false statements and material alterations, including Beard's false statement that Plaintiff said "the deans" said it seemed like the person who defaced her personal property multiple times probably had a crush on her.

## COUNT III – TITLE IX RETALIATION - DISCIPLINE FOR REPORTING SEX-BASED DISCRIMINATION FROM MCDONALD

207. Plaintiff adopts and incorporates by reference paragraphs 1 through 206 above

as fully set forth herein.

208. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

209. Title IX prohibits schools making a presumption that complainant is lying.

210. Plaintiff engaged in protected opposition to Title IX discrimination when she directly told McDonald to stop making disparaging, discriminatory comments about her in class, including saying, "this used to be looser" and "so she's old," and to leave her alone after making repeated licking gestures, causing her to write "are you obsessed with me" as he was doing so, and she reported McDonald's actions to Gash and Defendant, and Plaintiff reported to Defendant that Goodno made derogatory, discriminatory comment about her appearance, age, and sex, including saying "so old, so old," and "yup, and those gray hairs. [Good luck getting hired]."

211. Plaintiff's exercise of her protected rights to assert herself and say "no" and "stop" directly to McDonald was known to McDonald, as he was the recipient of the email, as well as Defendant, Jarvis, Beard, Gash, Hurley, and Baker when they were respectively apprised, and Plaintiff directly reported Goodno's discrimination to Defendant.

212. Plaintiff was subjected to an adverse action subsequent to this protected activity when she was denied equal access to education by being restricted from classes by Horton without probable cause, an authority who predetermined McDonald did not give Plaintiff a middle finger because she "[doesn't believe any employee of Pepperdine would do such a thing]," and was sanctioned by Defendant for telling McDonald to stop harassment, including waiting outside her classes and staring at her on multiple occasions, saying, "this used to be

looser" and "so she's old," and repeatedly staring at her during class, prompting Plaintiff to write "are you obsessed with me" on a piece of paper, as well as being sanctioned for participating in a protected activity and without due process, including denial of cross-examination, evaluation of cited evidence, or calling of witnesses.

213. Plaintiff was subjected to adverse action subsequent to protected activity when Plaintiff opposed McDonald's discrimination, reported his actions, and then Beard used Ms. Brandt's false statements and omissions as cause for sanctions for actions in which there was no charge, no Plaintiff, no details, no investigation, and no due process, to include no opportunity to cross-examine or question Ms. Brandt or Larsen and while using the same facts reported to Defendant as sex-based discrimination.

214. There is direct evidence of retaliation and a causal connection between the protected activity and the adverse action because Horton and Defendant restricted Plaintiff from classes one day after she opposed discrimination, denying her equal access to education, because she reported and opposed McDonald's harassment, Horton and Beard could not offer a single example of something Plaintiff did wrong during a phone conversation, Beard and Defendant could not and did not cite any incident committed by Plaintiff to prove probable cause to remove her from classes because of "disruptive public behavior" in the sanctions, and Beard ultimately sanctioned Plaintiff for exercising her protected Title IX rights and without proper due process as required by §106.44.

215. There is a causal connection between the protected activity and the adverse action when Beard materially altered statements about "V100 firm[s]," excluded her statements and facts about "gray hairs," and punished Plaintiff

using the same facts reported as discrimination by Goodno.

216. There is direct evidence of retaliation because during all proceedings Title IX was not permitted to be apprised or present, Plaintiff was being punished for engaging in protected activities, and Plaintiff was not allowed to question or cross-examine parties, as required by Title IX, see evidence cited by Beard, an authority who predetermined no faculty would ever do such things, or call witnesses from the school, a requirement of both Title IX and school policy.

## COUNT IV – TITLE IX RETALIATION – DISCIPLINE FOR OPPOSING AND REPORTING SEX-BASED DISCRIMINATION FROM JOYCE

217. Plaintiff adopts and incorporates by reference paragraphs 1 through 216 above as fully set forth herein.

218. Title IX prohibits retaliation against anyone participating in protected opposition of sex-based discrimination.

219. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

220. Plaintiff engaged in protected opposition to Title IX discrimination when she directly told Joyce to cease making disparaging comments about her, Plaintiff removed consent from Joyce over any decisions and access to her professional life, and Plaintiff reported Joyce's actions to Richards and Jarvis.

