apply." Under both lines of decisions, implied malice requires a defendant's awareness of the risk of death to another.

The earlier of these two lines of decisions, *** originated in *** *People v. Thomas* (1953) 41 Cal.2d 470, 480, 261 P.2d 1, which stated that malice is implied when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." *** The later line dates from this court's 1966 decision in *People v. Phillips*, [64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353]: Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" ***

In *People v. Watson* (1981) 30 Cal.3d 290, 300, 179 Cal.Rptr. 43, 637 P.2d 279, we held that these two definitions of implied malice in essence articulated the same standard. Concerned, however, that juries might have difficulty understanding the *Thomas* test's concept of "wanton disregard for human life," we later emphasized that the "better practice in the future is to charge juries solely in the straightforward language of the conscious disregard for human life definition of implied malice," the definition articulated in the *Phillips* test.

## NOTES AND QUESTIONS

1. Based on the law set out in the case, should Knoller be convicted of second-degree murder? Why, or why not?

2. If you would find Knoller guilty of second-degree murder, would your verdict change (and, if so, why) in light of one or more of the following changed circumstances:

A. The dog, Bane, had never shown signs of aggression before, nor had Knoller ever witnessed the dog act aggressively, so she genuinely believed that the veterinarian's concerns were exaggerated. *[handwritten: Yes - recklessness]*

B. Although Knoller was aware of Bane's aggressive nature, she kept the dog because she loved animals and wanted a loving companion, which Bane was to her. *[handwritten: No - doesn't change]*

C. Knoller did in fact make a heroic but unsuccessful effort to protect Whipple with her body, as she claimed. Further assume Knoller then contacted 911 quickly and expressed deep remorse to the paramedics and police thereafter. *[handwritten: Yes - indifference to human life]*

3. All human conduct involves risk-taking, so *how* risky must a person's conduct be in order to display a "depraved" or "abandoned and malignant" heart? What's the lesson from reading *Knoller*?

rebuttal. That was too late to sustain the State's case-in-chief for manslaughter.

The State concedes that when it closed its case-in-chief it did not have a prima facie case to support acceleration. Therefore, even though the State could, based on Dr. Hofman's testimony, establish a prima facie case of acceleration at the end of the trial, Oxendine's conviction of manslaughter must be set aside for insufficiency of the evidence to establish that his conduct accelerated Jeffrey's death. * * *

It is extremely "difficult to be objective about the death of a child. * * * Those responsible ought to be punished. Nevertheless, there must be proof as to who, if anyone, inflicted the injuries that resulted in death." "Reprehensible and repulsive as the conduct of the defendant is, nevertheless it is not proof of manslaughter."

The Trial Court, however, properly denied Oxendine's motion for judgment of acquittal at the close of the State's case because its medical testimony was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that Oxendine was guilty of the lesser included offense of assault in the second degree, 11 Del.C. § 612(1). Therefore, we reverse Oxendine's conviction of manslaughter and remand the case to Superior Court for entry of a judgment of conviction and resentence of defendant for the lesser included offense of assault in the second degree.

## NOTES AND QUESTIONS

1. The court observed that the prosecution abandoned its initial theories of causation in favor of what it called the "acceleration" theory. What other theories do you think the prosecution might have had in mind?

2. Who is the actual cause of V's death in the following hypotheticals? (Assume that D and X did not act in concert.) How would these cases be resolved under Model Penal Code § 2.03(1)?

   A. X intentionally stabs V in the chest. V will die from loss of blood in 15 minutes. Simultaneously, D intentionally shoots V in the leg. V would not die from this wound by itself. V dies in 10 minutes.

   B. The same as A., except that D unintentionally shoots V.

   C. The same as A., except that V dies in 15 minutes.

   D. X stabs V. Simultaneously, D stabs V. Neither wound by itself would kill V. V dies from loss of blood from the two wounds.

   E. X shoots V in the heart. Simultaneously, D shoots V in the head. V would die instantly from either wound. V dies instantly.

   F. X stabs V. Five minutes later, D shoots V in the head. V would die from the wound inflicted by X in 15 minutes. V would and does die instantly from the wound inflicted by D.

promote or facilitate the commission of the crime is the "mens rea" of accomplice liability.

