Kira Howell

█████████████

Kira.howell8@yahoo.com

███████

In Pro Per

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

KIRA HOWELL

        Plaintiff,

vs.

PEPPERDINE UNIVERSITY;

SHARON BEARD; JASON JARVIS

        Defendant

Case No.: 2:24-cv-06332-WLH-RAO

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff, Kira Howell, brings this suit to recover for federal statute violations and state law claims, as follows:

### JURISDICTION AND VENUE

1. Jurisdiction in this Court is asserted under the provisions of 28 U.S.C. §1331. This action arises under the provisions of Title IX of the Education Amendments of 1972. This Court has supplemental jurisdiction over the state claims asserted herein pursuant to 28 U.S.C. §1367.

2. Venue is appropriately laid in the Court pursuant to 28 U.S.C. §1391(b) in that the actions complained of took place in Malibu, which is within the bounds of the Central District, and Defendant carries on business within the Central District.

**PARTIES**

3.  Plaintiff, Kira Howell is a resident of 23719 Aster Trail, Calabasas, California.

4.  On information and belief, Defendant Pepperdine University owns, operates, manages, directs, and controls Pepperdine Caruso School of Law, and which employs all of the persons named as non-parties herein.

5.  Jason Jarvis is sued in his individual and official capacity as Associate Dean for Academic Affairs.

6.  Sharon Beard is sued in her individual and official capacity as Dean of Students of Pepperdine University.

7.  At all times relevant to this action, the University acted through its employees as listed below.

**NON-PARTIES**

8.  Jim Gash ("Gash") was at all time President of Pepperdine University.

9.  Sharon Beard ("Beard") was at all relevant times the Dean of Students at Pepperdine University.

10. Jeffrey Baker ("Baker") was at all relevant times the Assistant Dean of Clinical Education at Pepperdine University.

11. Jay Brewster ("Brewster") was at all relevant times the Provost of Pepperdine University.

12. Chalak Richards ("Richards") was at all relevant times the Assistant Dean of Student Life at Pepperdine Caruso School of Law.

13. Jason Jarvis ("Jarvis") was at all relevant times the Associate Dean of Strategic Initiatives and Projects at Pepperdine University.

14. Tom Stipanowich ("Stipanowich") was at all relevant times the Chair in Dispute Resolution at Pepperdine University.

15. Barry McDonald ("McDonald") was at all relevant times the Professor of Law at Pepperdine Caruso School of Law.

16. Alexis Joyce ("Joyce") was at all relevant times the Director of Career Development Office at Pepperdine Caruso School of Law.

17. Suzanne Freyer ("Freyer") was at all relevant times the Assistant Director of Academic Excellence Professor at Pepperdine Caruso School of Law.

18. Stephanie Williams ("Williams") was at all relevant times the Assistant Professor at Pepperdine Caruso School of Law.

19. Connie Horton ("Horton") was at all relevant times the Dean of Student Affairs at Pepperdine University.

20. John Doe I ("Proctor") was at all relevant times a Proctor at Pepperdine University.

21. Arnold Barba ("Barba") was at all relevant times the Chief of Staff of Pepperdine Caruso School of Law.

22. Colleen Graffy ("Graffy") was at all relevant times a Professor at Pepperdine Caruso School of Law.

23. Ed Larsen ("Larsen") was at all relevant times a Professor at Pepperdine Caruso School of Law.

THIRD AMENDED COMPLAINT

24. Doug Hurley ("Hurley") was at all relevant times an Associate Dean of Student Affairs at Pepperdine University.

25. Naomi Goodno ("Goodno") was at all relevant times an employee at Pepperdine University.

26. Jacob Charles ("Charles") was at all relevant times an Associate Professor at Pepperdine Caruso School of Law.

27. Peter Neumann ("Neumann") was as all times an Adjunct Professor at Pepperdine Caruso School of Law, Straus Institute for Dispute Resolution.

28. Jack Coe ("Coe") was at all times a Professor at Pepperdine Caruso School of Law, Straus Institute of Dispute Resolution.

29. Matthew Dunn ("Dunn") was at all relevant times an Investigator with Pepperdine University Department of Public Safety.

## FACTUAL ALLEGATIONS ON THE MERITS

30. Plaintiff is a law student at Pepperdine Caruso School of Law.

31. At Summer orientation, Richards made a derogatory, disparaging joke about Plaintiff being "still in school" at her age.

32. Title IX Office contacted Plaintiff via email offering support after a male student repeatedly acted sexually inappropriately towards her in and out of class and Plaintiff said "weird" in response to his continued behavior. Plaintiff agreed not to interact with this male student and just wanted to separate herself from him. Goodno later said publicly several times, "he is [weird]," causing Plaintiff extreme stress by coercing her into further interaction and involvement with the situation.

33. Student Blanche Doe grabbed her butt to emphasize it in front of several male students during Issues In Dispute Resolution class, including Jonathan Abraham, and, on information and belief, Noah Werksman and Michael Moss, and she made one other reference to her butt while making a presentation.

34. On July 20, 2023, during the first lecture of International Commercial Arbitration, Coe kicked at Plaintiff's back side towards a group of male students as her back was to him and when she saw him, he subsequently got angry and embarrassed and gave middle fingers with both hands, witnessed by the entire class, including students Jacob Yadegar and Jonathan Abraham.

35. During the International Commercial Arbitration course, Neumann made repeated licking gestures directed at Plaintiff during class.

36. After Plaintiff and other students were heard mentioning sexual harassment, Neumann stood by Plaintiff and passed gas loudly, paused and stared at her while smiling.

37. Student Alicia Percell approached Plaintiff as they were leaving class and asked her to go out to dinner. Plaintiff thanked her for the offer but declined.

**Orientation Week**

38. During Orientation week, August 14-18, 2023, Gash made a gun with his hand and "shot" it at an unidentified female student sitting in the auditorium.

39. Gash looked directly at Plaintiff during his speech, once while making a comment about being "a little gassy."

40. During Orientation week, several non-parties and faculty introduced themselves at the podium to the entire 180 students of the Class of 2026.

5          THIRD AMENDED COMPLAINT

41. While speaking at the podium, Goodno and Graffy made homophobic gestures at Plaintiff and then made guns with their hands.

42. Stipanowich stood at the podium to introduce himself, looked at Plaintiff, kicked, laughed, and said, "how about this gay?"

43. Jarvis sat near Plaintiff after an orientation session and said he would contact the Bar if she recorded lectures without permission.

44. Joyce approached and sat down at Plaintiff's Orientation table during the week of August 14-18, 2023.

45. Joyce addressed Plaintiff and other students, including Conor Fairtlough, Ian Kitts, unidentified blonde female student in Section B, and an unidentified Asian female student, and said she was sent to replace the group's Mentor, Professor Shelly Saxer, who was unavailable to have lunch that day.

46. Joyce introduced herself as Director of CDO, and after speaking informally about her role, she fielded questions.

47. Plaintiff asked her about the importance and availability of internships at a District Attorney's office if a student was in the Accelerated Program and Plaintiff spoke about the level of difficulty entering Los Angeles County District Attorney's Office as a new graduate, and Joyce and Plaintiff engaged in conversation back and forth for several minutes.

48. After Plaintiff finished asking questions and speaking, Joyce looked at her as Plaintiff checked email on her phone, pointed at her and said, "that's weird."

49. Plaintiff then received multiple homophobic comments and gestures, on belief, presuming Plaintiff's sexual orientation from Ian Kitts and other unidentified students sitting nearby.

50. During a Section B lecture led by Richards, Richards stood in front of Plaintiff and screamed at her and jumped at her as if threatening her, and a male student immediately told her "no" by shaking his head, and began talking to Plaintiff about being Armenian.

**Defendant's Sex-Based Discrimination**

51. On July 6, 2023, Snyder stood outside classroom where Plaintiff sat reading and her and an unidentified male said loudly, "I know."

52. At the end of a class session that week, Plaintiff smiled and said goodbye to Snyder and she refused to speak to Plaintiff.

53. Snyder made a homophobic gesture at student Alicia Percell and then nodded her head as if to assert Ms. Percell's sexual orientation, and Ms. Percell looked uncomfortable and, on belief, she did not respond.

54. After CDO Assistant Director Rachel Levine glared at Plaintiff and kicked repeatedly, and Joyce singled Plaintiff out during a Professional Formation lecture, Plaintiff sent an email to Joyce telling her to refrain from further disparaging comments and removing consent from Joyce over any aspect of Plaintiff's professional life.

55. Minutes after Plaintiff sent Joyce the email, an unidentified woman stood outside her classroom and angrily yelled, "butt."

56. In August 2023, student Elias Guanunu stood behind Plaintiff as she waited to sign the Professional Formation attendance sheet, and kicked at her towards Freyer, who then kicked at Plaintiff from two feet away.

57. On August 24, 2023, Mr. Guanunu stood behind Plaintiff's seat during Legal Research and Writing (LRW) class, looked at Williams, kicked at Plaintiff while making a homophobic gesture.

58. Williams looked at Mr. Guanunu and laughed, never telling him to stop.

59. During the same class, Williams told a joke while looking at the clock, then at Plaintiff, and saying sarcastically to the class, "and [this] starts right at 40."

60. Williams told a joke about the size of Plaintiff's rear end as Plaintiff was turning to walk away from her in front of the class by saying, "and we don't know what that is."

61. Student Kyle Gillick then stared at and referenced Plaintiff's butt on two occasions, once shortly after Williams' joke and once in January 2024 when he laughed and said, "it's huge," as if to indicate someone told him about Stipanowich's sexual harassment.

62. Mr. Guanunu then made disparaging jokes about Plaintiff being old to the entire class in subsequent sessions as a means to prevent her from speaking in class.

63. During a Professional Formation class in September 2023, Freyer made a homophobic gesture at Plaintiff as she sat in her seat and then made a gun with her hand.

64. Student Bryan Weitzman immediately jumped out of his seat laughing.

65. In a subsequent class, Plaintiff said, "so you can feel free to shoot me if I'm gay…[I do have a problem with that]" while stating her fear and opposition to this discriminatory threat, and Barba acknowledged the incident with Freyer and Mr. Weitzman by pointing at him.

66. Williams looked directly at Plaintiff during LRW class in October 2023 and said disparagingly, "you don't know the law" and "[you aren't doing a good job]" even though no means of assessment had been made, and these disparaging comments were followed up with praise and references to another female student being marriage material and "beautiful."

67. Williams then later called another minority female student "ugly" by indicating student Kyle Gillick would not find her attractive.

68. Williams inserted the word "ugly" while staring at Plaintiff, including one occasion in November 2023 where Williams looked at student Kyle Gillick and said, "so ugly," as if to ask him to call someone in class ugly, to which Mr. Gillick looked at the class and said, "ha!"

69. In January 2024, Williams said to the entire LRW class, "so this is really pretty" and then looked at Plaintiff and said, "cute" while shrugging her shoulders, one or two days after Professor Larsen did something similar to Plaintiff and student Taylor Hitchan in Property class a few days earlier.

70. During Professor Larsen's class, an unidentified female student, stood in front of Larsen and made a homophobic gesture with her hand, and he stared at her but did not say anything.

71. Throughout the Fall semester, Baker participated in four acts of discrimination against Plaintiff, including once in October 2023 when he walked into the law school by walking past a large group of students seated outside the café, he saw Plaintiff standing at the door and gave her a dirty look while watching the students follow his actions.

72. As soon as he entered the school, Baker then began to go back outside while making a face and mumbling to himself as if he felt bad for ostracizing and mistreating Plaintiff, but then saw her and changed his mind.

73. Baker once shunned Plaintiff as he saw her in the hallway, refusing to smile back at her while running towards a group of male students and laughing and joking with them.

74. Baker refused to say hello or smile at Plaintiff as they passed each other in the hallway weeks later in October 2023.

75. Baker stood outside his office as Plaintiff was walking at the other end of the hallway and he stared at her and made a homophobic gesture.

**Serial Illegal Book Defacements and Stalking**

76. During successive Monday morning announcement sessions, Richards made homophobic gestures at Plaintiff in front of the class and made one comment "we'll guess what you are" while making discriminatory homophobic gestures at her.

77. In September 2023, an unidentified male approached Plaintiff's car as she sat in it across from the law school, he pressed his face against the window of the rear

driver's side seat, looked inside, saw Plaintiff sitting in the driver's seat, got angry, and ran away shaking his arms as if to say leave him alone or get off his back.

78. Later, the same man appeared outside Plaintiff's class as she went to the bathroom, and he was seen on two other occasions walking around campus staring at her, and three of the four times Plaintiff saw him, he was coming from or heading to faculty housing.

79. On August 29, 2023, Plaintiff reported to Department of Public Safety's Dunn that Stipanowich had harassed her and publicly chastised her for covering up her rear end as she walked out of the classroom. She also reported student Bryan Weitzman to appear to make a gun with his hand and "shoot" it at her head during a Contracts class, but that his hand was in her periphery, she did not know if he made a gun or if he just appeared to, and she blamed Stipanowich more than Weitzman because she felt he was just doing what the podium wanted. DPS report states they felt it was more properly handled via a grievance and not through them. Plaintiff was never apprised of the grievance procedure.

80. On September 14, 2023, Plaintiff saw her new Criminal Law book was defaced when she turned to page 236 and saw all of the answers were filled in.

81. Plaintiff reported the illegal defacement to Richards via email and stated she wasn't sure if it was someone at the school or her landlady, the only other person who had access to her property.

82. On September 26, 2023, Plaintiff saw her book was defaced again and in another color ink on page 329. Plaintiff emailed Richards to report it and emailed Joyce

to remove consent from her having access to Plaintiff's professional life and to tell her to stop making discriminatory comments about her publicly.  KH000118-25. 000008-11.

83. Plaintiff reported the defacement to Graffy, Richards, and Jarvis.

84. Plaintiff told Williams she was unmarried and voiced opposition and offense to being defamed about her sexuality but being morally opposed to homophobia.

85. Williams stated Plaintiff seemed friendly with a "50-year-old man" during a fire drill.

86. During a meeting with Jarvis and Richards on October 17, 2023, Plaintiff reported that she was being inundated with violent homophobia, stating this was the apparent cause of the defacements, and Jarvis immediately rolled his eyes and got frustrated.

87. During the meeting, Richards focused on Plaintiff not being able to prove stalking, to which Plaintiff replied, "this is a strict liability misdemeanor" which doesn't require proof of intent.

88. On October 21, 2023, Britney Summerville-Brannon emailed Plaitniff to offer Title IX protection and support.  000012.

89. Plaintiff saw her book was defaced on a third page, 899-900, in the weeks after the meeting with Richards and Jarvis.

90. Richards asked Plaintiff about her email telling Joyce to leave her alone, and Plaintiff said she had handled it to advocate for herself, she thought Joyce appeared friendly to her during a Professional Formation lecture and that her

actions did not seem discriminatory at that time, and Richards insisted on a reconciliation in which she was present, a meeting Plaintiff said she would do "if" Richards really wanted to.

91. On February 24, 2024, Graffy confirmed via email that she had met or conferred with Plaintiff numerous times about the serial book defacements, Plaintiff reported the defacements were "creepy" and seemed to show a pattern of stalking and she feared her safety, and both Plaintiff and Graffy had expressed prolonged concern for Plaintiff's safety.

**Stipanowich's Contracts Class**

92. In September 2023, Stipanowich looked at Plaintiff while she sat in her seat and said, "[then you] come to my office and [I will tell you]" after saying something to the class about how to do well on his final exam.

93. Stipanowich told a joke about "eating at Cougars" before pausing, laughing, looking at Plaintiff, and then looking around the room to elicit laughter.

94. Stipanowich made numerous, repeated unwanted comments about Plaintiff's rear end, including saying the word, "butt" as soon as Plaintiff and student Jonny Yadegar began sharing a book, saying "butt" as Plaintiff walked out of the classroom to use the restroom, saying "it's huge" while laughing, and laughing and saying, "because you don't have one" on another day as Plaintiff took her seat after turning around while standing and after staring at her.

95. On one occasion, a male student told Stipanowich to stop, and Stipanowich gave him an angry look and chastised him. On information and belief, no male student

ever stood up for a female in the face of sexual harassment again, even though

more than one repeatedly mentioned his harmful, unwanted acts.

96. Stipanowich looked at Plaintiff before making sexual licking gestures with his

lips and mouth in the same exact manner Neumann sexually harassed Plaintiff a

month earlier towards a female student sitting one row in front of Plaintiff and to

her left.

97. Plaintiff feared sexual assault of women, looked scared and opposed of

Stipanowich's actions, and Stipanowich got angry.

98. In the next class, a male student sat in the female's assigned seat, Stipanowich

paused and stared but did not say anything.

99. In October 2023, Stipanowich stood in front of the class and angrily made a

homophobic gesture at Plaintiff.

100.   In November 2023, Stipanowich stood in front of student Grace Brandt and

made the same licking gestures at her.

101.   Ms. Brandt began sniffling to indicate, on belief, she was hurt and she, too,

did not want the gestures.

102.   In November 2023, Stipanowich made a hand gesture by holding his hands

up parallel to each other as if to indicate size while smirking, as a female student

walked to her seat.

103.   Student Jonny Yadegar indicated to Plaintiff that this was a joke about her

butt between male students and Stipanowich.

104.   In November 2023, Stipanowich used sexual innuendo while lecturing when

he paused, inserted the phrase, "erection of a building," as he pulled a chair in

front of his groin and held his hand there while smirking and looked at Plaintiff directly.

105.   Mr. Weitzman began laughing and the class understood Stipanowich was again using sexual innuendo to accost students.

106.   Plaintiff opposed his harassment by shaking her head no repeatedly.

107.   Stipanowich then made a comment to Plaintiff about his disdain for her opposition to his repeated sexual innuendo and overt comments, including saying towards Grace Brandt and the class, "I like that" as if to make Plaintiff seem like a bad person for opposing his sex-based harassment.

108.   Stipanowich then said to Grace Brandt, "yes, okay" while smirking, as if to tell Ms. Brandt he was attracted to her.

109.   On a subsequent day, Grace Brandt walked into class through the Atrium and told someone loudly, "I'm a slut," then stopped talking and looked down at the ground when she saw Plaintiff.

110.   During a Professional Formation lecture where Stipanowich was a guest speaker, he stared at a female student's butt as she stood in front of him at the podium, the video was first minimized as picture-in-picture on Courses and the video was then edited to remove this portion of the lecture.

111.    Plaintiff spoke in Contracts class 1-2 times for approximately 1 minute throughout the entire Fall 2023 semester.

112.   Stipanowich stated in class that he knew Plaintiff was not gay by saying while looking at her, "you know, [she's] not."

**Goodno's Civil Procedure Class**

113.   At the beginning of Civil Procedure class in September 2023, Goodno stood in front of Plaintiff's seat from the bottom of the auditorium and said, "[and] Kira, you know . . . you have [a disease]..."

114.   Plaintiff responded that Goodno was lying and this was a violation.

115.   Over the next few days to weeks, Goodno made at least three more references directed at Plaintiff about "lying," as if to place Plaintiff in a position of fear for repeatedly asserting herself in class and to allude to the class that her false statement was true.

116.   On information and belief as to identity, male student Caden Cutter walked deliberately in front of Plaintiff's seat and made a homophobic hand gesture at her.

117.   As Plaintiff left the classroom, an unidentified male student said, "sick" as she walked by.

116.   During class, Goodno said to the class and towards student Grace Brandt, "[so] I *know*," as if to further propagate the lie she told.

117.   At the beginning of a lecture on October 6, 2023, Plaintiff walked down to the podium to tell Goodno she thought she made a mistake on the assignment she had just turned in.

118.   As Plaintiff was turning to walk back to her seat, Goodno looked at the top of her head, stared for a second, then said, "yup, and those gray hairs. [Good luck getting hired somewhere]."

119.   Grace Brandt began following Plaintiff around campus and intimidating her through heckles, screams, and unwanted comments about Plaintiff's butt prior

16        THIRD AMENDED COMPLAINT

to a final exam, and on February 2, 2024, during their Property midterm exam, she told a harassing, discriminatory and disparaging joke about Plaintiff's age and Plaintiff being "her mother" and then said, "because I *know*" as Plaintiff sat silently in her seat preparing to take the exam.

120. During class in October 2023, while the class was answering questions on iClicker through our phones, Plaintiff could not see the question or answer it on her phone.

121. Plaintiff expressed desire to participate in class by saying she did not have access to the question, and Goodno began laughing and pretended to be controlling Plaintiff's access from her computer.

122. Goodno continued to laugh at Plaintiff, playing on her computer and showing she was controlling answers from her computer.

123. Student Michelle Yao began smirking and laughing at Plaintiff as Goodno made fun of her.

124. In November 2023, student Conor Fairtlough turned towards Plaintiff and several female students during class and said, "blood" to which Stipanowich stopped, looked at him, and responded.

125. On November 9, 2023, Goodno hosted a lunch lecture and as Plaintiff was cleaning the Subway food trays off her desk, Goodno laughed, hugged a female student and was extremely kind to her before giving Plaintiff dirty looks and saying, "oh, you don't have to clean that...," in an exaggerated manner and as if she was holding back the rest of the comment.

126. Throughout the semester, Goodno made several dirty looks, including smirking at Plaintiff or calling her "weird" without cause and while Plaintiff was seated in the back row, and Caden Cutter, on information and belief as to identity, walked to Plaintiff at her seat, stared down at Goodno, indicated he knew she was referencing her and he indicated it was about sexual orientation.

127. In class on November 28, 2023, student Caden Cutter, on information and belief as to identity, made a statement to Goodno about her statement about Plaintiff having a disease months earlier.

128. Goodno stopped and appeared nervous, not responding except to say, "uhh" and nod her head "yes" as if convicted.

129. Goodno never said her statement was retracted or untrue even when Plaintiff was being harassed and humiliated by other students.

130. Goodno made a comment during lecture where she paused, stared up at Plaintiff in her seat, and said repeatedly, "they're just so old, so old."

131. Goodno gave an untrue, biased written statement to Pepperdine University which said Plaintiff used an "unprofessional tone" and said, "I pay for this and you have to answer me," when Plaintiff actually said, "This is what I'm going to be doing for a living" and "I care about [doing a good job]."

132. Unidentified male student who taunted Plaintiff about being "sick" then stood by her seat and gave Goodno a look as if he would "handle" Plaintiff and students were following faculty lead.

133. Plaintiff spoke 2-3 times for approximately 5 minutes total throughout the entire Fall 2023 semester.

**McDonald's Constitutional Structure Class**

134.   McDonald was the Professor for a Constitutional Structure class during the Spring 2024 semester.

135.   Plaintiff was a student in McDonald's class during the Spring 2024 semester.

136.   The normal practice at Pepperdine Caruso School of Law is to video record all lectures and make them available on Courses, the school's internal website.

137.   Defendant refused to record his lectures and prohibited students from using their own devices to record them.

138.   On January 9, 2024, McDonald stared at Plaintiff on and off for approximately five minutes prior to beginning the first lecture class.

139.   During the first class, McDonald stood in front of a group of male students, including Conor Fairtlough, Jonny Yadegar, Jacob Yadegar, on information and belief Caden Cutter, William Steele, and several others easily identified from the assigned seating chart for the class.

140.   While McDonald stood in front of these male students, he grabbed the skin under his neck and said, "this used to be looser."

141.   Student Conor Fairtlough smirked and began laughing.

142.   McDonald then laughed minutes later and joked to the same group of male students, "so she's old" while looking at Plaintiff, and then minutes after that stopped mid-sentence to stare at Plaintiff again and ask if she was okay.

143.   In late January 2024, McDonald made a middle finger with his right hand while pausing to look at Plaintiff as she sat in her seat adjusting her top.

144.   In a subsequent Constitutional Structure class, Ms. Aswani looked back towards Plaintiff and shook her head "no" as class was beginning.

145.   McDonald then got upset at Ms. Aswani and a female student to her left easily identified by the assigned seating chart, whom he thought were making fun of him, and he looked at Plaintiff, shook his head "no" while making a motion with his hand as if to say, "no, no, I'll take care of it."

146.   Plaintiff then shook her head no and made a gesture to indicate he was mistaken about the female students.

147.   On belief, McDonald refused to accept this as a mistake, and made another middle finger as he was writing on the board.

148.   In the next class, McDonald said to the entire class, "I like that."

149.   Charles repeated this phrase, "I like that" before pausing and looking to the class during his Torts class the next day.

150.   McDonald was seen outside Plaintiff's other classes, staring at her for prolonged periods each time, on three occasions, once signaling her to stop and talk with him, telling her to come by his office and saying he was disappointed she didn't stay after class to speak with him privately, and another time where he stared at her as she pretended to look for someone else as she walked by him.

151.   McDonald stared at Plaintiff repeatedly in multiple classes, and as she took notes on a case, he looked at her and said, "tsk" as if to say pay more attention to him while other students actively took notes.

152. Plaintiff wrote on a piece of paper, "are you obsessed with me?" and showed it to Michelle Yao after McDonald repeatedly stopped class to stare at her and after McDonald made the exact same licking gestures at Plaintiff that Neumann and Stipanowich made, prompting Plaintiff to oppose his actions while students watched.

153. On February 6, 2024, McDonald shook his hand at Plaintiff as if wagging his finger at her and called her a name as she walked out of class.

154. Student Marcello Jones said, "[you have] pretty eyes" to Plaintiff as soon as they got in the hallway, after saying loudly in Property class on January 8, 2024 to Dean Al Sturgeon, "I'll never go against you [all] again."

155. Plaintiff wrote an email to McDonald telling him to stop making disparaging comments about her in class or she would call the police.

156. Within hours, Plaintiff received an email stating she had been restricted from her classes.

157. On February 13, 2023, Plaintiff emailed Provost Jay Brewster and stated the restriction letter contained "no facts. There [was] not a single fact I can answer to."

158. On February 14, 2024, Brewster's response stated no such facts or reason fro restricted Plaintiff and instead merely stated the school needed to investigate the matter.

159. Plaintiff wrote a written response to the school that McDonald was "extremely aggressive towards me on day one" and he "then told a cruel joke about me to a group of male students about me being old or ugly."

160. McDonald wrote an email response to Beard stating, "the bit about a cruel joke is patently false. I have no idea what she is talking about."

161. McDonald's words, "so she's old" while laughing and after saying, "this used to be looser" are overt acts done, in part, directly to Plaintiff as she sat silently in her seat and while male students smirked.

162. McDonald's actions, circling back around to Plaintiff again minutes later, pausing class to indicate he wanted to see if she was okay, are overt acts made towards a passive student who wanted to be left alone.

163. McDonald stated, about his words and actions, "I certainly never told her I liked her" and "I have no idea what she's talking about re 'middle finger.'"

**Discipline For Reporting Title IX Violations**

164. On February 6, 2024, Plaintiff sent an email telling McDonald to refrain from making disparaging, discriminatory comments about her in class.

165. Hours later on February 7, 2024, Plaintiff received a letter from Horton stating that she had restricted Plaintiff from classes, was initiating an investigation, and Plaintiff needed to appear at a hearing once information was known.

166. Plaintiff wrote a letter to Brewster stating her opposition to this action, and stating she is a professional woman, she did not know why this happened, and she did not do anything wrong, to which Brewster replied the restriction was due to "public disruptive behavior" on February 14, 2024.

167. While on a telephone conversation on February 23, 2024, Horton said in response to Plaintiff's complaint of being given a middle finger in class, that she didn't believe any faculty at Pepperdine would ever do something like that.

168. Beard immediately agreed by saying she takes dishonesty "very seriously," and implied she was certain Plaintiff was not being truthful.

169. Plaintiff said she didn't do anything wrong and didn't understand why she was being restricted, to which Horton said, "[umm, well,] I don't know, Kira, something's been going on with you," and neither Beard nor Horton could give a single example of something disruptive or otherwise that Plaintiff did to warrant their actions.

170. Beard then cited McDonald's comments and Plaintiff stated repeatedly that she was reporting his discrimination.

171. Beard stated in email on February 24, 2024, that she wanted Plaintiff to be "aware" that Defendant University was calling named faculty as witnesses, and she reiterated orally that she would determine whether or not they appeared at the hearing.

172. On February 26, 2024, Plaintiff was asked to give an opening statement, and she began speaking by saying she alone uses the term "V100" because she used that list when applying to and researching law firms, and that Goodno's comments about her age were more specific.

173. Plaintiff then stated that Goodno made a derogatory comment while Plaintiff was wearing a tweed skirt and orange sweater, and after she approached

Goodno at the podium about her homework assignment, Goodno looked at her head and said, "yup. And that gray hair. [Good luck getting hired.]"

174. Plaintiff stated to Defendant, Beard, and Baker at the start of the hearing, "you mentioned that [everyone involved] was going to be present [for cross-examination]" and then asked when that would occur.

175. Beard responded by saying, "the [voting committee members determined] that was not necessary" and she was disallowing their appearance, even after Plaintiff stated multiple times both orally and in writing that she wanted them present and their cross-examination was critical to fact-finding.

176. McDonald wrote a defamatory false statement, "they also indicated to me that she is delusional" while denying he made factual statements to the entire class about Plaintiff, and when Plaintiff asked about this during the hearing, Beard denied her an answer or due process to cross-examine McDonald.

177. When Plaintiff began reporting McDonald's repeated incidences of staring at her outside her other classes in such a pronounced manner as to force Plaintiff to pretend to be looking for someone else as she walked by him, Beard and Baker intimidated her with angry stares and gestures.

178. Ms. Brandt followed Plaintiff around campus on multiple occasions, including once where she screamed at Plaintiff as she walked into the law school, once when making unwanted comments about Plaintiff's butt before a final exam, once when she harassed and intimidated her during a Property midterm by calling her old and saying, "because I know," once appearing at Plaintiff's

LRW class while Williams said, "so she's [entitled] to stalk [and harass] you",
and then Ms. Brandt made a false statement when she said in regards to
Plaintiff's behavior, "the entire class quite literally reacts" and there are
"groans, exasperated sighs, many wide-eyed stares" and "[she] has given me
so much anxiety" in an email to Beard, when in fact she was the instigator and
aggressor each time, and Plaintiff has never interacted with her.

**Pervasive Discrimination, Hate, and Defamation From Jason Jarvis**

179.  Plaintiff adopts and incorporates all aforementioned and other paragraphs set
forth herein.

180.  At Summer Orientation, Richards met Plaintiff for the first time after offering
her a diversity scholarship. She showed resentment at Plaintiff's mixed race,
and this carried on for months. Richards then began antagonizing Plaintiff
publicly, including making a statement, "so we'll guess what you are" and
using threatening postures and tone of voice when publicly addressing her.
Richards began making the same hand gestures at her each time she addressed
the class. Plaintiff emailed Richards to ask about getting professional
headshots taken and about an article she was writing. Every single time
Plaintiff showed ambition or zeal appropriate for her age and experience,
Richards responded in front of Jarvis with condescension and a desire to
reframe Plaintiff's independence as weakness or fault.  Richards used Moss's
request for counseling as the basis for contacting Nivla Fitzpatrick, who then
immediately contacted Beard and said they should seek to punish Plaintiff's

behavior and coerce a diagnosis out of *her*. None of this aligns with the facts or with Plaintiff's lived experiences on campus. And no one ever discussed this with Plaintiff. Moss sought counseling and admitted he was too unstable to attend school, and Richards and Jarvis reframed this as something bad about Plaintiff, a laser-focused professional woman with tunnel vision for success in a niche field.

181. During Summer 2023 term, Plaintiff had several courses with male student Michael Moss. Moss sat behind Plaintiff during their first class together and made "tsk" noises at her as she sat in her seat and then began making the same hand gesture at her or while standing near her daily. Moss repeatedly appeared emotionally distressed, dejected, arrogant, and showed an unwillingness to respect Plaintiff's boundaries when he ogled her rear end (causing a faculty member to admonish him by saying, "whoa!"), made private pressured comments about sex, and fomenting animus towards minorities. Moss would follow Plaintiff to her car at night and court her if she didn't show interest in him, and he drove to the bottom of the hill and pulled to the side of the road until Plaintiff drove past him . . .ten minutes later.

182. Moss made false statements and omitted statements he made to Plaintiff – likely because he was mitigating the word "weird" and his own social advances. For example, Moss stated in class one day he saw numerous people were stepping on snails outside. Plaintiff didn't believe it until she saw twenty smooshed snails on the walkway from the parking lot the next day. Moss then entered the classroom while Plaintiff was talking with another student about

GW Bush and he acted like he was left out and hurt. Plaintiff tried to include him and sent him an email about how troubling the snailicide was and telling him to watch a documentary on Bush she thought was great. KH000115-17.

183. Moss then proactively told Jarvis he only said there were some snails outside (not that someone had killed them), said he didn't understand the friendly emails Plaintiff sent, and then lied and said Plaintiff accused a faculty member of sexual noises and he called it "crazy." It was Moss who was preoccupied with sex, not another male faculty. Plaintiff said "weird" in class as he was staring at a woman's rear end in a pressured way and he got convicted in his own mind. Jarvis is then on the record saying Moss was "credible" and he began a campaign of hate against Plaintiff behind her back.

184. Moss would often look sad and dejected in front of female faculty Betty Snyder and Stephanie Blondell, prompting Snyder to tell Plaintiff to go easy on him since he was fragile and "going through" some stuff. Moss would pick fights with minorities while looking rejected and sad towards white female faculty and seeking solace and protection from other males.

185. In Snyder's class, we were asked to write an essay after purposely watching a violent or morally reprehensible video. Plaintiff searched "violent disturbing video" and things similar on YouTube. After trying to write about a human rights crisis in South America and about Mengele, and having writer's block and an inability to watch the entire videos, Plaintiff watched a short video of a rumored gay man in the Middle East being taunted and then murdered in the

town square, akin to a lynching. Plaintiff believes the original video aired on PBS or on CNN International. Plaintiff watched the video because it appeared on the results after a generic search and because it was only a few minutes long. Shortly thereafter, Snyder made this gesture at a a female student in class.

186. During a discussion in class where Plaintiff expressed how difficult it was to get through the assignment, Moss called Plaintiff a wannabe Jew for denouncing Mengele as a monster. Plaintiff grew up in a single parent home and a close family friend who helped raise her is a Jewish woman. She has contemplated converting to Judaism multiple times throughout her life. Plaintiff's father was a career Intelligence Officer in the U.S. Army and Defense Intelligence Agency, and his expertise was on Southeast Asia, World War II, and the Cold War.  Our nation invests billions of dollars to research, analyze, contemplate, and defend against the next World War, the next despot, and terrorism. It is irresponsible not to denounce Mengele at all times and it is never done childishly. It is also irresponsible not to denounce violence or hate of any sort, especially when it is escalating. Nonetheless, it was another student who brought up Mengele.

187. Jarvis is privy to the anonymous course evaluations, as is Dean of Straus Sukhsimranjit Singh. Singh singled Plaintiff out during Fall orientation angrily, and she began to field constant anger about being sympathetic to LGBT+ people. It was said overtly at least once that it is impolite. A white

female saw Singh mistreat Plaintiff during orientation and she yelled across

the room angrily, "nice to meet you" as if to say it wasn't.

188. Jarvis ignored Moss's slightly goading, petulant demeanor and began focusing

on hating Plaintiff for reporting sex-based harassment or for even existing.

189. In a document disclosed by the University, a university official states Moss

and Plaintiff attended a Cross Cultural Conflict & Dispute Resolution class.

Plaintiff never took this class. And Moss's statement included nonsensical

interactions with Plaintiff that were never asked of her and are not memorable

to her at all.

190. On July 19, 2023, Title IX emailed Plaintiff to offer to investigate and provide

support. PEP000671. This fact seems to have enraged Jarvis and was the

springboard for all downstream actions. After Title IX offered support,

numerous faculty made public references to Moss, saying the word "weird"

over and over. Moss began kicking at the ground and air in class once, and

faculty began kicking constantly as well. During Orientation Week, Moss

walked in front of Plaintiff's car as she parked and angrily grabbed his butt at

her. Inside the building on another day, he turned around to see Plaintiff and

said, "I can smell you" to Plaintiff.  Plaintiff felt coerced and thought she was

doing the right thing by not airing out these details in previous complaints. She

had no idea Jarvis used Moss's private statements to him as a catalyst to

defame, discriminate, and attack her. Jarvis immediately began showing

adamant, obsessive desire to blame Plaintiff for anything related to men,

including stating in an email that she made "reactive" claims in order to discredit her. Plaintiff's statements were made without ever knowing what he had said, and she did not know she was being attacked, so they were not reactive at all. In fact, she showed extreme care not to harm Moss and sought only to remove herself from the situation. Jarvis began raging in emails ahead of ever investigating or even speaking to Plaintiff. The record shows he obsessed over and relied on this brief incident with Moss for months, using it to bolster defamatory statements and gossip about Plaintiff to the University.

191. Jarvis does not act as a neutral authority, as a Dean, but rather his emails all show a hateful, irresponsible, propagandist with no regard for the truth or facts. The tone of his emails are all completely off from the reality of Plaintiff's brief interactions with him.

192. Jarvis was seen during Orientation Week kicking at two female students as they nodded their heads and sat in their seats. The tone of male faculty on campus became profoundly misogynist, with kicking and chastising of women and a forced focus on women being bad or the purveyors of male debauchery.

193. On November 5, 2023, Plaintiff told Stacey Nelson, Senior Director of Faculty Support, that Endrew Amana, a proctor, was rude and harsh with students during a Criminal Law midterm exam. Nelson's reply stated her understanding this was "feedback" and offered an explanation for his unprofessional behavior, along with a statement, "[t]his certainly does not excuse any behavior you or your classmates felt was inappropriate or unprofessional." KH000200. Richards then told Plaintiff Title IX was initiating support. After

Jarvis was apprised, the entire tone of the situation changed, and the focus became on punishing Plaintiff and using Title IX as the office to punish women who report anything about a man.  This incident is shielded from punitive action as protected activity, and it was over and properly handled by Nelson.

194.

## COUNT I – TITLE IX DISCRIMINATION –- DELIBERATE INDIFFERENCE TO PERVASIVE DISCRIMINATION, STALKING, AND PROTECTED OPPOSITION TO SEXUAL HARASSMENT

195. Plaintiff adopts and incorporates all other paragraphs set forth herein.

196. Title IX prohibits sex-based discrimination and harassment based on sex or gender, and interference with any right or privilege secured by Title IX, in schools receiving federal funding.

197. At all relevant times, Defendant was a recipient of federal funds from the U.S. Department of Education, and all named non-parties were subject to Title IX regulations.

198. Sexual harassment includes unwelcome conduct that is severe and pervasive and effectively denies a person equal access to her education or activity, and/or conditions the provision of a recipient's aid, benefit, or service on her participation in unwelcome sex-based conduct.

199. Sexual harassment includes overt acts that may, but are not required, to have created an environment and effect such that the student suffers emotional distress or fears her safety, and the school is required to provide supportive

measures that protect the student's equal access to education when she opposes discrimination.

200. Defendant had substantial control over Stipanowich and context of events because he is an employee of the school and all events occurred during lectures.

201. Defendant had knowledge of the pervasive, severe, and objectively offensive harassment Plaintiff alleges because she repeatedly reported to Department of Public Safety, Jarvis, and Richards that Stipanowich was making unwanted remarks about Plaintiff's rear end during numerous Contracts classes, including saying, "because you don't have one," "it's huge," and "butt," and Defendant showed deliberate indifference to Title IX discrimination when refusing to investigate Plaintiff's allegations for months and intimidating her directly by telling her not to report continued harassment from Stipanowich.

202. Defendants effectively denied Plaintiff equal access to her education when Stipanowich told her she had to "come to his office" to learn how to perform well on the final exam, she was not welcome at a class picnic after opposing discriminatory comments and licking gestures, Defendant and Stipanowich forced her to endure months of unwanted harassing comments and refused to investigate numerous reports of his repeated unwanted comments about her buttocks, and Stipanowch gave a male student an angry, threatening look for sticking up for her.

203. Student Grace Brandt was an additional female student Stipanowich made licking gestures at during Contracts class, and Ms. Brandt began sniffling in

response, and the continued use of the same unwanted sexual licking gestures made during class by multiple non-party employees, including Neumann and McDonald, and after being told "no" and being intimidated by Horton and Beard who stated they don't believe any Pepperdine faculty would do such a thing, shows deliberate indifference to Plaintiff's assertion of her rights protected by Title IX and intention to cause harm and intimidate. Brandt was allowed to participate in sex-based harassment discrimination which was facilitated by the school for months and across multiple semesters.

204. Defendant's actions were unwelcome as evidenced by Plaintiff's repeated reports and attempts to report Stipanowich's comments and acts, and they were objectively severe and pervasive because they occurred nonstop for the duration of the Fall 2023 semester and in educational settings where Plaintiff was not permitted to be excused or appear remotely, and Stipanowich predicated Plaintiff's grade on meeting with him privately in his office

205. Sexual harassment includes unwelcome conduct that is severe and pervasive and effectively denies a person equal access to her education or activity, and/or conditions the provision of a recipient's aid, benefit, or service on her participation in unwelcome sex-based conduct.

206. Sexual harassment includes overt acts that may, but are not required, to have created an environment and effect such that the student suffers emotional distress or fears her safety, and the school is required to provide supportive measures that protect the student's equal access to education when she opposes discrimination.

207. Title IX defines stalking as a course of conduct directed at a particular person which causes fear for her own safety and/or her suffering substantial emotional distress.

208. Title IX prohibits schools from using punitive measures in retaliation for reporting sex-based harassment.

209. 34 C.F.R. §106.44 requires that Title IX office contact complainant to offer supportive measures in response to reports of sex-based discrimination regardless of whether or not a formal complaint is filed.

**Deliberate Indifference And Protected Opposition To McDonald**

210. Defendant had substantial control over both the harasser and the context because reported acts occurred in class and on campus, Defendant is McDonald's employer, and Beard and Horton acted in his personal interest by telling Plaintiff no faculty at Pepperdine would ever do such a thing and taking action to deny Plaintiff equal access from her education based on McDonald's untrue statements that he did not do and say all acts contained in this complaint, including saying "this used to be looser," "so she's old," heckling Plaintiff during class, and getting angry with her when she wrote on a piece of paper, "are you obsessed with me?"

211. McDonald's actions were objectively pervasive and denied Plaintiff equal access to her education because he made an "aggressive" gesture at her when she inadvertently glanced at the camera in the classroom after telling her he refused to record his lectures and denied access to record on her own device, and while making multiple unwanted sex-based comments, such as "this used

to be looser" and "so she's old,", multiple sexual licking gestures directed only at Plaintiff during class, and waiting for Plaintiff outside her other classes on three occasions, staring at her, and causing her to pretend to be looking for someone else to walk to her car, and prompting her to write "are you obsessed with me" on a paper and show it to a classmate as he repeatedly stared at her and singled her out.

212. Defendant had knowledge of Plaintiff's email to McDonald telling him to stop making disparaging comments about her in class when they cited the email as a reason for reprimanding Plaintiff, and Defendant knew of McDonald's unwanted appearances at her other classes because she reported it to them and intimidated her for reporting it by cutting her off, getting angry and refusing to investigate.

213. Horton acted with deliberate indifference and intimidated Plaintiff during a phone conversation with Horton and Beard when she said, in response to Plaintiff reporting faculty giving middle fingers to students and to discourage Plaintiff's reporting, that she doesn't believe any faculty at Pepperdine University would ever do something like that, when in fact, Coe and McDonald made these gestures, and this represents a pattern and practice of denying faculty acts violative of Title IX.

214. Beard acted with deliberate indifference and coerced and intimidated Plaintiff when she also stated in response to Horton's denial of male faculty actions that she takes dishonesty "very seriously," insisted she reconsider reporting, and failed to abide by § 106.44 by refusing to initiate Title IX support.

215. Defendant, Horton, and Beard discriminated against Plaintiff, acted with deliberate indifference, and denied her equal access to education by stating their conclusions about male faculty conduct even before investigating reports, using threatening stares, heckles, and comments while silencing her while she was reporting McDonald's repeated stares and his behavior outside her other classes, and removing her from classes without probable cause as punishment in response to reports of discrimination and without abiding by Title IX requirements to offer supportive measures.

216. Defendant acted with deliberate indifference when refusing to investigate, take action, or contact Title IX office for months while Plaintiff repeatedly reported Stipanowich's sex-based harassment, refusing to take seriously serial misdemeanor defacement of Plaintiff's personal property, and facilitating McDonald's sex-based discrimination when he continued the same sexual gestures, comments, and actions endured from Stipanowich.

**Deliberate Indifference And Protected Opposition To Joyce**

217. Defendant had substantial control over both Joyce and the context because Joyce made these statements publicly during mandatory activities and they continued to occur for months after Plaintiff told her to stop.

218. Defendants' actions, including all unwanted sex-based comments, homophobic gestures followed by making guns with their hands, jokes, and acts, were so severe, pervasive, and objectively offensive that they effectively denied Plaintiff equal access to her education in violation of Title IX because Joyce's derogatory comment, "that's weird" was an abuse of her authority as

CDO Director, was discriminatory, defamatory, retaliatory, and inflammatory in nature, encouraged violence and discrimination, and denied Plaintiff equal access to mandatory law school curriculum requirements coordinated by CDO.

219. Plaintiff was participating in protected opposition to discrimination by telling Joyce to stop disparaging her and Defendant violated Title IX by seeking Plaintiff out to punish her for exercising her legal right.

220. Defendant showed deliberate indifference to Joyce's discrimination when Jarvis rolled his eyes while fielding reports of continued violent homophobia and illegal serial book defacements, Richards insisted on a reconciliation with Joyce after she made numerous homophobic gestures at Plaintiff in class over months, and Defendant sought to punish Plaintiff for stating that Joyce's actions immediately subsequent to Plaintiff's opposition to discrimination no longer appeared to be discriminatory and actually seemed friendly when Beard made the false statement "you reported to Dean Chalak Richards that you 'reconciled' with Alexis when you had not had any further interactions with her," and Richards' indifference led to Joyce's further and continued unwanted sexual discrimination by saying publicly in a Professional Formation class that Plaintiff "just came out" after being told to leave Plaintiff alone.

221. Richards' repeated public gestures and comments like "we'll guess what you are" were defamatory, discriminatory, retaliatory, and inflammatory in nature, with intent to spread untruths about Plaintiff or require Plaintiff to be complicit and victim to unlawful discrimination she opposes amounts to deliberate

indifference such that the Defendant effectively caused all harmful acts, subjecting Plaintiff to all reported harassment.

**Freyer And Baker**

222. Defendant had substantial control over Freyer because she is a faculty member who made these gestures repeatedly in front of class during mandatory lectures, Barba publicly acknowledged these acts, and the violent, discriminatory acts occurred over months.

223. Defendant had direct knowledge of the harassment Plaintiff alleges because Freyer's conduct included the act of making homophobic gestures followed by threats of violence by making a gun with her hand directed at Plaintiff as she sat in her seat.

224. Freyer's act of discrimination was witnessed by 180 students, including student Bryan Weitzman, who immediately jumped out of his seat laughing, and Barba, who acknowledged her acts on two separate occasions.

225. Defendant acted with deliberate indifference when Joyce, Stipanowich, and Richards ignored Freyer's acts and continued to use ABA-mandated class time to make homophobic gestures and references directed towards Plaintiff and while Plaintiff was being stalked, as evidenced by three incidents of defacement of her personal property, peering into her car, heckling her in the law school parking lot, and numerous occasions of one to four strangers following her into the bathroom.

226. Defendant's actions, including all unwanted sex-based comments, gestures, jokes, and acts, effectively denied Plaintiff equal access to her education in

violation of Title IX because Freyer's, Joyce's, and Richards' overt homophobic and violent gestures and comments furthered tension, contributed to student harassment and illegal defacement of personal property, and caused fear of Plaintiff's safety.

227. At all relevant times, Defendant, Gash, Baker, Beard, and Hurley knew of the unlawful harassment, acted unconscionably and through overt coercion by using threat of punishment for asserting Plaintiff's protected rights to oppose unwanted sex-based comments and actions amounting to discrimination as described herein, including all unwanted comments and acts from Stipanowich, McDonald, Joyce, Freyer, Williams, Baker, and Richards.

228. Baker's pervasive discrimination on four separate occasions where he publicly encouraged student harassment, gave her dirty looks and refused to be inclusive by speaking to her, and his use of homophobic gestures towards her prior to using his authority as Dean to sanction her and intimidate her for reporting sexual harassment shows deliberate indifference to discrimination that ultimately denied Plaintiff equal access to her education.

229. Defendants showed deliberate indifference to Title IX discrimination being reported when they coerced Plaintiff during the hearing through repeated angry stares, comments, intimidating heckles, and threats of punishment for reporting violations and directly asserting her protected rights, as well as conducting coercive interrogations where false statements were inserted

repeatedly while giving Plaintiff angry stares and making noises at her, simultaneously punishing her and intimidating her for asserting herself.

230. Hurley discriminated against Plaintiff, showing deliberate indifference, when he ignored reports of coercion, did not contact or allow Title IX Coordinator involvement, as required by law, to include providing supportive measures and protecting equal access to education, he ignored reports of discrimination from Baker, dishonestly restating the facts without actually addressing or properly reporting Baker's discriminatory acts, and he ignored repeated false statements and material alterations, including Beard's false statement that Plaintiff said "the deans" said it seemed like the person who defaced her personal property multiple times probably had a crush on her.

## COUNT II – TITLE IX RETALIATION - FOR REPORTING SEX-BASED DISCRIMINATION FROM MCDONALD

231. Plaintiff adopts and incorporates all other paragraphs set forth herein.

232. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

233. Title IX prohibits schools making a presumption that complainant is lying.

234. Plaintiff engaged in protected opposition to Title IX discrimination when she directly told McDonald to stop making disparaging, discriminatory comments about her in class, including saying, "this used to be looser" and "so she's old," and to leave her alone after making repeated licking gestures, causing her to

write "are you obsessed with me" as he was doing so, and she reported McDonald's actions to Gash and Defendant, and Plaintiff reported to Defendant that Goodno made derogatory, discriminatory comment about her appearance, age, and sex, including saying "so old, so old," and "yup, and those gray hairs. [Good luck getting hired]."

235.  Plaintiff's exercise of her protected rights to assert herself and say "no" and "stop" directly to McDonald was known to McDonald, as he was the recipient of the email, as well as Defendant, Jarvis, Beard, Gash, Hurley, and Baker when they were respectively apprised, and Plaintiff directly reported Goodno's discrimination to Defendant.

236.  Plaintiff was subjected to an adverse action subsequent to this protected activity when she was denied equal access to education by being restricted from classes by Horton, an authority who predetermined McDonald did not give Plaintiff a middle finger because she "[doesn't believe any employee of Pepperdine would do such a thing]," and was sanctioned by Defendant for telling McDonald to stop harassment.  including waiting outside her classes and staring at her on multiple occasions, saying, "this used to be looser" and "so she's old," and repeatedly staring at her during class, prompting Plaintiff to write "are you obsessed with me" on a piece of paper, as well as being sanctioned for participating in a protected activity via punitive actions beginning 24-hours after Plaintiff opposed the discrimination, showing temporal proximity proving retaliation, and without due process, including

denial of cross-examination, evaluation of cited evidence, or calling of witnesses.

237. Plaintiff stated in a February 14, 2024 email to Brewster that the restriction "contained no facts. There were no facts Plaintiff could respond to."

238. In Brewster's February 15, 2024 response, he stated no facts and instead stated there needed to be an investigation to find cause for this adverse action.

239. Plaintiff was subjected to adverse action subsequent to protected activity when Plaintiff opposed McDonald's discrimination, reported his actions, and then Beard used Ms. Brandt's false statements and omissions as cause for sanctions for actions in which there was no charge, no Plaintiff, no Defendant, no details, no investigation, and no due process, to include no opportunity to cross-examine or question Ms. Brandt or Larsen and while using the same facts reported to Defendant as sex-based discrimination in violation of Title IX and proving temporal proximity supporting retaliation.

240. There is direct evidence of retaliation and a causal connection between the protected activity and the adverse action because Horton and Defendant restricted Plaintiff from classes one day after she opposed discrimination, denying her equal access to education, because she reported and opposed McDonald's harassment, Horton and Beard could not offer a single example of something Plaintiff did wrong during a phone conversation, Beard and Defendant could not and did not cite any incident committed by Plaintiff to prove probable cause to remove her from classes because of "disruptive public behavior" in the sanctions, and Beard ultimately sanctioned Plaintiff for

exercising her protected Title IX rights and without proper due process as required by §106.44.

241. There is a causal connection between the protected activity and the adverse action when Beard materially altered statements about "V100 firm[s]," excluded her statements and facts about "gray hairs," and punished Plaintiff using the same facts reported as discrimination by Goodno.

242. There is direct evidence of retaliation because during all proceedings Title IX was not permitted to be apprised or present, Plaintiff was being punished for engaging in protected activities, and Plaintiff was not allowed to question or cross-examine parties, as required by Title IX, see evidence cited by Beard, an authority who unlawfully predetermined no faculty would ever do such things, or call witnesses from the school, a requirement of both Title IX and school policy.

## COUNT III – TITLE IX RETALIATION – FOR OPPOSING AND REPORTING SEX-BASED DISCRIMINATION FROM JOYCE

243. Plaintiff adopts and all other paragraphs set forth herein.

244. Title IX prohibits retaliation against anyone participating in protected opposition of sex-based discrimination.

245. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

246. Plaintiff engaged in protected opposition to Title IX discrimination when she directly told Joyce to cease making disparaging public comments about her, Plaintiff removed consent from Joyce over any decisions and access to her professional life, and Plaintiff reported Joyce's actions to Richards and Jarvis.

247. Plaintiff's exercise of her protected rights was known to Joyce because she was the recipient of the email, and it was known to University, Richards, Jarvis, Gash, Beard, Hurley, and Baker when they were respectively apprised of the email and Plaintiff subsequently reported the discrimination to them on multiple occasions, including at a meeting with Richards and Jarvis, and meetings and hearings with Defendant.

248. Plaintiff was subjected to an adverse action subsequent to protected activity when Defendant and Beard sanctioned Plaintiff using the same reported sex-based discrimination as the basis, and, additionally, they materially altered statements Plaintiff made stating Joyce's actions during a Professional Formation class no longer seemed discriminatory after Plaintiff told her to stop, and materially altered testimony and written statements from Plaintiff about a lengthy conversation with Richards regarding Richards' desire to be present for a reconciliation with Joyce.

249. Plaintiff's written and oral testimony, as well as disclosed written statements from Joyce, directly refute Richards' and Beard's false statements that "Alexis only communicated with you via email" when, in fact, she sat at an orientation table with Plaintiff, and answered direct questions from Plaintiff during a conversation that lasted at least 30 minutes, and Plaintiff was engaging in

protected activity when she told Joyce to leave her alone and reported Joyce's
discrimination, and "you reported to Dean Chalak Richards that you
'reconciled' with Alexis when you had not had any further interactions," when,
in fact, Plaintiff only reported Joyce had not engaged in further discrimination
and seemed friendly, and both Joyce and Plaintiff are on the written record
denying this ever occurred.   Joyce continued to publicly defame Plaintiff by
trying to "out" her to the class by saying Plaintiff, a heterosexual woman, "just
came out" during a Professional Formation class.

250. There is direct evidence of retaliation because Defendant removed Plaintiff
from her education without probable cause one day after she reported
McDonald's sex-based discrimination, and there is a causal connection
between the protected activity involving Joyce and the adverse action because
Beard stated, "Alexis only communicated with you via email" after Joyce
engaged in a corroborated public conversation lasting over 30 minutes, and
"you failed to offer any credible evidence that Alexis said or did anything
inappropriate" as the reason for sanctioning Plaintiff, violating Title IX
protections which both prohibits Joyce from retaliating against Plaintiff for
reporting a male student's sexual harassment and permits telling Joyce directly
to leave Plaintiff alone and reporting Joyce's factual discriminatory actions,
including saying the phrase "that's weird" to a group of students who
subsequently mistreated her due to her perceived sexual orientation, to
Defendant without fear of punishment. Plaintiff was protected from retaliation
for anything involving Moss, as evidenced in Title IX's offer of support.

Plaintiff is protected from opposing Joyce's instigating and damaging actions directly under Title IX as well. Further, the sanctions for telling Joyce to leave her alone occurred only in retaliation for reporting McDonald and telling him to stop.

**COUNT IV – TITLE IX RETALIATION - FOR REPORTING PROCTOR**

251. Plaintiff adopts and incorporates all other paragraphs set forth herein.

252. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

253. Plaintiff engaged in protected opposition to Title IX discrimination when she reported to Defendant a Proctor's actions during a Criminal Law midterm exam where Proctor's behavior was met with loud heckles or laughs from student Grace Brandt and several other male students, student Bryan Weitzman made direct comment in class the next day when he said, "I'm gonna need to see video on that one," Graffy looked at him while lecturing and made direct comment to him in opposition to his actions several days later, Jarvis stated to the class in reference to his actions, "so she'll fail [the exam then]," and Defendant expressly stated only five out of seven students asked denied it occurred, one of which was a participant.

254. Plaintiff reported Endrew Amana's actions to Stacey Nelson when she requested a copy of her exam on November 5, 2023. KH000200. In Nelson's response, she states, "thank you for the feedback concerning the proctor of your exam. My team is given a precise amount of time to proctor exams for

students . . .it is difficult to get exams started on-time . . .[t]his certainly does not excuse any behavior you or your classmates felt was inappropriate or unprofessional." Id.  On November 9, 2023, Richards responded to Plaintiff via email and said Title IX was being contacted.  CITE.  On November 9, 2023, Plaintiff responded to Richards' email stating Title IX was being contacted by adding that "I heard several students make jokes and heckles regarding the Criminal Law midterm, however I do not know or pay attention to names and specific instances. . . I have had my personal property defaced multiple times and this is a violation of policies and the law. . .emphasis on treating everyone with respect and dignity."  KH000202.

255.  Defendant subjected Plaintiff to adverse action for participating in a protected activity when Defendant purposely sought to include this activity in retaliatory proceedings involving McDonald, even after the matter was resolved, and after Richards used repeated homophobic gestures directed at Plaintiff for months during successive Monday morning announcements and intimidated Plaintiff by threatening to harm her if she reported harassment again. Disclosed and discovered evidence, including cited emails, prove retaliation for reporting this event to Nelson, and with an intentional focus on blaming Plaintiff when even Amana's supervisor, Nelson, deemed it appropriate and normal to run it by her. School policy allowed it as well.

256. There is direct evidence of retaliation and a causal connection between the protected activity and the adverse action because during all proceedings, the Title IX Coordinator and Title IX office were not present and did not

participate, Plaintiff was being punished for engaging in protected activities, Plaintiff was not allowed to question or cross-examine parties, see evidence cited by Beard, or call or question witnesses from the school, as required by Title IX and school policy, and Richards had threatened Plaintiff if she reported harassment while the discrimination continued to occur.

## COUNT V – TITLE IX RETALIATION – FOR ENGAGING IN PROTECTED ACTIVITY AGAINST WILLIAMS

257. Plaintiff adopts and incorporates all other paragraphs set forth herein.

258. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

259. Plaintiff engaged in protected opposition to discrimination when she told Williams her actions were creating a hostile learning environment for Plaintiff due to her repeated disparaging, unwanted jokes at Plaintiff's expense, including, but not limited to, comments about her being "ugly," old, and "not doing a good job" in conjunction with telling younger, white female students they were "beautiful" and marriage material.

260. Defendant, Beard, Baker, and Hurley were on notice of Plaintiff's assertion of her protected rights because Plaintiff told them she was the victim of Williams' discrimination.

261. Plaintiff suffered adverse action subsequent to her protected activity and there was a causal connection between the two when Defendant sought out Williams

for a statement asking her specifically if Plaintiff had been disruptive as a means of retaliation for Plaintiff's exercise of her protected rights against McDonald and after Plaintiff reported and opposed Williams' discrimination, Williams stated that she could not in good faith dock Plaintiff any professionalism points during final grading, confirming Plaintiff was never unprofessional, Williams was not required to provide details of her discriminatory jokes and comments, Title IX Coordinator was not informed, Plaintiff was not entitled to question or cross-examine Williams, as required by Title IX and school policy, and Beard materially altered facts about Williams' acts by stating that Williams said Plaintiff was disruptive without also stating Williams was prompted by the school to do so after independently determining otherwise.

## COUNT VI – RALPH ACT VIOLATIONS

242. Plaintiff adopts and incorporates all other paragraphs contained herein.

243. The Ralph Act prohibits threats of violence and violent acts against persons or property.

244. The Ralph Act prohibits violent or discriminatory conduct motivated by perception of a person's age, disability, race, sex, religion, or perceived sexual orientation.

245. Defendant used repeated threats of violence and violent acts against Plaintiff and others when Freyer and Stipanowich, as well as Caden Cutter, made guns with their hands directed at Plaintiff in mandatory lectures and Jarvis rolled his eyes when Plaintiff attempted to report violent defamatory homophobia, a practice she opposes,

was terrifying, is morally reprehensible and violative of both the law and Defendant's missions, and does not apply to her biographically, misdemeanor destruction of personal property, and when Plaintiff fielded intimidation and indifference to opposing and reporting Stipanowich's and McDonald's pervasive sex-based harassment, including making licking gestures and numerous unwanted comments about her body, looks, and age, as well as intimidation for reporting misconduct to the Department of Public Safety and punishment for opposing and reporting Goodno's and Williams's discrimination.

246. Defendant used violent and discriminatory conduct motivated by Plaintiff's perceived age, disability, and sex when it made numerous threats of violence towards Plaintiff while defaming her by saying, "how about this gay" and kicking, Stipanowich, McDonald, and Williams used repeated discriminatory comments like "so she's old," "eat at cougars," "butt," "it's huge," "we don't know what that is" and "you don't have one," Joyce and Richards abused their authority and incited discrimination through pervasive public, defamatory homophobic comments and gestures furthering untrue sentiments about Plaintiff's perceived sexual orientation, Richards used threatening postures of jumping at Plaintiff as she sat in her seat silently, Richards repeatedly used false statements and material alterations to intimidate Plaintiff for opposing sex-based harassment according to the law and school policy, including saying Plaintiff said her and Joyce had reconciled and intimidating her for telling the truth about the Proctor, and Goodno used repeated defamatory and discriminatory gestures, comments, and abusive tactics during class and while giving a false statement to the school.

247. Defendant's discriminatory and violent threats and acts fostered a hostile learning environment and allowed students to further discriminate against Plaintiff, including making comments such as numerous comments about Plaintiff's "butt," as well as numerous discriminatory comments and heckles during ABA-mandated exams.

248. The Ralph Act prohibits harm to a person based on aforementioned criteria. Plaintiff was harmed by Defendant's violent and discriminatory acts because she was stalked into bathrooms, repeatedly apprehended by faculty through defamatory homophobic gestures and assaults, and her property was vandalized on three separate occasions, as well Plaintiff suffered adverse action for opposing pervasive sex-based harassment and age discrimination.

249. Defendant's conduct was a substantial factor in causing the harm because all acts were led or coerced by faculty, staff, and students at the behest of Defendant and Defendant sought to punish Plaintiff for opposing discrimination and violence through written and oral threats of punishment, facilitation of discrimination for months showing deliberate indifference, and intimidating threats of more severe punishment if Plaintiff told the truth by stating Plaintiff was lying before investigating and telling her directly and through coercive proceedings that she would suffer more if she continued to tell the truth.

## COUNT VII – BANE ACT VIOLATIONS

250. Plaintiff adopts and incorporates all other paragraphs set forth herein.

251. Defendant interfered with or attempted to interfere with Plaintiff's statutory right to oppose sex-based discrimination by threatening violent acts through public

defamatory homophobic gestures and guns, as well as refusing to retract violent and defamatory incitation, including saying, "how about this gay?" and "just came out," refusing to publicly or seriously acknowledge or investigate serial misdemeanor defacements of Plaintiff's personal property occurring after Defendant began publicly encouraging discrimination, and using coercive internal proceedings to threaten, intimidate, and punish Plaintiff for exercising her statutory rights under Title IX, The Ralph Act, and Cal. Educ. Code Section 66270.

252. Plaintiff reasonably believed that if she exercised her statutory right the Defendant would commit violence against her or her property as evidenced through her reporting to Department of Public Safety continued threatening behaviors after faculty incited violence and discriminated against her sexually, including Stipanowich making threatening looks to a male student when he stood up for her against his sexual harassment, repeated attempts to report violent acts to the Defendant, and actual serial vandalism of her personal property.

253. Defendant injured Plaintiff and her property to prevent her from exercising her statutory right by repeatedly intimidating her through emails, verbal attacks, and denial of equal access to education for opposing and reporting sex-based discrimination and harassment, including participating in a Title IX inquiry and attempted reporting of faculty and student misconduct, insisting on cruelly and perversely covering up sexual harassment from a male student and Stipanowich through defamatory and disparaging comments about Plaintiff, such as "how about this gay?" causing months of stalking and abuse and serial misdemeanor defacement of personal property.

254. Defendant retaliated against Plaintiff for having exercised her statutory right when it launched a public campaign to call Plaintiff "weird"  in violation of its own CDO policies after Title IX office offered her support for a male student's "weird" sexually harassing behavior towards her lasting for months, repeatedly publicly made defamatory homophobic gestures along with gestures of guns at her while saying, "how about this gay" and kicking, repeatedly stalked her around campus, repeatedly harassed her in classes by making unwanted comments about her buttocks, looks, appearance, and age, and encouraged students and others to discriminate against her under threat of penalty or coercion.

255. Plaintiff was harmed because she suffered three acts of vandalism to her Criminal Law book, endured daily discrimination and sexual harassment, was stalked around campus, was threatened by Richards, Horton, and Beard repeatedly for exercising her statutory right to oppose sex-based discrimination from Stipanowich and McDonald, was punished for telling the truth in said opposition, and was coerced and intimidated into silence while attempting to tell the truth about McDonald, Stipanowich, Williams, Goodno, and Richards.

256. Defendant's conduct was a substantial factor in causing the Plaintiff's harm because all acts and events occurred on campus and by employees of Defendant or students, including, on information and belief, all three serial book defacements.

**COUNT VIII – CALIFORNIA EDUCATION CODE § 66270 VIOLATIONS**

257.  Plaintiff adopts and incorporates all other paragraphs set forth herein.

258.  §66270 prohibits discrimination on the basis of disability, gender, race, sexual orientation, and any characteristic contained within the penal code defining hate crimes, in any postsecondary educational institution receiving state financial aid.

259.  At all times, Defendant was a recipient of state financial aid.

260. Plaintiff endured pervasive and offensive harassment, depriving her literally of her right of equal access to educational benefits and opportunities, because Defendant used repetitive sex- and race-based discriminatory comments, including "we don't know what that is," "it's huge," "you don't have one," "eat at Cougars," "yup, and those gray hairs…[good luck getting hired]," "so old," "ugly," "cute," "[she] just came out," "that's weird," "this used to be looser," "so she's old," and "erection of a building," along with serial illegal book defacements and invasions on her other property, repeated gestures of guns while making homophobic gestures and defamatory comments directed at Plaintiff, and punishment for reporting and/or telling her harasser to leave her alone.

261. Plaintiff was also told she must endure unwanted harassment and mistreatment in order to obtain her education when Stipanowich predicated her grade on meeting with him privately, she was threatened with and suffered sanctions for reporting harassment while the harassers were still committing the acts, and she was not even allowed to tell them directly to "leave her alone" and "stop," creating an oppressive quid pro quo that Defendant was aware of and ignored, if not wholly facilitated.

262. Defendant acted with deliberate indifference as stated above, and when they repeatedly ignored attempted reports of harassment and mistreatment and, in fact, furthered tensions and discrimination as evidenced through several faculty members

making the same, explicit sexual gestures at Plaintiff, along with the same or similar

sex-based comments about her rear end, looks, and age, ultimately punishing her for

demanding a stop to discrimination and defamation.

## COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

263. Plaintiff adopts and incorporates all other paragraphs set forth herein.

264.  California Civil Code §3294 states a business is liable for oppression and

malice, defined as despicable conduct that subjects a person to cruel and unjust

hardship, and fraud, defined as misrepresentation, deceit, or concealment of a

material fact, in the form of compensatory and punitive damages.

265. Under the doctrine of respondeat superior, Defendant is responsible for all

common law torts its employees commit in the scope of their employment.

266.  At all relevant times, all parties were acting within the scope of their

employment by Defendant, a business operating in California, and Defendant's

managers, including Gash, Beard, Hurley, Baker, Richards, and Jarvis, participated

in, were aware and indifferent to, if not wholly facilitated, all oppressive conduct

contained herein.

267.  Defendant engaged in prolonged, pervasive, and outrageous conduct when it

used repetitive harassment techniques, ignored then punished Plaintiff's protected

opposition to discrimination and harassment, and was especially calculated such as

to shock the conscience and exceed the limits of normal tolerable civil society when

it used threats of violence, hate, sex-based discrimination, and indifference to serial

illegal defacements of Plaintiff's personal property while pursuing retaliatory punishment for telling the truth and participating in a legally protected act.

268. Defendant showed intention to cause emotional distress when it not only failed to prevent stalking and harassment, but encouraged and fostered both by refusing to investigate factual, pervasive harassment and discrimination, it

threatened Plaintiff for reporting unlawful acts or defending herself through protected opposition, intimidated Plaintiff for reporting serial book defacements and unwanted sexually harassing comments like "we don't know what that is," "butt," "you don't have one," and "it's huge," "this used to be looser," and "so she's old," employed students to harass Plaintiff even during ABA-mandated exams about her butt, her sex, and by saying, "I know," and Defendant used its power to both thwart state and federal laws while adversely affecting her interests by removing her equal access to education and livelihood.

269.  Defendant knew Plaintiff was vulnerable to distress when it violated federal laws requiring supportive measures to victims when they report or oppose sexual harassment and threatened and intimidated her if she told the truth.

270.  Defendant knew its conduct would cause severe emotional distress when it made numerous unwanted sexually harassing comments, Plaintiff reported the effects of being victimized by serial criminal defacements of personal property, and it ignored repeated incidents of stalking and unwanted harassment while using fraud to removed her from her education when Horton restricted Plaintiff's education on February 7, 2024 without cause via an email and subsequent phone call, stating falsely that Plaintiff was "public[ly] disruptive," and used fraud as the basis of

sanctions, as evidenced through numerous false and materially altered statements about Joyce, Richards, Beard, McDonald, and Brandt in a letter dated February 27, 2024, signed by Beard, and stating, "Alexis only communicated with you via email," "you reported to Dean Chalak Richards that you 'reconciled' with Alexis," "V100 firms," and "[seven] students stated" Proctor acted professionally, evidence Plaintiff was not allowed to review, essentially representing all evidence used.

271.  Defendant is the actual and proximate cause of the emotional distress because all events occurred at and in association with Pepperdine, were prolonged, and perverse, and Defendant used its authority to adversely affect Plaintiff's life irreparably by sanctioning her for saying "no" and "leave me alone."

## COUNT X – DEFAMATION – Plaintiff against PEPPERDINE UNIVERSITY (Office of Community Standards) and SHARON BEARD

272.  Plaintiff adopts and incorporates all other paragraphs set forth herein.

273.  Pepperdine University and Sharon Beard made the following false statements and failed to take care to establish the truth or falsity of each:

   a.  "Alexis only communicated via email with you, and the Committee reviewed those emails."

      i.  This statement is false because:

         1.  Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

         2.  Joyce admits in her own emails to Richards that "she sat at my Launch Week table in August and then briefly

stopped by the CDO right after to ask a quick question." PEP000522. Not only does this directly refute University's Beard's statement, but it is expressly exculpatory and was deliberately withheld from Plaintiff and from the sanctions record. For that reason, University and Beard failed to take reasonable care to determine truth or falsity before publishing it.

b. "[Y]ou reported to Dean Chalak Richards that you 'reconciled' with Alexis."

   i. This statement is false because:

      1. Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

      2. Both Plaintiff and Joyce are on the written record refuting this statement from Richards, and Plaintiff repeatedly clarified and substantiated how this statement could not be true given her lengthy conversation with Richards regarding Richards' desire to be present at a future reconciliation, should one occur.  Sealed PEP000613.

c. In regard to Proctor Endrew Amana, University and Beard state "Stacy forwarded your email [reporting his harsh behavior] to Associate Dean Jason Jarvis, and Associate Dean Jarvis contacted multiple students to

investigate the matter. Each student reported that the proctor acted professionally."

i. This statement is false because:

    1. Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

    2. This is not truthful accounting of Nelson's response to Plaintiff where she said, "I appreciate the feedback you provided . . . [I don't] excuse any behavior *you or* your classmates felt was inappropriate or unprofessional" (emphasis added). KH000200.

    3. Further, Beard's statement is false because it implies, if not outright expresses, Plaintiff's activity was not protected under Title IX, as evidenced in Richards' email stating Title IX was involved.

    4. Also, Beard left off the record Plaintiff's response to Richards that she sought to treat everyone with respect and dignity, and she "had her personal property defaced multiple times and this is a violation of policies and the law." KH000202. University and Beard continually excluded material facts and truth, failing to use reasonable care to determine their statements falsely implied to CSOL, Pepperdine Counseling Center, and Paul Caron

that they did not violate the law by retaliating against Plaintiff for engaging in protected activity.

d. "Associate Dean Jarvis contacted multiple students to investigate the matter. Each student reported that the proctor acted professionally. . . I contacted Grace Brandt and she reported that the proctor acted professionally."

    i. This statement is false because:

        1. Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

        2. Plaintiff's own reports state Brandt was a participant in the heckling and harassment and beard's statement fails to acknowledge this fact.

        3. Richards stated in her own correspondence to Plaintiff that this was being forwarded to Title IX for investigation, and it is thus protected activity and not punishable. Plaintiff testified Brandt was a participant in the heckling that occurred and this was left off the record, and no other evidence was ever provided.

        4. Jarvis is on the written record retaliating against Plaintiff on both McDonald's and Moss's behalf to exact these sanctions. Jarvis made numerous false statements in association with Plaintiff's reports of McDonald's actions,

including propaganda-like racist, sexist insults to dissuade University from taking seriously her concerns. This statement is false because it impliedly states University and Beard had a legal right to rely on retaliatory actions taken by Jarvis when sanctioning her for her truthful accounting of her lived experience.

e. "After the first incident with Professor Goodno, you emailed and apologized 'if my behavior was argumentative."

1. Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

2. University and Beard knew of a video of this argumentative legal discussion about claim preclusion, the role of the Circuit Court, and Final Judgments, and they hid this exculpatory evidence from Plaintiff and the record, punishing Plaintiff for being professional and cordial. Further, Goodno's mischaracterization to Department of Public Safety that Plaintiff said, "I pay you. You have to answer me" is disproven in the video and was not ever said or implied by Plaintiff in any way. Material evidence was withheld to promulgate this defamatory statement. Plaintiff endured numerous negative and aggressive public behaviors from Goodno showing

animus, making defamatory, disparaging statements that Plaintiff has a disease, and discriminating against her for her age, gender, and perceived medical history. For these reasons, University and Beard failed to take reasonable care to determine the truth or falsity.

f. "It was reported that Professor McDonald was 'visibly distressed.'"

   i. This statement is false because:

      1. This statement is false because it infers University and Beard had the legal right to punish Plaintiff for this at all. In fact, the sanction was unlawful Title IX retaliation and this statement impliedly states it was not.

      2. University and Beard never stated why McDonald appeared distressed or how Plaintiff is responsible for his appearance. Jarvis states in an undisclosed email that McDonald was not distressed but "highly agitated." This fact was withheld. Further, it relied once again on racist, sexist "polling" of select students who were a female student openly consenting to Stipanowich's sex-based harassment and while Plaintiff opposed his behaviors, and Stipanowich's personal research assistant. No one indicated how Plaintiff was involved, and McDonald was never required to answer to the truthfulness of this report in any way. All this indicates Plaintiff was not involved in

this false report at all. Plaintiff's only relation to McDonald at all is due to her protected activity of opposing his public discrimination.

3. University and Beard failed to take reasonable care to determine truth or falsity, as neither McDonald nor Plaintiff were ever even asked about this, Plaintiff is adamant she did not have anything to do with his appearance, and Beard and University failed to disclose Jarvis's reports that McDonald was, in fact, "highly agitated," a characterization that aligns with Plaintiff's reports and experience. Finally, students who reported this sat in front of Plaintiff and there is no way they could even connect Plaintiff to his appearance at any time. No factual details were ever disclosed.

g. "Professor Williams indicated you were disruptive in her class."

  i. This statement is false because:

1. Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

2. Williams' statement, occurring only when she was contacted by the school in retaliation for Plaintiff's reporting McDonald's sexual harassment, expressly includes, "I was able to give her all possible

professionalism points." This is incongruent with a sanction for disruption. Further, the incident Williams references where Plaintiff asked a line of questions is refuted by Plaintiff entirely, and Williams failed to disclose her discrimination in her accounting. Sealed PEP000613.

3. University and Beard failed to use reasonable care to determine truth or falsity of this statement because Williams states she gave all professionalism points. University and Beard failed to disclose the written record refuting this account, and failed to disclose Plaintiff's written record of discrimination from Williams, protecting her from punitive action further.

h. "You indicated that these incidents in both professor McDonald and Professor Goodno's class occurred in front of the class, yet no one other than yourself reported these behaviors."

i. This statement is false because:

1. Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

2. Plaintiff reported and testified that Goodno's comments "yup and those gray hairs" was made privately to her at the front of the room before class. Of McDonald's cruel

jokes and insults, Jarvis stated on February 7, 2024, that a student reported that Plaintiff said, "how dare you sexually assault me." This exculpatory evidence was withheld from Plaintiff and the record and it corroborates events reported, even if done through false quotes and statements. Further, no one reporting an action happening to Plaintiff is not proof it did not occur.

3.  Beard and University failed to use reasonable care to determine the truth or falsity of McDonald's sex-based discrimination here because McDonald is on the written record giving a false statement when he says to Beard in response to whether he made a cruel joke or insult about Plaintiff, "the bit about a cruel joke is patently false. I have no idea what she is talking about." McDonald said, "this used to be looser" before looking back and forth to Plaintiff and male students and then saying while laughing, "so she's old." Plaintiff did not say anything during this entire event, and it is impossible for McDonald to say these things while laughing and simultaneously say he has no idea what Beard or Plaintiff is talking about.

i.  "The University directly contacted multiple students, they all denied that the behaviors occurred."

i.  This statement is false because:

1.  Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

2.  Beard stated that she received twelve responses to this inquiry. Plaintiff has only received four. These four repsonses cannot possibly prove the events did not happen, they can only offer these four individuals did not se eit or subjectively did not think it was bad. This "popular vote" on factual events is itself discriminatory and corrupt, as only students cherry-picked by faculty involved were ever polled. And results of such racist, sexist polls are opinion. The students who were asked are Stipanowich's personal assistant and the female who openly benefited from Stipanowich's sexual overtures, and the most they can say is they did not see this occur. Brandt was one of four students who provided responses, and she did not answer this question at all. Brandt has also participated in discrimination against Plaintiff when she, too, made public derogatory jokes about Plaintiff being "her mother" during an ABA-mandated midterm exam where speaking is not permitted. This fact was left off the record, and the false statement made by University and Beard failed to account for Brandt's statement to the contrary. McDonald was

never required to attend a hearing to answer questions, and that would have resolved any dispute about facts or events reported.

3. This false statement made to CSOL and Paul Caron is reasonably understood to mean no corroboration of events here existed, when in fact, Brandt's own omission is corroboration, and McDonald himself was never even required to answer a direct question about this. It further reasonably means that punitive informal "popular votes" on discriminatory events is not violative of Title IX and it reasonably means Plaintiff was not protected from retaliation by sanctioning her based solely on the informal, undeposed written answers of three students.

j. "You gave me the name of a student named Marcello Jones, who you allege complimented your eyes after the incident where allegedly professor McDonald called you ugly." Plaintiff stated his comments and jokes called her "either old or ugly." Beard's statement here is knowingly false, as it seeks to exclude material facts. Further, Plaintiff was telling the truth the entire time and Jones lied. Plaintiff cannot control another person's decision to lie. Jones openly stated during morning announcements before a Property class that he'll "never go against you again" to the school and its male officials. Jones repeatedly showed he was seeking to align with the school officials without regard

to the truth. Nonetheless, Plaintiff's reports of Jones's statement was factual, honest, and protected activity under Title IX, as it was in conjunction with a report of sex-based discrimination. The sanctions letter purposely evades the truth of the matter and it is false on its face by stating University and Beard had any legal right to sanction Plaintiff for this reported event.

k.  You failed to offer any credible evidence that Alexis said or did anything inappropriate."

   i.  This statement is false because:

      1.  Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

      2.  Plaintiff emailed Joyce directly to remove consent from Joyce over access and decisions in her life after Joyce pointed at her and said, "that's weird." This protected activity is Plaintiff's own lived experience of Joyce's direct statements and action to Plaintiff's face. There is no fathomable reason why Plaintiff would do this if nothing occurred.  Further, University and Beard never asked for evidence even if it was preferred or needed. This false statement assumes that University or Beard asked for evidence, and it further assumes Plaintiff's own word about her lived experience is not enough to tell Joyce to

leave her alone both under Title IX or in life at all. Also, Beard and University attempt to assume Joyce did say "that's weird" if it benefitted them or was salacious, while Joyce took measures to deny or avoid speaking on this issue altogether. Joyce is trying to refute she said this in her email, while Beard falsely ignores this fact in the sanctions.

3. Because of the nature of the statement and all it implies, CSOL, Counseling Center, and Paul Caron reasonably took this to mean these events did not occur, that Plaintiff was dishonest in her accounting of them, and that Plaintiff's sanctioned truthful actions were not protected from punishment under Title IX. University and Beard led CSOL, Counseling Center, and Paul Caron to believe they did not violate the law when exacting these sanctions.

274. It was clear Pepperdine University Office of Community Standards and Beard were referring to Plaintiff because it states it expressly in the letter.

275. It is clear Caruso School of Law, Paul Caron, and Pepperdine Counseling Center understood the statements to mean that Plaintiff was rightfully sanctioned for being dishonest, disruptive, and that she was not protected from punishment in retaliation for reporting and opposing sex-based discrimination. This is false.

276. Because of the facts and circumstances known to CSOL, Paul Caron, and Pepperdine Counseling Center of the statements contained therein, they caused injury to Plaintiff's occupation by impeding her access to her education and ability to practice the law, exposing her to shame and contempt and discouraging others from dealing with Plaintiff.

277. Further, the University's and Beard's choice to adamantly deny access to witnesses and named parties to all events establishes malice and fraud above and beyond that established in above statements.  This shows Defendants failed to use reasonable care to establish truth or falsity. Their choice to withhold exculpatory evidence, as well their withholding of evidence that proves another's guilt, establishes malice, fraud, and oppression. And Hurley's refusal to properly address bias, his failure to prevent Title IX retaliation upon notice as required by law, and his failure to retract the defamatory statements shows malice, fraud, and oppression as well.

278. Finally, the pervasive, daily abuse, criminal acts reported and discussed during the hearings, and record of Title IX reporting were all left off the sanctions analysis and letter. This omission further proves University's and Beard's malice, fraud, and oppression.  The express statements listed above show direct evidence of defamation, but taken together with the totality of the circumstances and University's and Beard's intentional lack of disclosure of pertinent facts and failure to abide by Federal law, it is clear they acted with intent to oppress and perpetrate a fraud. Also, Beard's

reference to the CSOL Career Development Office as the "Career Center"
establishes how haphazard and irresponsible this sanctions letter was, and
it mirrors how Beard executed the entire process, with wanton disregard
for the facts or truth in favor of bullying, intimidation, and retaliation, as
well as a focus on other defamatory gossip not mentioned at the hearing.

279.  Plaintiff reserves the right to add additional evidence or assertion of false
statements made in other parts of the letter, should evidence or justice allow
or demand.

## COUNT XI – DEFAMATION – Plaintiff against JASON JARVIS

280.  Plaintiff adopts and incorporates all other paragraphs set forth herein.

281.  Jason Jarvis made the following false statements and failed to determine
the truth or falsity in each:

a.  On July 19, 2023, "I'm a little confused at where we are with respect to
supporting [Moss], however, the student she made her reactive claims
against." Jarvis falsely states Plaintiff made reactive claims against
Moss and he ignored the falsity of this statement because he was privy
to the entire time course of events and knew she was asked a question
about class blindly and without mention of Moss, and she truthfully
reported her interactions with him. Further, Jarvis states in this same
email, "what do we need to do to move Moss's claims forward?" Jarvis
ignored Title IX protection offered to Plaintiff. Jarvis repeatedly
discredits Plaintiff doggedly while immediately "advancing" Moss's
dishonest claims. Of note, Moss's claims were never advanced and

Plaintiff was never contacted about them. Moss continued to interact with and antagonize Plaintiff after a stay away order was issued, and no one ever approached her or apprised her of his statements. Jarvis is on the written record months later still relying on Moss's untrue, unnoticed statements and this violates Title IX and establishes he failed to take reasonable care to determine truth.

b.  "She wrote all over the whiteboard 'you said I'm stupid' and admitted that to Prof Snyder, who said she never said it." Plaintiff was erasing similar words from the whiteboard when Snyder walked into the room. Snyder said something to her while smirking, but Plaintiff never said she wrote it nor did she accuse Snyder of saying it. Further, Plaintiff's blindly written course evaluation, and her sincere opinions of Snyder, do not align with this unsubstantiated account. At no time did Plaintiff ever think Snyder was more intelligent than her.  Jarvis never asked Plaintiff about this event, nor did any other school official. It is not even a memorable occurrence as a result, and Jarvis failed to take reasonable care to determine the truth of this false statement he advances *against* her, while implying in other parts of the same email that Moss is too fragile to even be in school. Jarvis further fails to take reasonable care to determine the truth or falsity in his statement regarding Moss because Moss states of his less-than-five-minute interaction with Plaintiff that he was so severely distressed he was going to abandon his entire career and at least $60,000 investment to-date, while simultaneously accusing

Plaintiff, an impervious woman on the fast-track to success, of having mental health issues. It makes no sense.  Moss made strange statements about a mass of murdered snails then proactively lied about what he said even before it occurred to Plaintiff he was the one killing the innocent animals. These false statements and false analysis of unsubstantiated events show Jarvis's intent to malign Plaintiff at all costs, and his refusal to have a conversation with Plaintiff about his accounts and perception show his disregard for determining truth before making damaging statements. It is clear from Jarvis's other behaviors and statements he discriminates freely.

c. In an email on February 1, 2024 at 1:33 PM, "she is being extremely argumentative, saying random words, and one time she said 'how dare you sexually assault me?'" Plaintiff never said random words. It was the male student she responded to when she told him to "never do that to me again" who spoke random words by yelling at her for sitting with her hand in an awkward position. This male student was making a joke out of assaultive, repetitive homophobic gestures and kicking (and while saying overtly "how about this gay?" to the class in association with them), and Plaintiff was telling him to leave her alone. Plaintiff has never said "how dare you sexually assault me." This was never asked of Plaintiff and it never occurred. Jarvis failed to take care to determine the truth or falsity of this statement and his intention was to discredit and malign her without investigating for facts.

d.  In an email on February 1, 2024 at 2:21 PM, "I do not think it is right to allow Kira's schizophrenic paranoia to disrupt class and hurt other students." Plaintiff does not have schizophrenic paranoia, nor did she disrupt the class. It was the opposite. Jarvis repeatedly makes these harsh assertions to discredit Plaintiff and demean her and he took no reasonable care to determine truth or falsity before spreading these lies. This statement was never disclosed to Plaintiff at the time and it is false entirely.

e.  In an email to Camila Bonavia on February 7, 2024, "she has mental illness . . .she accused out of the blue students and professors of harassing her." This statement is false because it is about Moss, a male student who factually harassed Plaintiff during the Summer 2023 term. Plaintiff is protected from punitive or adverse action because Title IX initiated protection and support. Moss was a classmate in several classes and he is thus not at all "out of the blue." Disclosed evidence shows Moss was not truthful in his statements to Jarvis, Jarvis never spoke to Plaintiff or asked another to do so to seek clarity, and this shows lack of reasonable care to determine truth or falsity. Plaintiff also did not accuse "out of the blue . . . professors" of harassing her. It never happened and Jarvis advanced this lie without regard for the truth of the matter. Finally, Plaintiff has no mental illness. This is disproven as a lie repeatedly. Jarvis used this propaganda to facilitate unlawful retaliation against Plaintiff while ignoring facts regarding McDonald's actions.

Jarvis takes no care at all to determine truth or falsity, and he relied on a false statement from a man when doing so.

f.  "She later accused a professor of harassing her and making her feel unsafe, but we had proof it did not happen." This false statement mischaracterizes DPS's referral to file a grievance about Stipanowich's harassment. Jarvis purposely progagandized DPS's referral to file grievance after Plaintiff was painstakingly honest in her accounting of events and this shows malice, fraud, and oppression when failing to take reasonable care to determine truth or falsity.

g.  "Later, she claimed a student had stolen her textbook and defaced it (when we looked at it, it was actually just notes on the material and we suspect she wrote it herself and just forgot/couldn't remember through her dementia)." Plaintiff reported her book had been defaced on September 14, 2023 and September 26, 2023. Plaintiff brought her book into a meeting with Jarvis on October 17, 2023 and showed it to him. It is a misdemeanor offense to deface another's personal property without their permission, this was stated to Jarvis, and he falsely states here that an invasive crime like going into someone's bag and writing all over multiple pages on different days without their consent is "just notes on the material." The school's policy states this is an Honor Code violation and the State of California classifies it as a crime within $100 of being a felony. Nonetheless, Jarvis immediately wrote this off as no big deal and falsely characterizes it as just some (consensual) notes.

Plaintiff does not have dementia. Jarvis took no care at all to determine the truth or falsity of this lie and offers nothing to substantiate telling others in authority that she has a debilitating neurological disorder that cripples individuals and prevents them from functioning as humans. Taken together with all other statements and events, it is meant to malign and discredit or ridicule Plaintiff and stigmatize her, likely as punishment for reporting anti-LGBT+ and sexual harassment.

h. "She has previously been referred to Dawn Emrich, Brittney Brannon, and LaShonda Coleman, for making claims of harassment." This statement is false because it implies that Title IX involvement is bad for the victim of harassment and discrimination. Jarvis failed to take reasonable care to establish fact and truth here because he is a Dean who must abide by Title IX law, its express statute and its spirit and intent, which is to support and protect those who report or oppose discrimination. Jarvis shows increasing ability to reappropriate Title IX as a source of punishment for women who dare oppose sex-based harassment.

i. In an email to McDonald on February 7, 2024, "I'm sorry I don't have a great answer for you on how to process or handle mental illness. . . we cannot force someone to take medication." This false statement presumes McDonald was telling the truth and that Plaintiff has a "mental illness" and needs to be "force[d] to take medication." Plaintiff does not have any such mental illness, does not need to take medication,

and was telling the truth the entire time while McDonald lied. Jarvis failed to use reasonable care to determine the truth or falsity of his statements both about Plaintiff's health or about the events in the class. Jarvis never spoke to Plaintiff at all, and Jarvis's passed down assertions led to the retaliation and allowed McDonald and others to lie.

282. It was clear Jarvis was referring to Plaintiff because in all communications from him he directly uses her name.

283. It is clear Camila Bonavia, Barry McDonald, Jim Gash, University reasonably understood the statements to mean that Plaintiff suffers from dementia or other illness, needs to take medication for an illness, accused "out of the blue" students and faculty of harassing her, or said "how dare you sexually assault me." It is also clear Jarvis's statements conveyed that Plaintiff was not protected by Title IX for each action and that he was asking others to rely on his assertions to sanction Plaintiff.

284. Because of the facts and circumstances known to Camila Bonavia, University, Gahs, and others, Jarvis's false statements injured Plaintiff's life when she was unlawfully and dishonestly sanctioned.

285. Plaintiff reserves the right to add additional defamatory statements to support and establish this count, should they arise.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Kira Howell, respectfully requests that the Court find and determine, after trial by jury as appropriate, that Plaintiff suffered substantial and continuing injury as a result of deprivation of her civil rights, resulting in loss of wages, earning capacity, damage to her reputation, and other damages, and award the following relief, as appropriate:

(a) GRANT injunctive relief prohibiting Defendant from discrimination and retaliatory actions denying equal access to education against Plaintiff or any other student ever;

(b) DECLARE that Defendant has violated Plaintiff's civil rights;

(c) ENTER JUDGMENT holding Pepperdine University liable to Plaintiff for compensatory damages, punitive damages, and other damages totaling $10,000,000.00 (ten million dollars);

(d) ENTER JUDGMENT holding Sharon Beard liable to Plaintiff for damages totaling $5,000,000.00 (five million dollars);

(e) ENTER JUDGMENT holding Jason Jarvis liable to Plaintiff for damages totaling $5,000,000.00 (five million dollars);

(f) AWARD Plaintiff her costs and fees;

(g) GRANT such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues.

Dated: January 15, 2025                    Respectfully submitted,

                                           /s/Kira Howell

                                           23719 Aster Trail

                                           Calabasas, CA 91302

(612) 412-3472

Kira.howell8@yahoo.com

## PROOF OF SERVICE

I, Kira Howell, declare the following documents were served on the parties

listed below when I filed them with the Court's CM/ECF electronic filing system

on February 14, 2025.

**Plaintiff Kira Howell's THIRD AMENDED COMPLAINT**


**Karen Pazzani**

**700 North Central Avenue**

**Suite 400**

**Glendale, CA 91203**



I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 14, 2025 at Los Angeles, CA.

_/s/Kira Howell_

Kira Howell

Plaintiff In Pro Per