221. Plaintiff's exercise of her protected rights was known to Joyce because she was the recipient of the email, and it was known to Defendant, Richards, Jarvis, Gash, Beard, Hurley, and Baker when they were respectively apprised of the email and Plaintiff subsequently reported the discrimination to them on

multiple occasions, including at a meeting with Richards and Jarvis, and meetings and hearings with Defendant.

222. Plaintiff was subjected to an adverse action subsequent to protected activity when Defendant and Beard sanctioned Plaintiff using the same reported sex-based discrimination as the basis, and, additionally, they materially altered statements Plaintiff made stating Joyce's actions during a Professional Formation class no longer seemed discriminatory after Plaintiff told her to stop, and materially altered testimony and written statements from Plaintiff about a lengthy conversation with Richards regarding Richards' desire to be present for a reconciliation with Joyce.

223. Plaintiff's written and oral testimony, as well as both written statements from Joyce and available eye witnesses not permitted to appear or be questioned, directly refute Richards' and Beard's false statements that "Alexis only communicated with you via email" when, in fact, she sat at an orientation table with Plaintiff, and answered direct questions from Plaintiff during a conversation that lasted at least 30 minutes, and Plaintiff was engaging in protected activity when she told Joyce to leave her alone and reported Joyce's discrimination, and "you reported to Dean Chalak Richards that you 'reconciled' with Alexis when you had not had any further interactions," when, in fact, Plaintiff only reported Joyce had not engaged in further discrimination and seemed friendly, and Joyce continued to publicly defame Plaintiff by trying to "out" her to the class by saying Plaintiff, a heterosexual woman, "just came out" during a Professional Formation class.

224. There is direct evidence of retaliation because Defendant removed Plaintiff from her education without probable cause one day after she reported McDonald's sex-based discrimination, and there is a causal connection

between the protected activity involving Joyce and the adverse action because Beard stated, "Alexis only communicated with you via email" after Joyce engaged in a corroborated public conversation lasting over 30 minutes, and "you failed to offer any credible evidence that Alexis said or did anything inappropriate" as the reason for sanctioning Plaintiff, violating Title IX protections which permit telling Joyce directly to leave Plaintiff alone and reporting Joyce's factual discriminatory actions, including saying the phrase "that's weird" to a group of students who subsequently mistreated her due to her perceived sexual orientation, to Defendant without fear of punishment.

225. There is direct evidence of retaliation because Plaintiff was punished by Hurley, Beard, Baker, and Defendant for engaging in protected activities, Title IX was not apprised of reports and did not contact or offer support, as required by §106.44, Plaintiff was not allowed to cross-examine parties, as required by Title IX, see evidence cited by Beard, or call witnesses from the school, as required by both Title IX and school policy.

## COUNT V – TITLE IX RETALIATION - DISCIPLINE FOR REPORTING PROCTOR

226. Plaintiff adopts and incorporates by reference paragraphs 1 through 225 above as fully set forth herein.

227. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

228. Plaintiff engaged in protected opposition to Title IX discrimination when she reported to Defendant employee Stacey Nelson Proctor's actions during a Criminal Law midterm exam where Proctor's behavior was met with loud heckles or laughs from student Grace Brandt and several other male students,

student Bryan Weitzman made direct comment in class the next day when he said, "I'm gonna need to see video on that one," Graffy looked at him while lecturing and made direct comment to him in opposition to his actions several days later, Jarvis stated to the class in reference to his actions, "so she'll fail [the exam then]," and Defendant expressly stated only five out of seven students asked denied it occurred, one of which was a participant.

229. Defendant subjected Plaintiff to adverse action for participating in a protected activity when Defendant purposely sought to include this activity in retaliatory proceedings involving McDonald, even after the matter was resolved, and after Richards used repeated homophobic gestures directed at Plaintiff for months during successive Monday morning announcements and intimidated Plaintiff by threatening to harm her if she reported harassment again.

230. There is direct evidence of retaliation and a causal connection between the protected activity and the adverse action because during all proceedings, the Title IX Coordinator and Title IX office were not present and did not participate, Plaintiff was being punished for engaging in protected activities, Plaintiff was not allowed to question or cross-examine parties, see evidence cited by Beard, or call or question witnesses from the school, as required by Title IX and school policy, and Richards had threatened Plaintiff if she reported harassment while the discrimination continued to occur.

## COUNT VI – TITLE IX RETALIATION – DISCIPLINE FOR ENGAGING IN PROTECTED ACTIVITY AGAINST WILLIAMS

231. Plaintiff adopts and incorporates by reference paragraphs 1 through 230 above as fully set forth herein.

232. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

233. Plaintiff engaged in protected opposition to discrimination when she told Williams her actions were creating a hostile learning environment for Plaintiff due to her repeated disparaging, unwanted jokes at Plaintiff's expense.

234. Defendant, Beard, Baker, and Hurley were on notice of Plaintiff's assertion of her protected rights because Plaintiff told them she was the victim of Williams' discrimination.

235. Plaintiff suffered adverse action subsequent to her protected activity and there was a causal connection between the two when Defendant sought out Williams for a statement asking her specifically if Plaintiff had been disruptive as a means of retaliation for Plaintiff's exercise of her protected rights against McDonald and after Plaintiff reported and opposed Williams' discrimination, Williams stated that she could not in good faith dock Plaintiff any professionalism points during final grading, confirming Plaintiff was never unprofessional, Williams was not required to provide details of her discriminatory jokes and comments, Title IX Coordinator was not informed, Plaintiff was not entitled to question or cross-examine Williams, as required by Title IX and school policy, and Beard materially altered facts about Williams' acts by stating that Williams said Plaintiff was disruptive without also stating Williams was prompted by the school to do so after independently determining otherwise.

**COUNT VII – UNRUH CIVIL RIGHTS ACT VIOLATION**

236. Plaintiff adopts and incorporates by reference paragraphs 1 through 235 above as fully set forth herein.

---

COMPLAINT

237. The Unruh Civil Rights Act prohibits discrimination by businesses on the basis of sex, race, disability, medical condition, or sexual orientation.

238.  Defendants incited a denial of full and equal access to Plaintiff during her education at Pepperdine when they publicly made repeated violent gestures, defamatory, disparaging comments about Plaintiff's person, sex, perceived sexual orientation, and medical history.

239. Defendant's conduct was motivated by Plaintiff's sex, race, medical condition, and sexual orientation when Goodno, Joyce, Stipanowich, Freyer, Williams, McDonald, and Richards made public comments to the class that she had a disease, that her butt was "huge" or she "didn't have one" or "we don't know what that is," and when they made repeated homophobic gestures directed at Plaintiff followed by violent incitation and threats, made multiple discriminatory comments alluding to her sexual orientation, including "how about this gay" and "just came out," made repeated unwanted sex-based comments, including "so she's old," "this used to be looser," "erection of a building," "ugly" and "so this is pretty," as well as public affirmations that she is known, in fact, not to be gay by saying, "you know, [she's] not."

240.  Plaintiff was harmed when she was ostracized, threatened, stalked, told she was not welcome at learning activities for opposing and reporting unwanted sexual comments, and punished for telling faculty who were discriminating against her and harassing her to leave her alone. Plaintiff was repeatedly slandered with untrue comments during class that she had a disease and that was why she was not a doctor.

241. Defendant's conduct was a substantial factor in causing Plaintiff's harm because Defendant had a duty to prevent unlawful harassment and discrimination and instead denied Plaintiff equal access to her education and then targeted, stalked, and retaliated against her for reporting and opposing discrimination and serial misdemeanor defacements of personal property.

## COUNT VIII – CALIFORNIA EDUCATION CODE § 66270 VIOLATIONS

242. Plaintiff adopts and incorporates by reference paragraphs 1 through 241 above as fully set forth herein.

243. §66270 prohibits discrimination on the basis of disability, gender, race, sexual orientation, and any characteristic contained within the penal code defining hate crimes, in any postsecondary educational institution receiving state financial aid.

244. At all times, Defendant was a recipient of state financial aid.

245. Plaintiff endured pervasive and offensive harassment, depriving her literally of her right of equal access to educational benefits and opportunities, because Defendant used repetitive sex- and race-based discriminatory comments, including "we don't know what that is," "it's huge," "you don't have one," "eat at Cougars," "yup, and those gray hairs…[good luck getting hired]," "so old," "ugly," "cute," "[she] just came out," "that's weird," "this used to be looser," "so she's old," and "erection of a building," along with serial illegal book defacements and invasions on her other property, repeated gestures of guns while making homophobic gestures and comments directed at Plaintiff, and punishment for reporting and/or telling her harasser to leave her alone.

246. Plaintiff was also told she must endure unwanted harassment and mistreatment in order to obtain her education when Stipanowich predicated her grade on meeting with him privately, she was threatened with and suffered sanctions for reporting harassment while the harassers were still committing the acts, and she was not even allowed to tell them directly to "leave her alone" and "stop," creating an oppressive quid pro quo that Defendant was aware of and ignored, if not wholly facilitated.

247. Defendant acted with deliberate indifference as stated in #233 and above, and when they repeatedly ignored attempted reports of harassment and mistreatment.

**COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

248. Plaintiff adopts and incorporates by reference paragraphs 1 through 247 above as fully set forth herein.

249.   California Civil Code §3294 states a business is liable for oppression and malice, defined as despicable conduct that subjects a person to cruel and unjust hardship, and fraud, defined as misrepresentation, deceit, or concealment of a material fact, in the form of compensatory and punitive damages.

250. Under the doctrine of respondeat superior, Defendant is responsible for all common law torts its employees commit in the scope of their employment.

251.   At all relevant times, all parties were acting within the scope of their employment by Defendant, a business operating in California, and Defendant's managers, including Gash, Beard, Hurley, Baker, Richards, and Jarvis, participated in, were aware and indifferent to, if not wholly facilitated, all oppressive conduct contained herein.

252.   Defendant engaged in prolonged, pervasive, and outrageous conduct when it used repetitive harassment techniques, ignored then punished Plaintiff's protected opposition to discrimination and harassment, and was especially calculated such as to shock the conscience and exceed the limits of normal tolerable civil society when it used threats of violence, hate, sex-based discrimination, and indifference to serial illegal defacements of Plaintiff's personal property while pursuing retaliatory punishment for telling the truth and participating in a legally protected act.

253. Defendant showed intention to cause emotional distress when it not only failed to prevent stalking and harassment, but encouraged and fostered both by refusing to investigate factual, pervasive harassment and discrimination, it
threatened Plaintiff for reporting unlawful acts or defending herself through protected opposition, intimidated Plaintiff for reporting serial book defacements and unwanted sexually harassing comments like "we don't know what that is," "butt,"

"you don't have one," and "it's huge," "this used to be looser," and "so she's old," employed students to harass Plaintiff even during ABA-mandated exams about her butt, her sex, and by saying, "I know," and Defendant used its power to both thwart state and federal laws while adversely affecting her interests by removing her equal access to education and livelihood.

254. Defendant knew Plaintiff was vulnerable to distress when it violated federal laws requiring supportive measures to victims when they report or oppose sexual harassment and threatened and intimidated her if she told the truth.

255. Defendant knew its conduct would cause severe emotional distress when it made numerous unwanted sexually harassing comments, Plaintiff reported the effects of being victimized by serial criminal defacements of personal property, and it ignored repeated incidents of stalking and unwanted harassment while using fraud to removed her from her education when Horton restricted Plaintiff's education on February 7, 2024 without probable cause via an email and subsequent phone call, stating falsely that Plaintiff was "public[ly] disruptive," and used fraud as the basis of sanctions, as evidenced through numerous false and materially altered statements about Joyce, Richards, Beard, McDonald, and Brandt in a letter dated February 27, 2024, signed by Beard, and stating, "Alexis only communicated with you via email," "you failed to offer any credible evidence that Alexis did anything wrong," "you reported to Dean Chalak Richards that you 'reconciled' with Alexis," "V100 firms," and "[seven] students stated" Proctor acted professionally, evidence Plaintiff was not allowed to review, essentially representing all evidence used.

256. Defendant is the actual and proximate cause of the emotional distress because all events occurred at and in association with Pepperdine, were prolonged, and perverse, and Defendant used its authority to adversely affect Plaintiff's life irreparably by sanctioning her for saying "no" and "leave me alone."

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Kira Howell, respectfully requests that the Court find and determine, after trial by jury as appropriate, that Plaintiff suffered substantial and continuing injury as a result of deprivation of her civil rights, resulting in loss of wages, earning capacity, and other damages, and award the following relief, as appropriate:

(a) GRANT injunctive relief prohibiting Defendant from discrimination and retaliatory actions against Plaintiff and denying her equal access to education;

(b) DECLARE that Defendant has violated Plaintiff's civil rights;

(c) ENTER JUDGMENT holding Defendant liable to Plaintiff for compensatory damages, punitive damages, and other damages totaling $15,000,000.00 (fifteen million dollars);

(d) AWARD Plaintiff her costs and fees;

(e) GRANT such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues.

Dated: July 24, 2024                    Respectfully submitted,

                                        /s/Kira Howell

                                        1046 S Cleveland St. #37

                                        Oceanside, CA 92052

                                        (612) 412-3472

                                        Kira.howell8@yahoo.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28