Subject to important exceptions and clarifications considered in the next chapter subsection, the mens rea of an accomplice is sometimes described as a "dual intent," i.e., the intent to do the acts that constitute "assistance" of the primary party and the intent that such assistance result in commission of the offense charged. The actus reus of accomplice liability can take the form of solicitation of the offense, active assistance in the commission of the crime, encouragement of the offense, or failure to prevent commission of the crime if the secondary party has the legal duty to make such an effort.[a]

In this regard, also look carefully at the structure of MPC § 2.06, the complicity provision. Subsection (1) provides that a person may be guilty of an offense by his own conduct (direct accountability) and/or "by the conduct of another person for which he is legally accountable" (indirect accountability). Subsection (2) sets out three ways in which indirect accountability may arise. One way—subsection (2)(c)—is to be an "accomplice of such other person in the commission of the offense."

Subsection (3) then defines the term "accomplice." The required state of mind ("the purpose of promoting or facilitating the commission of the offense") is set out first in subsection (3)(a); the "actus reus" of accomplice liability is set out in three alternative subsections ((3)(a)(i)–(iii)).

3. In Hoselton, would Kevin have been an accomplice in the commission of the charged offense in the following circumstances? Apply common law doctrine and MPC § 2.06 (as both are discussed in Note 2).

A. Kevin's friends told him to wait in the car while they entered the barge. They falsely told Kevin (who believed their claims) that they were entering in order to pick up a television set the barge owner borrowed from them.

*NO*

B. Kevin's friends falsely told him that they had come to the barge "just to fool around." They asked him, and he agreed, to stay in the car and honk if he spotted the police. He spotted a police officer and honked. His friends heard the honk and hurried out of the barge, but were caught before they could escape.

*NO*

C. Kevin's friends told him the truth, i.e., that they had come to steal items from the barge. They asked him, and he agreed, to honk the horn if he spotted the police. When he spotted the police he honked. They heard him and tried to leave, but they were caught.

*yes*

D. The same as (C), except that when the police arrived, Kevin had fallen asleep so he did not honk the horn.

*yes*

---

[a] An example of the latter form of "assistance" is seen in United States v. Broussard, 882 F.3d 104 (5th Cir. 2018), in which the defendant, a jailer, stood by while his subordinates beat a handcuffed and compliant inmate. He was sentenced for aggravated assault, the offense committed by the subordinates.

E. Kevin's friends told him what they intended to do. They told him to sit in the car and wait. Although they did not ask him to honk the horn, he decided to help them anyway and honk if he saw the police. When he spotted the police, he honked the horn, but his friends did not hear it.

F. Same as (A), except that Kevin knew what his friends intended to do. While waiting in the car, he considered calling the police on his cell phone, but declined to do so.

4. Albert, Bob, and Carla are in a car. Albert is seeking to sell a quantity of heroin to Bob. Bob asks, "Where are the drugs?" Carla points to a bag lying on the floor of the car. Based solely on this act, is Carla an accomplice in the drug sale? Do you think the sale would not have occurred if she hadn't pointed to the bag? If it would have occurred anyway, *should* Carla be guilty of the drug sale?

As it turns out, Carla's liability as an accomplice does *not* depend on whether the sale would have happened even if she hadn't pointed to the bag. In other words, a person who (with the requisite *mens rea*) assists in a crime is accountable for the principal's conduct (and potentially punishable to the same degree), *even if the crime would have occurred without the assistance*. For more on this controversial feature of accomplice liability, see pp. 922–924.

### 3. MENS REA

#### a. Intent: "Purpose" or "Knowledge"?

##### PEOPLE V. LAURIA
California Court of Appeal, Second District, 1967.
251 Cal.App.2d 471, 59 Cal.Rptr. 628.

[For the opinion in this case, see p. 845, supra.]

#### NOTES AND QUESTIONS

1. *The meaning of "intent" in the context of accomplice liability.* Assume that Lauria had been prosecuted as an accomplice, rather than as a co-conspirator, in the acts of prostitution committed by the women who used his answering service. In terms of *mens rea*, should Lauria be guilty based on proof of mere *knowledge* that he was assisting in their acts of prostitution, or should the State be required to prove that he assisted with the *purpose* of facilitating the commission of the offense(s)? Is "intent" in this context a synonym for "purpose" (as in "I want the crime to occur"), or does "intent" also encompass mere "knowledge" (as in, "I know that my acts are assisting, but I am indifferent as to whether the crime occurs")?

As with conspiracy law, this issue has been vigorously debated, with no universally accepted answer. In United States v. Peoni, 100 F.2d 401 (2d Cir. 1938), Judge Learned Hand came down on the side of requiring purposeful conduct: