KAREN J. PAZZANI (State Bar No. 252133)
kpazzani@psemploymentlaw.com
PUNEET K. SANDHU (State Bar No. 254726)
psandhu@psemploymentlaw.com
JOSEPH V. MARRA III (State Bar No. 238181)
jmarra@psemploymentlaw.com
PAZZANI & SANDHU LLP
700 N. Central Avenue, Suite 460
Glendale, CA 91203
Telephone:(213) 362-1860
Facsimile: (213) 362-1861

Attorneys for Defendant
PEPPERDINE UNIVERSITY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRA HOWELL,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PEPPERDINE UNIVERSITY,<br><br>　　　　　Defendant. | Case No.  2:24-CV-06332-WLH-RAO<br><br>The Honorable Wesley L. Hsu<br><br>**JOINT STIPULATION TO ALLOW PLAINTIFF TO FILE FOURTH AMENDED COMPLAINT**<br><br>[Fed. R. Civ. Pro. 15(a)(2); L.R. 7-1] |

PAZZANI & SANDHU LLP
700 N. CENTRAL AVENUE, SUITE 460
GLENDALE, CALIFORNIA 91203

**PAZZANI & SANDHU LLP**
700 N. CENTRAL AVENUE, SUITE 460
GLENDALE, CALIFORNIA 91203

## JOINT STIPULATION TO ALLOW PLAINTIFF TO FILE
## FOURTH AMENDED COMPLAINT

Plaintiff Kira Howell ("Plaintiff"), on the one hand, and Defendant
Pepperdine University ("Pepperdine"), on the other hand, hereby enter into the
following joint stipulation to allow Plaintiff to file a Fourth Amended Complaint:

**WHEREAS**, Plaintiff initiated this action on July 24, 2024, by filing a
Complaint against Pepperdine alleging (1) Title IX Discrimination – Quid Pro Quo
and Deliberate Indifference to Stipanowich's Discrimination; (2) Title IX
Discrimination – Deliberate Indifference to Pervasive Discrimination, Stalking, and
Protected Opposition to Sexual Harassment; (3) Title IX Retaliation – Discipline for
Reporting Sex Based Discrimination from McDonald; (4) Title IX Retaliation –
Discipline for Opposing and Report Sex-Based Discrimination from Joyce; (5) Title
IX Retaliation – Discipline for Reporting Proctor; (6) Title IX Retaliation –
Discipline for Engaging in Protected Activity Against Williams; (7) Unruh Civil
Rights Act Violation; (8) California Education Code § 66270 Violation; and (9)
Intentional Infliction of Emotional Distress (Dkt # 1);

**WHEREAS**, on August 7, 2024, Plaintiff filed a First Amended Complaint
asserting the same claims but adding allegations (Dkt # 16);

**WHEREAS**, on October 2, 2024, the Plaintiff and Pepperdine entered into a
joint stipulation allowing Plaintiff to file a Second Amended Complaint (Dkt # 28,
34), which removed the Unruh Civil Rights Act claim, and added claims under
California's Ralph and Bane Acts (Dkt # 38);

**WHEREAS**, Pepperdine filed an answer to the Second Amended Complaint
on October 29, 2024, and an amended answer on November 8, 2024 (Dkt # 37, 40);

**WHEREAS**, Pepperdine and Plaintiff have since exchanged initial
disclosures;

**WHEREAS**, on February 10, 2025, the Court entered an order granting

PAZZANI & SANDHU LLP
700 N. CENTRAL AVENUE, SUITE 460
GLENDALE, CALIFORNIA 91203

1  Plaintiff's motion for leave to file a Third Amended Complaint, to add, among other

2  things, a "Count X" for defamation against Pepperdine and Sharon Beard, and a

3  "Count XI" for defamation against Jason Jarvis (Dkt # 70);

4       **WHEREAS**, Plaintiff filed her Third Amended Complaint on Pepperdine on

5  February 14, 2025 (Dkt. # 71), making Pepperdine's response deadline February 28,

6  2025;

7       **WHEREAS**, Counsel for Pepperdine and Plaintiff have been conferring

8  regarding: [1] potential motion challenges to the defamation claims raised in the

9  Third Amended Complaint; [2] service of the lawsuit on new defendants Beard and

10  Jarvis; and [3] potential further amendments to the complaint in this action;

11       **WHEREAS**, Plaintiff has prepared a proposed Fourth Amended Complaint,

12  which is attached hereto as **Exhibit A**;

13       **WHEREAS**, Plaintiff and Pepperdine agree and stipulate that the Court

14  should grant Plaintiff leave to file the attached **Exhibit A** as her Fourth Amended

15  Complaint in this action, and that service of the Fourth Amended Complaint shall be

16  deemed complete on all Defendants as of the date the Court enters an order granting

17  Plaintiff leave to file **Exhibit A**;

18       **WHEREAS**, Plaintiff and Pepperdine agree and stipulate that those causes of

19  action present in the Third Amended Complaint but omitted from the Fourth

20  Amended Complaint (specifically, [a] Count I for TITLE IX DISCRIMINATION –

21  DELIBERATE INDIFFERENCE TO PERVASIVE DISCRIMINATION,

22  STALKING AND PROTECTED OPPOSITION TO SEXUAL HARASSMENT;

23  [b] Count VI for RALPH ACT VIOLATIONS; [c] Count VII for BANE ACT

24  VIOLATIONS; and [d] Count VIII for CALIFORNIA EDUCATION CODE §

25  66270 VIOLATIONS) are dismissed *without prejudice*, and Plaintiff's Count IX –

26  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS is dismissed *with*

27  *prejudice*;

28

**THEREFORE**, Pepperdine and Plaintiff hereby stipulate and agree and respectfully request that the Court enter an order granting Plaintiff leave to file the attached **Exhibit A** as her Fourth Amended Complaint in this action.

**IT IS SO STIPULATED.**

DATED:  February 27, 2025

By:  /s/ Kira Howell
KIRA HOWELL
Plaintiff in Pro Per

DATED:  February 27, 2025        KAREN J. PAZZANI
PAZZANI & SANDHU LLP

By:  /s/ Karen J. Pazzani*
KAREN J. PAZZANI
Attorneys for Defendants
PEPPERDINE UNIVERSITY

*Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

PAZZANI & SANDHU LLP
700 N. CENTRAL AVENUE, SUITE 460
GLENDALE, CALIFORNIA 91203

EXHIBIT A

Kira Howell

Kira.howell8@yahoo.com

In Pro Per

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRA HOWELL | Case No.: 2:24-cv-06332-WLH-RAO |
| Plaintiff, | |
| vs. | **PLAINTIFF'S FOURTH AMENDED COMPLAINT** |
| PEPPERDINE UNIVERSITY; | **DEMAND FOR JURY TRIAL** |
| SHARON BEARD; JASON JARVIS | |
| Defendant | |

Plaintiff, Kira Howell, brings this suit to recover for federal statute violations and state law claims, as follows:

## JURISDICTION AND VENUE

1. Jurisdiction in this Court is asserted under the provisions of 28 U.S.C. §1331. This action arises under the provisions of Title IX of the Education Amendments of 1972. This Court has supplemental jurisdiction over the state claims asserted herein pursuant to 28 U.S.C. §1367.

2. Venue is appropriately laid in the Court pursuant to 28 U.S.C. §1391(b) in that the actions complained of took place in Malibu, which is within the bounds of the Central District, and Defendant carries on business within the Central District.

**PARTIES**

3.  Plaintiff, Kira Howell is a resident of ██████████████ California.

4.  On information and belief, Defendant Pepperdine University owns, operates, manages, directs, and controls Pepperdine Caruso School of Law, and which employs all of the persons named as non-parties herein.

5.  Jason Jarvis is sued in his individual and official capacity as Associate Dean for Academic Affairs.

6.  Sharon Beard is sued in her individual and official capacity as Dean of Students of Pepperdine University.

7.  At all times relevant to this action, the University acted through its employees as listed below.

**NON-PARTIES**

8.  Jim Gash ("Gash") was at all time President of Pepperdine University.

9.  Sharon Beard ("Beard") was at all relevant times the Dean of Students at Pepperdine University.

10. Jeffrey Baker ("Baker") was at all relevant times the Assistant Dean of Clinical Education at Pepperdine University.

11. Jay Brewster ("Brewster") was at all relevant times the Provost of Pepperdine University.

12. Chalak Richards ("Richards") was at all relevant times the Assistant Dean of Student Life at Pepperdine Caruso School of Law.

13. Jason Jarvis ("Jarvis") was at all relevant times the Associate Dean of Strategic Initiatives and Projects at Pepperdine University.

14. Tom Stipanowich ("Stipanowich") was at all relevant times the Chair in Dispute Resolution at Pepperdine University.

15. Barry McDonald ("McDonald") was at all relevant times the Professor of Law at Pepperdine Caruso School of Law.

16. Alexis Joyce ("Joyce") was at all relevant times the Director of Career Development Office at Pepperdine Caruso School of Law.

17. Suzanne Freyer ("Freyer") was at all relevant times the Assistant Director of Academic Excellence Professor at Pepperdine Caruso School of Law.

18. Stephanie Williams ("Williams") was at all relevant times the Assistant Professor at Pepperdine Caruso School of Law.

19. Connie Horton ("Horton") was at all relevant times the Dean of Student Affairs at Pepperdine University.

20. John Doe I ("Proctor") was at all relevant times a Proctor at Pepperdine University.

21. Arnold Barba ("Barba") was at all relevant times the Chief of Staff of Pepperdine Caruso School of Law.

22. Colleen Graffy ("Graffy") was at all relevant times a Professor at Pepperdine Caruso School of Law.

23. Ed Larsen ("Larsen") was at all relevant times a Professor at Pepperdine Caruso School of Law.

24. Doug Hurley ("Hurley") was at all relevant times an Associate Dean of Student Affairs at Pepperdine University.

25. Naomi Goodno ("Goodno") was at all relevant times an employee at Pepperdine University.

26. Jacob Charles ("Charles") was at all relevant times an Associate Professor at Pepperdine Caruso School of Law.

27. Peter Neumann ("Neumann") was as all times an Adjunct Professor at Pepperdine Caruso School of Law, Straus Institute for Dispute Resolution.

28. Jack Coe ("Coe") was at all times a Professor at Pepperdine Caruso School of Law, Straus Institute of Dispute Resolution.

29. Matthew Dunn ("Dunn") was at all relevant times an Investigator with Pepperdine University Department of Public Safety.

### FACTUAL ALLEGATIONS ON THE MERITS

30. Plaintiff is a law student at Pepperdine Caruso School of Law.

31. At Summer orientation, Richards made a derogatory, disparaging joke about Plaintiff being "still in school" at her age.

32. Title IX Office contacted Plaintiff via email offering support after a male student repeatedly acted sexually inappropriately towards her in and out of class and Plaintiff said "weird" in response to his continued behavior. Plaintiff agreed not to interact with this male student and just wanted to separate herself from him. Goodno later said publicly several times, "he is [weird]," causing Plaintiff extreme stress by coercing her into further interaction and involvement with the situation.

33. Student Blanche Doe grabbed her butt to emphasize it in front of several male students during Issues In Dispute Resolution class, including Jonathan Abraham, and, on information and belief, Noah Werksman and Michael Moss, and she made one other reference to her butt while making a presentation.

34. On July 20, 2023, during the first lecture of International Commercial Arbitration, Coe kicked at Plaintiff's back side towards a group of male students as her back was to him and when she saw him, he subsequently got angry and embarrassed and gave middle fingers with both hands, witnessed by the entire class, including students Jacob Yadegar and Jonathan Abraham.

35. During the International Commercial Arbitration course, Neumann made repeated licking gestures directed at Plaintiff during class.

36. After Plaintiff and other students were heard mentioning sexual harassment, Neumann stood by Plaintiff and passed gas loudly, paused and stared at her while smiling.

37. Student Alicia Percell approached Plaintiff as they were leaving class and asked her to go out to dinner. Plaintiff thanked her for the offer but declined.

**Orientation Week**

38. During Orientation week, August 14-18, 2023, Gash made a gun with his hand and "shot" it at an unidentified female student sitting in the auditorium.

39. Gash looked directly at Plaintiff during his speech, once while making a comment about being "a little gassy."

40. During Orientation week, several non-parties and faculty introduced themselves at the podium to the entire 180 students of the Class of 2026.

41. While speaking at the podium, Goodno and Graffy made homophobic gestures at Plaintiff and then made guns with their hands.

42. Stipanowich stood at the podium to introduce himself, looked at Plaintiff, kicked, laughed, and said, "how about this gay?"

43. Jarvis sat near Plaintiff after an orientation session and said he would contact the Bar if she recorded lectures without permission.

44. Joyce approached and sat down at Plaintiff's Orientation table during the week of August 14-18, 2023.

45. Joyce addressed Plaintiff and other students, including Conor Fairtlough, Ian Kitts, unidentified blonde female student in Section B, and an unidentified Asian female student, and said she was sent to replace the group's Mentor, Professor Shelly Saxer, who was unavailable to have lunch that day.

46. Joyce introduced herself as Director of CDO, and after speaking informally about her role, she fielded questions.

47. Plaintiff asked her about the importance and availability of internships at a District Attorney's office if a student was in the Accelerated Program and Plaintiff spoke about the level of difficulty entering Los Angeles County District Attorney's Office as a new graduate, and Joyce and Plaintiff engaged in conversation back and forth for several minutes.

48. After Plaintiff finished asking questions and speaking, Joyce looked at her as Plaintiff checked email on her phone, pointed at her and said, "that's weird."

49. Plaintiff then received multiple homophobic comments and gestures, on belief, presuming Plaintiff's sexual orientation from Ian Kitts and other unidentified students sitting nearby.

50. During a Section B lecture led by Richards, Richards stood in front of Plaintiff and screamed at her and jumped at her as if threatening her, and a male student immediately told her "no" by shaking his head, and began talking to Plaintiff about being Armenian.

**Defendant's Sex-Based Discrimination**

51. On July 6, 2023, Snyder stood outside classroom where Plaintiff sat reading and her and an unidentified male said loudly, "I know."

52. At the end of a class session that week, Plaintiff smiled and said goodbye to Snyder and she refused to speak to Plaintiff.

53. Snyder made a homophobic gesture at student Alicia Percell and then nodded her head as if to assert Ms. Percell's sexual orientation, and Ms. Percell looked uncomfortable and, on belief, she did not respond.

54. After CDO Assistant Director Rachel Levine glared at Plaintiff and kicked repeatedly, and Joyce singled Plaintiff out during a Professional Formation lecture, Plaintiff sent an email to Joyce telling her to refrain from further disparaging comments and removing consent from Joyce over any aspect of Plaintiff's professional life.

55. Minutes after Plaintiff sent Joyce the email, an unidentified woman stood outside her classroom and angrily yelled, "butt."

56. In August 2023, student Elias Guananu stood behind Plaintiff as she waited to sign the Professional Formation attendance sheet, and kicked at her towards Freyer, who then kicked at Plaintiff from two feet away.

57. On August 24, 2023, Mr. Guananu stood behind Plaintiff's seat during Legal Research and Writing (LRW) class, looked at Williams, kicked at Plaintiff while making a homophobic gesture.

58. Williams looked at Mr. Guananu and laughed, never telling him to stop.

59. During the same class, Williams told a joke while looking at the clock, then at Plaintiff, and saying sarcastically to the class, "and [this] starts right at 40."

60. Williams told a joke about the size of Plaintiff's rear end as Plaintiff was turning to walk away from her in front of the class by saying, "and we don't know what that is."

61. Student Kyle Gillick then stared at and referenced Plaintiff's butt on two occasions, once shortly after Williams' joke and once in January 2024 when he laughed and said, "it's huge," as if to indicate someone told him about Stipanowich's sexual harassment.

62. Mr. Guananu then made disparaging jokes about Plaintiff being old to the entire class in subsequent sessions as a means to prevent her from speaking in class.

63. During a Professional Formation class in September 2023, Freyer made a homophobic gesture at Plaintiff as she sat in her seat and then made a gun with her hand.

64. Student Bryan Weitzman immediately jumped out of his seat laughing.

65. In a subsequent class, Plaintiff said, "so you can feel free to shoot me if I'm gay…[I do have a problem with that]" while stating her fear and opposition to this discriminatory threat, and Barba acknowledged the incident with Freyer and Mr. Weitzman by pointing at him.

66. Williams looked directly at Plaintiff during LRW class in October 2023 and said disparagingly, "you don't know the law" and "[you aren't doing a good job]" even though no means of assessment had been made, and these disparaging comments were followed up with praise and references to another female student being marriage material and "beautiful."

67. Williams then later called another minority female student "ugly" by indicating student Kyle Gillick would not find her attractive.

68. Williams inserted the word "ugly" while staring at Plaintiff, including one occasion in November 2023 where Williams looked at student Kyle Gillick and said, "so ugly," as if to ask him to call someone in class ugly, to which Mr. Gillick looked at the class and said, "ha!"

69. In January 2024, Williams said to the entire LRW class, "so this is really pretty" and then looked at Plaintiff and said, "cute" while shrugging her shoulders, one or two days after Professor Larsen did something similar to Plaintiff and student Taylor Hitchan in Property class a few days earlier.

70. During Professor Larsen's class, an unidentified female student, stood in front of Larsen and made a homophobic gesture with her hand, and he stared at her but did not say anything.

71. Throughout the Fall semester, Baker participated in four acts of discrimination against Plaintiff, including once in October 2023 when he walked into the law school by walking past a large group of students seated outside the café, he saw Plaintiff standing at the door and gave her a dirty look while watching the students follow his actions.

72. As soon as he entered the school, Baker then began to go back outside while making a face and mumbling to himself as if he felt bad for ostracizing and mistreating Plaintiff, but then saw her and changed his mind.

73. Baker once shunned Plaintiff as he saw her in the hallway, refusing to smile back at her while running towards a group of male students and laughing and joking with them.

74. Baker refused to say hello or smile at Plaintiff as they passed each other in the hallway weeks later in October 2023.

75. Baker stood outside his office as Plaintiff was walking at the other end of the hallway and he stared at her and made a homophobic gesture.

**Serial Illegal Book Defacements and Stalking**

76. During successive Monday morning announcement sessions, Richards made homophobic gestures at Plaintiff in front of the class and made one comment "we'll guess what you are" while making discriminatory homophobic gestures at her.

77. In September 2023, an unidentified male approached Plaintiff's car as she sat in it across from the law school, he pressed his face against the window of the rear

driver's side seat, looked inside, saw Plaintiff sitting in the driver's seat, got angry, and ran away shaking his arms as if to say leave him alone or get off his back.

78. Later, the same man appeared outside Plaintiff's class as she went to the bathroom, and he was seen on two other occasions walking around campus staring at her, and three of the four times Plaintiff saw him, he was coming from or heading to faculty housing.

79. On August 29, 2023, Plaintiff reported to Department of Public Safety's Dunn that Stipanowich had harassed her and publicly chastised her for covering up her rear end as she walked out of the classroom. She also reported student Bryan Weitzman to appear to make a gun with his hand and "shoot" it at her head during a Contracts class, but that his hand was in her periphery, she did not know if he made a gun or if he just appeared to, and she blamed Stipanowich more than Weitzman because she felt he was just doing what the podium wanted. DPS report states they felt it was more properly handled via a grievance and not through them. Plaintiff was never apprised of the grievance procedure.

80. On September 14, 2023, Plaintiff saw her new Criminal Law book was defaced when she turned to page 236 and saw all of the answers were filled in.

81. Plaintiff reported the illegal defacement to Richards via email and stated she wasn't sure if it was someone at the school or her landlady, the only other person who had access to her property.

82. On September 26, 2023, Plaintiff saw her book was defaced again and in another color ink on page 329. Plaintiff emailed Richards to report it and emailed Joyce

to remove consent from her having access to Plaintiff's professional life and to tell her to stop making discriminatory comments about her publicly. KH000118-25. 000008-11.

83. Plaintiff reported the defacement to Graffy, Richards, and Jarvis.

84. Plaintiff told Williams she was unmarried and voiced opposition and offense to being defamed about her sexuality but being morally opposed to homophobia.

85. Williams stated Plaintiff seemed friendly with a "50-year-old man" during a fire drill.

86. During a meeting with Jarvis and Richards on October 17, 2023, Plaintiff reported that she was being inundated with violent homophobia, stating this was the apparent cause of the defacements, and Jarvis immediately rolled his eyes and got frustrated.

87. During the meeting, Richards focused on Plaintiff not being able to prove stalking, to which Plaintiff replied, "this is a strict liability misdemeanor" which doesn't require proof of intent.

88. On October 21, 2023, Britney Summerville-Brannon emailed Plaitniff to offer Title IX protection and support. 000012.

89. Plaintiff saw her book was defaced on a third page, 899-900, in the weeks after the meeting with Richards and Jarvis.

90. Richards asked Plaintiff about her email telling Joyce to leave her alone, and Plaintiff said she had handled it to advocate for herself, she thought Joyce appeared friendly to her during a Professional Formation lecture and that her

actions did not seem discriminatory at that time, and Richards insisted on a reconciliation in which she was present, a meeting Plaintiff said she would do "if" Richards really wanted to.

91. On February 24, 2024, Graffy confirmed via email that she had met or conferred with Plaintiff numerous times about the serial book defacements, Plaintiff reported the defacements were "creepy" and seemed to show a pattern of stalking and she feared her safety, and both Plaintiff and Graffy had expressed prolonged concern for Plaintiff's safety.

**Stipanowich's Contracts Class**

92. In September 2023, Stipanowich looked at Plaintiff while she sat in her seat and said, "[then you] come to my office and [I will tell you]" after saying something to the class about how to do well on his final exam.

93. Stipanowich told a joke about "eating at Cougars" before pausing, laughing, looking at Plaintiff, and then looking around the room to elicit laughter.

94. Stipanowich made numerous, repeated unwanted comments about Plaintiff's rear end, including saying the word, "butt" as soon as Plaintiff and student Jonny Yadegar began sharing a book, saying "butt" as Plaintiff walked out of the classroom to use the restroom, saying "it's huge" while laughing, and laughing and saying, "because you don't have one" on another day as Plaintiff took her seat after turning around while standing and after staring at her.

95. On one occasion, a male student told Stipanowich to stop, and Stipanowich gave him an angry look and chastised him. On information and belief, no male student

ever stood up for a female in the face of sexual harassment again, even though more than one repeatedly mentioned his harmful, unwanted acts.

96. Stipanowich looked at Plaintiff before making sexual licking gestures with his lips and mouth in the same exact manner Neumann sexually harassed Plaintiff a month earlier towards a female student sitting one row in front of Plaintiff and to her left.

97. Plaintiff feared sexual assault of women, looked scared and opposed of Stipanowich's actions, and Stipanowich got angry.

98. In the next class, a male student sat in the female's assigned seat, Stipanowich paused and stared but did not say anything.

99. In October 2023, Stipanowich stood in front of the class and angrily made a homophobic gesture at Plaintiff.

100.    In November 2023, Stipanowich stood in front of student Grace Brandt and made the same licking gestures at her.

101.    Ms. Brandt began sniffling to indicate, on belief, she was hurt and she, too, did not want the gestures.

102.    In November 2023, Stipanowich made a hand gesture by holding his hands up parallel to each other as if to indicate size while smirking, as a female student walked to her seat.

103.    Student Jonny Yadegar indicated to Plaintiff that this was a joke about her butt between male students and Stipanowich.

104.    In November 2023, Stipanowich used sexual innuendo while lecturing when he paused, inserted the phrase, "erection of a building," as he pulled a chair in

front of his groin and held his hand there while smirking and looked at Plaintiff directly.

105.  Mr. Weitzman began laughing and the class understood Stipanowich was again using sexual innuendo to accost students.

106.  Plaintiff opposed his harassment by shaking her head no repeatedly.

107.  Stipanowich then made a comment to Plaintiff about his disdain for her opposition to his repeated sexual innuendo and overt comments, including saying towards Grace Brandt and the class, "I like that" as if to make Plaintiff seem like a bad person for opposing his sex-based harassment.

108.  Stipanowich then said to Grace Brandt, "yes, okay" while smirking, as if to tell Ms. Brandt he was attracted to her.

109.  On a subsequent day, Grace Brandt walked into class through the Atrium and told someone loudly, "I'm a slut," then stopped talking and looked down at the ground when she saw Plaintiff.

110.  During a Professional Formation lecture where Stipanowich was a guest speaker, he stared at a female student's butt as she stood in front of him at the podium, the video was first minimized as picture-in-picture on Courses and the video was then edited to remove this portion of the lecture.

111.   Plaintiff spoke in Contracts class 1-2 times for approximately 1 minute throughout the entire Fall 2023 semester.

112.  Stipanowich stated in class that he knew Plaintiff was not gay by saying while looking at her, "you know, [she's] not."

**Goodno's Civil Procedure Class**

113.   At the beginning of Civil Procedure class in September 2023, Goodno stood in front of Plaintiff's seat from the bottom of the auditorium and said, "[and] Kira, you know . . . you have [a disease]..."

114.   Plaintiff responded that Goodno was lying and this was a violation.

115.   Over the next few days to weeks, Goodno made at least three more references directed at Plaintiff about "lying," as if to place Plaintiff in a position of fear for repeatedly asserting herself in class and to allude to the class that her false statement was true.

116.   On information and belief as to identity, male student Caden Cutter walked deliberately in front of Plaintiff's seat and made a homophobic hand gesture at her.

117.   As Plaintiff left the classroom, an unidentified male student said, "sick" as she walked by.

116.   During class, Goodno said to the class and towards student Grace Brandt, "[so] I *know*," as if to further propagate the lie she told.

117.   At the beginning of a lecture on October 6, 2023, Plaintiff walked down to the podium to tell Goodno she thought she made a mistake on the assignment she had just turned in.

118.   As Plaintiff was turning to walk back to her seat, Goodno looked at the top of her head, stared for a second, then said, "yup, and those gray hairs. [Good luck getting hired somewhere]."

119.   Grace Brandt began following Plaintiff around campus and intimidating her through heckles, screams, and unwanted comments about Plaintiff's butt prior

to a final exam, and on February 2, 2024, during their Property midterm exam, she told a harassing, discriminatory and disparaging joke about Plaintiff's age and Plaintiff being "her mother" and then said, "because I *know*" as Plaintiff sat silently in her seat preparing to take the exam.

120. During class in October 2023, while the class was answering questions on iClicker through our phones, Plaintiff could not see the question or answer it on her phone.

121. Plaintiff expressed desire to participate in class by saying she did not have access to the question, and Goodno began laughing and pretended to be controlling Plaintiff's access from her computer.

122. Goodno continued to laugh at Plaintiff, playing on her computer and showing she was controlling answers from her computer.

123. Student Michelle Yao began smirking and laughing at Plaintiff as Goodno made fun of her.

124. In November 2023, student Conor Fairtlough turned towards Plaintiff and several female students during class and said, "blood" to which Stipanowich stopped, looked at him, and responded.

125. On November 9, 2023, Goodno hosted a lunch lecture and as Plaintiff was cleaning the Subway food trays off her desk, Goodno laughed, hugged a female student and was extremely kind to her before giving Plaintiff dirty looks and saying, "oh, you don't have to clean that...," in an exaggerated manner and as if she was holding back the rest of the comment.

126. Throughout the semester, Goodno made several dirty looks, including smirking at Plaintiff or calling her "weird" without cause and while Plaintiff was seated in the back row, and Caden Cutter, on information and belief as to identity, walked to Plaintiff at her seat, stared down at Goodno, indicated he knew she was referencing her and he indicated it was about sexual orientation.

127. In class on November 28, 2023, student Caden Cutter, on information and belief as to identity, made a statement to Goodno about her statement about Plaintiff having a disease months earlier.

128. Goodno stopped and appeared nervous, not responding except to say, "uhh" and nod her head "yes" as if convicted.

129. Goodno never said her statement was retracted or untrue even when Plaintiff was being harassed and humiliated by other students.

130. Goodno made a comment during lecture where she paused, stared up at Plaintiff in her seat, and said repeatedly, "they're just so old, so old."

131. Goodno gave an untrue, biased written statement to Pepperdine University which said Plaintiff used an "unprofessional tone" and said, "I pay for this and you have to answer me," when Plaintiff actually said, "This is what I'm going to be doing for a living" and "I care about [doing a good job]."

132. Unidentified male student who taunted Plaintiff about being "sick" then stood by her seat and gave Goodno a look as if he would "handle" Plaintiff and students were following faculty lead.

133. Plaintiff spoke 2-3 times for approximately 5 minutes total throughout the entire Fall 2023 semester.

**McDonald's Constitutional Structure Class**

134.   McDonald was the Professor for a Constitutional Structure class during the Spring 2024 semester.

135.   Plaintiff was a student in McDonald's class during the Spring 2024 semester.

136.   The normal practice at Pepperdine Caruso School of Law is to video record all lectures and make them available on Courses, the school's internal website.

137.   Defendant refused to record his lectures and prohibited students from using their own devices to record them.

138.   On January 9, 2024, McDonald stared at Plaintiff on and off for approximately five minutes prior to beginning the first lecture class.

139.   During the first class, McDonald stood in front of a group of male students, including Conor Fairtlough, Jonny Yadegar, Jacob Yadegar, on information and belief Caden Cutter, William Steele, and several others easily identified from the assigned seating chart for the class.

140.   While McDonald stood in front of these male students, he grabbed the skin under his neck and said, "this used to be looser."

141.   Student Conor Fairtlough smirked and began laughing.

142.   McDonald then laughed minutes later and joked to the same group of male students, "so she's old" while looking at Plaintiff, and then minutes after that stopped mid-sentence to stare at Plaintiff again and ask if she was okay.

143.   In late January 2024, McDonald made a middle finger with his right hand while pausing to look at Plaintiff as she sat in her seat adjusting her top.

144.   In a subsequent Constitutional Structure class, Ms. Aswani looked back towards Plaintiff and shook her head "no" as class was beginning.

145.   McDonald then got upset at Ms. Aswani and a female student to her left easily identified by the assigned seating chart, whom he thought were making fun of him, and he looked at Plaintiff, shook his head "no" while making a motion with his hand as if to say, "no, no, I'll take care of it."

146.   Plaintiff then shook her head no and made a gesture to indicate he was mistaken about the female students.

147.   On belief, McDonald refused to accept this as a mistake, and made another middle finger as he was writing on the board.

148.   In the next class, McDonald said to the entire class, "I like that."

149.   Charles repeated this phrase, "I like that" before pausing and looking to the class during his Torts class the next day.

150.   McDonald was seen outside Plaintiff's other classes, staring at her for prolonged periods each time, on three occasions, once signaling her to stop and talk with him, telling her to come by his office and saying he was disappointed she didn't stay after class to speak with him privately, and another time where he stared at her as she pretended to look for someone else as she walked by him.

151.   McDonald stared at Plaintiff repeatedly in multiple classes, and as she took notes on a case, he looked at her and said, "tsk" as if to say pay more attention to him while other students actively took notes.

152. Plaintiff wrote on a piece of paper, "are you obsessed with me?" and showed it to Michelle Yao after McDonald repeatedly stopped class to stare at her and after McDonald made the exact same licking gestures at Plaintiff that Neumann and Stipanowich made, prompting Plaintiff to oppose his actions while students watched.

153. On February 6, 2024, McDonald shook his hand at Plaintiff as if wagging his finger at her and called her a name as she walked out of class.

154. Student Marcello Jones said, "[you have] pretty eyes" to Plaintiff as soon as they got in the hallway, after saying loudly in Property class on January 8, 2024 to Dean Al Sturgeon, "I'll never go against you [all] again."

155. Plaintiff wrote an email to McDonald telling him to stop making disparaging comments about her in class or she would call the police.

156. Within hours, Plaintiff received an email stating she had been restricted from her classes.

157. On February 13, 2023, Plaintiff emailed Provost Jay Brewster and stated the restriction letter contained "no facts. There [was] not a single fact I can answer to."

158. On February 14, 2024, Brewster's response stated no such facts or reason fro restricted Plaintiff and instead merely stated the school needed to investigate the matter.

159. Plaintiff wrote a written response to the school that McDonald was "extremely aggressive towards me on day one" and he "then told a cruel joke about me to a group of male students about me being old or ugly."

160. McDonald wrote an email response to Beard stating, "the bit about a cruel joke is patently false. I have no idea what she is talking about."

161. McDonald's words, "so she's old" while laughing and after saying, "this used to be looser" are overt acts done, in part, directly to Plaintiff as she sat silently in her seat and while male students smirked.

162. McDonald's actions, circling back around to Plaintiff again minutes later, pausing class to indicate he wanted to see if she was okay, are overt acts made towards a passive student who wanted to be left alone.

163. McDonald stated, about his words and actions, "I certainly never told her I liked her" and "I have no idea what she's talking about re 'middle finger.'"

**Discipline For Reporting Title IX Violations**

164. On February 6, 2024, Plaintiff sent an email telling McDonald to refrain from making disparaging, discriminatory comments about her in class.

165. Hours later on February 7, 2024, Plaintiff received a letter from Horton stating that she had restricted Plaintiff from classes, was initiating an investigation, and Plaintiff needed to appear at a hearing once information was known.

166. Plaintiff wrote a letter to Brewster stating her opposition to this action, and stating she is a professional woman, she did not know why this happened, and she did not do anything wrong, to which Brewster replied the restriction was due to "public disruptive behavior" on February 14, 2024.

167. While on a telephone conversation on February 23, 2024, Horton said in response to Plaintiff's complaint of being given a middle finger in class, that she didn't believe any faculty at Pepperdine would ever do something like that.

168. Beard immediately agreed by saying she takes dishonesty "very seriously," and implied she was certain Plaintiff was not being truthful.

169. Plaintiff said she didn't do anything wrong and didn't understand why she was being restricted, to which Horton said, "[umm, well,] I don't know, Kira, something's been going on with you," and neither Beard nor Horton could give a single example of something disruptive or otherwise that Plaintiff did to warrant their actions.

170. Beard then cited McDonald's comments and Plaintiff stated repeatedly that she was reporting his discrimination.

171. Beard stated in email on February 24, 2024, that she wanted Plaintiff to be "aware" that Defendant University was calling named faculty as witnesses, and she reiterated orally that she would determine whether or not they appeared at the hearing.

172. On February 26, 2024, Plaintiff was asked to give an opening statement, and she began speaking by saying she alone uses the term "V100" because she used that list when applying to and researching law firms, and that Goodno's comments about her age were more specific.

173. Plaintiff then stated that Goodno made a derogatory comment while Plaintiff was wearing a tweed skirt and orange sweater, and after she approached

23          FOURTH AMENDED COMPLAINT

Goodno at the podium about her homework assignment, Goodno looked at her head and said, "yup. And that gray hair. [Good luck getting hired.]"

174. Plaintiff stated to Defendant, Beard, and Baker at the start of the hearing, "you mentioned that [everyone involved] was going to be present [for cross-

examination]" and then asked when that would occur.

175. Beard responded by saying, "the [voting committee members determined] that was not necessary" and she was disallowing their appearance, even after Plaintiff stated multiple times both orally and in writing that she wanted them present and their cross-examination was critical to fact-finding.

176. McDonald wrote a defamatory false statement, "they also indicated to me that she is delusional" while denying he made factual statements to the entire class about Plaintiff, and when Plaintiff asked about this during the hearing, Beard denied her an answer or due process to cross-examine McDonald.

177. When Plaintiff began reporting McDonald's repeated incidences of staring at her outside her other classes in such a pronounced manner as to force Plaintiff to pretend to be looking for someone else as she walked by him, Beard and Baker intimidated her with angry stares and gestures.

178. Ms. Brandt followed Plaintiff around campus on multiple occasions, including once where she screamed at Plaintiff as she walked into the law school, once when making unwanted comments about Plaintiff's butt before a final exam, once when she harassed and intimidated her during a Property midterm by calling her old and saying, "because I know," once appearing at Plaintiff's

LRW class while Williams said, "so she's [entitled] to stalk [and harass] you", and then Ms. Brandt made a false statement when she said in regards to Plaintiff's behavior, "the entire class quite literally reacts" and there are "groans, exasperated sighs, many wide-eyed stares" and "[she] has given me so much anxiety" in an email to Beard, when in fact she was the instigator and aggressor each time, and Plaintiff has never interacted with her.

**Pervasive Discrimination, Hate, and Defamation From Jason Jarvis**

179. Plaintiff adopts and incorporates all aforementioned and other paragraphs set forth herein.

180. At Summer Orientation, Richards met Plaintiff for the first time after offering her a diversity scholarship. She showed resentment at Plaintiff's mixed race, and this carried on for months. Richards then began antagonizing Plaintiff publicly, including making a statement, "so we'll guess what you are" and using threatening postures and tone of voice when publicly addressing her. Richards began making the same hand gestures at her each time she addressed the class. Plaintiff emailed Richards to ask about getting professional headshots taken and about an article she was writing. Every single time Plaintiff showed ambition or zeal appropriate for her age and experience, Richards responded in front of Jarvis with condescension and a desire to reframe Plaintiff's independence as weakness or fault. Richards used Moss's request for counseling as the basis for contacting Nivla Fitzpatrick, who then immediately contacted Beard and said they should seek to punish Plaintiff's

behavior and coerce a diagnosis out of *her*. None of this aligns with the facts or with Plaintiff's lived experiences on campus. And no one ever discussed this with Plaintiff. Moss sought counseling and admitted he was too unstable to attend school, and Richards and Jarvis reframed this as something bad about Plaintiff, a laser-focused professional woman with tunnel vision for success in a niche field.

181.   During Summer 2023 term, Plaintiff had several courses with male student Michael Moss. Moss sat behind Plaintiff during their first class together and made "tsk" noises at her as she sat in her seat and then began making the same hand gesture at her or while standing near her daily. Moss repeatedly appeared emotionally distressed, dejected, arrogant, and showed an unwillingness to respect Plaintiff's boundaries when he ogled her rear end (causing a faculty member to admonish him by saying, "whoa!"), made private pressured comments about sex, and fomenting animus towards minorities. Moss would follow Plaintiff to her car at night and court her if she didn't show interest in him, and he drove to the bottom of the hill and pulled to the side of the road until Plaintiff drove past him . . .ten minutes later.

182.   Moss made false statements and omitted statements he made to Plaintiff – likely because he was mitigating the word "weird" and his own social advances. For example, Moss stated in class one day he saw numerous people were stepping on snails outside. Plaintiff didn't believe it until she saw twenty smooshed snails on the walkway from the parking lot the next day. Moss then entered the classroom while Plaintiff was talking with another student about

GW Bush and he acted like he was left out and hurt. Plaintiff tried to include him and sent him an email about how troubling the snailicide was and telling him to watch a documentary on Bush she thought was great. KH000115-17.

183. Moss then proactively told Jarvis he only said there were some snails outside (not that someone had killed them), said he didn't understand the friendly emails Plaintiff sent, and then lied and said Plaintiff accused a faculty member of sexual noises and he called it "crazy." It was Moss who was preoccupied with sex, not another male faculty. Plaintiff said "weird" in class as he was staring at a woman's rear end in a pressured way and he got convicted in his own mind. Jarvis is then on the record saying Moss was "credible" and he began a campaign of hate against Plaintiff behind her back.

184. Moss would often look sad and dejected in front of female faculty Betty Snyder and Stephanie Blondell, prompting Snyder to tell Plaintiff to go easy on him since he was fragile and "going through" some stuff. Moss would pick fights with minorities while looking rejected and sad towards white female faculty and seeking solace and protection from other males.

185. Disclosed documents indicate Moss and Jarvis said there was some nebulous brief interaction between Plaintiff and Moss. There are no other details, no facts, and no one ever confronted or asked Plaintiff about this. It is not memorable to Plaintiff and she never mistreated Moss. Moss told several lies to the school about his interactions with Plaintiff and she was never notified about it. He would stare at Plaintiff in bizarre ways during class, had

27        FOURTH AMENDED COMPLAINT

pronounced reactions to her body, and was socially tone deaf towards her and other women.

186. In Snyder's class, we were asked to write an essay after purposely watching a violent or morally reprehensible video. Plaintiff searched "violent disturbing video" and things similar on YouTube. After trying to write about a human rights crisis in South America and about Mengele, and having writer's block and an inability to watch the entire videos, Plaintiff watched a short video of a rumored gay man in the Middle East being taunted and then murdered in the town square, akin to a lynching. Plaintiff believes the original video aired on PBS or on CNN International. Plaintiff watched the video because it appeared on the results after a generic search and because it was only a few minutes long. Shortly thereafter, Snyder made this gesture at a female student in class.

187. During a discussion in class where Plaintiff expressed how difficult it was to get through the assignment, a male student said he could sympathize with Mengele and understood why Mengele did what he did. Moss called Plaintiff a wannabe Jew in an indirect way for denouncing Mengele as a monster. Plaintiff grew up in a single parent home and a close family friend who helped raise her is a Jewish woman. She has contemplated converting to Judaism multiple times throughout her life. Plaintiff's father was a career Intelligence Officer in the U.S. Army and Defense Intelligence Agency, and his expertise

was on Southeast Asia, World War II, and the Cold War.  Our nation invests billions of dollars to research, analyze, contemplate, and defend against the next World War, the next despot, and terrorism. It is irresponsible not to denounce Mengele at all times and it is never done childishly. It is also irresponsible not to denounce violence or hate of any sort, especially when it is escalating. Nonetheless, it was another student who brought up Mengele.

188. Jarvis is privy to the anonymous course evaluations, as is Dean of Straus Sukhsimranjit Singh. Singh singled Plaintiff out during Fall orientation angrily, and she began to field constant anger about being sympathetic to LGBT+ people. It was said overtly at least once that it is impolite. A white female saw Singh mistreat Plaintiff during orientation and she yelled across the room angrily, "nice to meet you" as if to say it wasn't.

189. Jarvis ignored Moss's slightly goading, petulant demeanor and began focusing on hating Plaintiff for reporting sex-based harassment or for even existing.

190. In a document disclosed by the University, a university official states Moss and Plaintiff attended a Cross Cultural Conflict & Dispute Resolution class. Plaintiff never took this class. And Moss's statement included nonsensical interactions with Plaintiff that were never asked of her and are not memorable to her at all.

191. On July 19, 2023, Title IX emailed Plaintiff to offer to investigate and provide support. PEP000671. This fact seems to have enraged Jarvis and was the

springboard for all downstream actions. After Title IX offered support, numerous faculty made public references to Moss, saying the word "weird" over and over. Moss began kicking at the ground and air in class once, and faculty began kicking constantly as well. During Orientation Week, Moss walked in front of Plaintiff's car as she parked and angrily grabbed his butt at her. Inside the building on another day, he turned around to see Plaintiff and said, "I can smell you" to Plaintiff. Plaintiff felt coerced and thought she was doing the right thing by not airing out these details in previous complaints. She had no idea Jarvis used Moss's private statements to him as a catalyst to defame, discriminate, and attack her. Jarvis immediately began showing adamant, obsessive desire to blame Plaintiff for anything related to men, including stating in an email that she made "reactive" claims in order to discredit her. Plaintiff's statements were made without ever knowing what he had said, and she did not know she was being attacked, so they were not reactive at all. In fact, she showed extreme care not to harm Moss and sought only to remove herself from the situation. Jarvis began raging in emails ahead of ever investigating or even speaking to Plaintiff. The record shows he obsessed over and relied on this brief incident with Moss for months, using it to bolster defamatory statements and gossip about Plaintiff to the University.

192. Jarvis does not act as a neutral authority, as a Dean, but rather his emails all show a hateful, irresponsible, propagandist with no regard for the truth or facts. The tone of his emails are all completely off from the reality of Plaintiff's brief interactions with him.

193.  Jarvis was seen during Orientation Week kicking at two female students as they nodded their heads and sat in their seats. The tone of male faculty on campus became profoundly misogynist, with kicking and chastising of women and a forced focus on women being bad or the purveyors of male debauchery.

194.  On November 5, 2023, Plaintiff told Stacey Nelson, Senior Director of Faculty Support, that Endrew Amana, a proctor, was rude and harsh with students during a Criminal Law midterm exam. Nelson's reply stated her understanding this was "feedback" and offered an explanation for his unprofessional behavior, along with a statement, "[t]his certainly does not excuse any behavior you or your classmates felt was inappropriate or unprofessional." KH000200. Richards then told Plaintiff Title IX was initiating support. After Jarvis was apprised, the entire tone of the situation changed, and the focus became on punishing Plaintiff and using Title IX as the office to punish women who report anything about a man. This incident is shielded from punitive action as protected activity, and it was over and properly handled by Nelson.

## COUNT I – TITLE IX RETALIATION - FOR REPORTING SEX-BASED DISCRIMINATION FROM MCDONALD

195.  Plaintiff adopts and incorporates all other paragraphs set forth herein.

196.  34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

197.  Title IX prohibits schools making a presumption that complainant is lying.

198. Plaintiff engaged in protected opposition to Title IX discrimination when she directly told McDonald to stop making disparaging, discriminatory comments about her in class, including saying, "this used to be looser" and "so she's old," and to leave her alone after making repeated licking gestures, causing her to write "are you obsessed with me" as he was doing so, and she reported McDonald's actions to Gash and Defendant, and Plaintiff reported to Defendant that Goodno made derogatory, discriminatory comment about her appearance, age, and sex, including saying "so old, so old," and "yup, and those gray hairs. [Good luck getting hired]."

199. Plaintiff's exercise of her protected rights to assert herself and say "no" and "stop" directly to McDonald was known to McDonald, as he was the recipient of the email, as well as Defendant, Jarvis, Beard, Gash, Hurley, and Baker when they were respectively apprised, and Plaintiff directly reported Goodno's discrimination to Defendant.

200. Plaintiff was subjected to an adverse action subsequent to this protected activity when she was denied equal access to education by being restricted from classes by Horton, an authority who predetermined McDonald did not give Plaintiff a middle finger because she "[doesn't believe any employee of Pepperdine would do such a thing]," and was sanctioned by Defendant for telling McDonald to stop harassment. including waiting outside her classes and staring at her on multiple occasions, saying, "this used to be looser" and "so she's old," and repeatedly staring at her during class, prompting Plaintiff to write "are you obsessed with me" on a piece of paper, as well as being

sanctioned for participating in a protected activity via punitive actions beginning 24-hours after Plaintiff opposed the discrimination, showing temporal proximity proving retaliation, and without due process, including denial of cross-examination, evaluation of cited evidence, or calling of witnesses.

201. Plaintiff stated in a February 14, 2024 email to Brewster that the restriction "contained no facts. There were no facts Plaintiff could respond to."

202. In Brewster's February 15, 2024 response, he stated no facts and instead stated there needed to be an investigation to find cause for this adverse action.

203. Plaintiff was subjected to adverse action subsequent to protected activity when Plaintiff opposed McDonald's discrimination, reported his actions, and then Beard used Ms. Brandt's false statements and omissions as cause for sanctions for actions in which there was no charge, no Plaintiff, no Defendant, no details, no investigation, and no due process, to include no opportunity to cross-examine or question Ms. Brandt or Larsen and while using the same facts reported to Defendant as sex-based discrimination in violation of Title IX and proving temporal proximity supporting retaliation.

204. There is direct evidence of retaliation and a causal connection between the protected activity and the adverse action because Horton and Defendant restricted Plaintiff from classes one day after she opposed discrimination, denying her equal access to education, because she reported and opposed McDonald's harassment, Horton and Beard could not offer a single example

of something Plaintiff did wrong during a phone conversation, Beard and Defendant could not and did not cite any incident committed by Plaintiff to prove probable cause to remove her from classes because of "disruptive public behavior" in the sanctions, and Beard ultimately sanctioned Plaintiff for exercising her protected Title IX rights and without proper due process as required by §106.44.

205. There is a causal connection between the protected activity and the adverse action when Beard materially altered statements about "V100 firm[s]," excluded her statements and facts about "gray hairs," and punished Plaintiff using the same facts reported as discrimination by Goodno.

206. There is direct evidence of retaliation because during all proceedings Title IX was not permitted to be apprised or present, Plaintiff was being punished for engaging in protected activities, and Plaintiff was not allowed to question or cross-examine parties, as required by Title IX, see evidence cited by Beard, an authority who unlawfully predetermined no faculty would ever do such things, or call witnesses from the school, a requirement of both Title IX and school policy.

## COUNT II – TITLE IX RETALIATION – FOR OPPOSING AND REPORTING SEX-BASED DISCRIMINATION FROM JOYCE

207. Plaintiff adopts and all other paragraphs set forth herein.

208. Title IX prohibits retaliation against anyone participating in protected opposition of sex-based discrimination.

209. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

210. Plaintiff engaged in protected opposition to Title IX discrimination when she directly told Joyce to cease making disparaging public comments about her, Plaintiff removed consent from Joyce over any decisions and access to her professional life, and Plaintiff reported Joyce's actions to Richards and Jarvis.

211. Plaintiff's exercise of her protected rights was known to Joyce because she was the recipient of the email, and it was known to University, Richards, Jarvis, Gash, Beard, Hurley, and Baker when they were respectively apprised of the email and Plaintiff subsequently reported the discrimination to them on multiple occasions, including at a meeting with Richards and Jarvis, and meetings and hearings with Defendant.

212. Plaintiff was subjected to an adverse action subsequent to protected activity when Defendant and Beard sanctioned Plaintiff using the same reported sex-based discrimination as the basis, and, additionally, they materially altered statements Plaintiff made stating Joyce's actions during a Professional Formation class no longer seemed discriminatory after Plaintiff told her to stop, and materially altered testimony and written statements from Plaintiff about a lengthy conversation with Richards regarding Richards' desire to be present for a reconciliation with Joyce.

213. Plaintiff's written and oral testimony, as well as disclosed written statements from Joyce, directly refute Richards' and Beard's false statements that "Alexis

only communicated with you via email" when, in fact, she sat at an orientation table with Plaintiff, and answered direct questions from Plaintiff during a conversation that lasted at least 30 minutes, and Plaintiff was engaging in protected activity when she told Joyce to leave her alone and reported Joyce's discrimination, and "you reported to Dean Chalak Richards that you 'reconciled' with Alexis when you had not had any further interactions," when, in fact, Plaintiff only reported Joyce had not engaged in further discrimination and seemed friendly, and both Joyce and Plaintiff are on the written record denying this ever occurred.   Joyce continued to publicly defame Plaintiff by trying to "out" her to the class by saying Plaintiff, a heterosexual woman, "just came out" during a Professional Formation class.

214. There is direct evidence of retaliation because Defendant removed Plaintiff from her education without probable cause one day after she reported McDonald's sex-based discrimination, and there is a causal connection between the protected activity involving Joyce and the adverse action because Beard stated, "Alexis only communicated with you via email" after Joyce engaged in a corroborated public conversation lasting over 30 minutes, and "you failed to offer any credible evidence that Alexis said or did anything inappropriate" as the reason for sanctioning Plaintiff, violating Title IX protections which both prohibits Joyce from retaliating against Plaintiff for reporting a male student's sexual harassment and permits telling Joyce directly to leave Plaintiff alone and reporting Joyce's factual discriminatory actions, including saying the phrase "that's weird" to a group of students who

subsequently mistreated her due to her perceived sexual orientation, to Defendant without fear of punishment. Plaintiff was protected from retaliation for anything involving Moss, as evidenced in Title IX's offer of support. Plaintiff is protected from opposing Joyce's instigating and damaging actions directly under Title IX as well. Further, the sanctions for telling Joyce to leave her alone occurred only in retaliation for reporting McDonald and telling him to stop.

**COUNT III – TITLE IX RETALIATION - FOR REPORTING PROCTOR**

215. Plaintiff adopts and incorporates all other paragraphs set forth herein.

216. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

Plaintiff engaged in protected opposition to Title IX discrimination when she reported to Defendant a Proctor's actions during a Criminal Law midterm exam where Proctor's behavior

217. Plaintiff reported Endrew Amana's actions to Stacey Nelson when she requested a copy of her exam on November 5, 2023. KH000200. In Nelson's response, she states, "thank you for the feedback concerning the proctor of your exam. My team is given a precise amount of time to proctor exams for students . . .it is difficult to get exams started on-time . . .[t]his certainly does not excuse any behavior you or your classmates felt was inappropriate or unprofessional." Id. On November 9, 2023, Richards responded to Plaintiff via email and said Title IX was being contacted. On November 9, 2023,

Plaintiff responded to Richards' email stating Title IX was being contacted by adding that "I heard several students make jokes and heckles regarding the Criminal Law midterm, however I do not know or pay attention to names and specific instances. . . I have had my personal property defaced multiple times and this is a violation of policies and the law. . .emphasis on treating everyone with respect and dignity." KH000202.

218.  Defendant subjected Plaintiff to adverse action for participating in a protected activity when Defendant purposely sought to include this activity in retaliatory proceedings involving McDonald, even after the matter was resolved. Disclosed and discovered evidence, including cited emails, prove retaliation for reporting this event to Nelson, and with an intentional focus on blaming Plaintiff when even Amana's supervisor, Nelson, deemed it appropriate and normal to run it by her. School policy allowed it as well.

219.  There is direct evidence of retaliation and a causal connection between the protected activity and the adverse action because during all proceedings, the Title IX Coordinator and Title IX office were not present and did not participate, Plaintiff was being punished for engaging in protected activities, Plaintiff was not allowed to question or cross-examine parties, see evidence cited by Beard, or call or question witnesses from the school, as required by Title IX and school policy.

220.  Beard falsely stated that all students queried by Jarvis stated Amana acted professionally. In fact, one student said he did not remember, another falsely remembered Amana as a female, and another reported other unsubstantiated

disruptions. None of the students was ever asked about Amana's factual behavior- they were simply asked about their experience during the administration of the exam. Plaintiff was denied access to review or examine evidence and witnesses.

## COUNT IV – TITLE IX RETALIATION – FOR ENGAGING IN PROTECTED ACTIVITY AGAINST WILLIAMS

221. Plaintiff adopts and incorporates all other paragraphs set forth herein.

222. 34 CFR §106.71 prohibits retaliation, defined as intimidation, threats, coercion, or discrimination, including charges against an individual arising from the same facts or circumstances reported as sex discrimination.

223. Plaintiff engaged in protected opposition to discrimination when she told Williams her actions were creating a hostile learning environment for Plaintiff due to her repeated disparaging, unwanted jokes at Plaintiff's expense, including, but not limited to, comments about her being "ugly," old, and "not doing a good job" in conjunction with telling younger, white female students they were "beautiful" and marriage material.

224. Defendant, Beard, Baker, and Hurley were on notice of Plaintiff's assertion of her protected rights because Plaintiff told them she was the victim of Williams' discrimination.

225. Plaintiff suffered adverse action subsequent to her protected activity and there was a causal connection between the two when Defendant sought out Williams for a statement asking her specifically if Plaintiff had been disruptive as a

means of retaliation for Plaintiff's exercise of her protected rights against McDonald and after Plaintiff reported and opposed Williams' discrimination, Williams stated that she could not in good faith dock Plaintiff any professionalism points during final grading, confirming Plaintiff was never unprofessional, Williams was not required to provide details of her discriminatory jokes and comments, Title IX Coordinator was not informed, Plaintiff was not entitled to question or cross-examine Williams, as required by Title IX and school policy, and Beard materially altered facts about Williams' acts by stating that Williams said Plaintiff was disruptive without also stating Williams was prompted by the school to do so after independently determining otherwise.

## COUNT V – DEFAMATION – Plaintiff against PEPPERDINE UNIVERSITY and SHARON BEARD

272.  Plaintiff adopts and incorporates all other paragraphs set forth herein.

273.  In a letter dated February 27, 2024, Defendants write, "it is more likely than not that you were dishonest."  This is the central, if not only, false statement that needs to be disproven to establish this defamation count. Defendants then list four supporting reasons (a-d) why they advance this false statement, indicating that if these stated reasons are disproven in any way, defamation of Plaintiff is established. As listed below, all supporting statements are disproven, and there are several individual instances where the withheld evidentiary record directly contradicts and disproves Defendants' defamatory statement. This establishes malice, overcomes any

common interest privilege, and overcomes any tendency to view this defamation as opinion. Further, separating someone from their profession effectively moves any opinions into the realm of fact for purposes of proving defamation. The statements are:

a. "Alexis only communicated via email with you, and the Committee reviewed those emails."

    i. This statement is false because:

        1. Making it in an official sanctions letter impliedly states University and Beard had the legal right to make it at all and they were not violating Title IX in doing so.

        2. The statement supports University's and Beard's broader statement that Plaintiff was dishonest about her interaction with Joyce when Joyce admits in her own emails to Richards that "she sat at my Launch Week table in August and then briefly stopped by the CDO right after to ask a quick question." PEP000522.  Not only does this directly refute University's and Beard's statement, but it is expressly exculpatory and was deliberately withheld from Plaintiff and from the sanctions and evidentiary record until she sued. For that reason, University and Beard not only failed to take reasonable care to determine truth or falsity before publishing it, they used actual malice when

advancing a knowingly false statement in an official letter

calling Plaintiff dishonest when she was not.

b. "[Y]ou reported to Dean Chalak Richards that you 'reconciled' with
Alexis."

    i.  This statement is false because:

        1.  Both Plaintiff and Joyce are on the written record refuting
this statement from Richards, and Plaintiff repeatedly
clarified and substantiated how this statement could not be
true given her lengthy conversation with Richards
regarding Richards' desire to be present at a future
reconciliation, should one occur.  Sealed PEP000613.

c. In regard to Proctor Endrew Amana, University and Beard state "Stacy
forwarded your email [reporting his harsh behavior] to Associate Dean
Jason Jarvis, and Associate Dean Jarvis contacted multiple students to
investigate the matter. Each student reported that the proctor acted
professionally."

    i.  This statement is false because:

        1.  Making it in an official sanctions letter impliedly states
University and Beard had the legal right to make it at all
and they were not violating Title IX in doing so. Plaintiff's
feedback to Stacey Nelson was protected activity and any
punishment after Richards offered Title IX support is

unlawful retaliation. For this reason, University and Beard acted with malice.

2. Richards stated in her own correspondence to Plaintiff that this was being forwarded to Title IX for investigation, and it is thus protected activity and not punishable.

3. In violation of Cal. Civ. Pro. § 1094.5, evidence cited was never provided.   On February 7, 2025, University disclosed several redacted emails which directly disprove this statement, including witness statements asserting they did not recall if Proctor acted professionally, misremembering Proctor as a female, and making other unsubstantiated claims about Proctor's behavior not ever mentioned to Plaintiff. This withholding of evidence that disproves University and Beard's statements establishes malice.   Further, none of the students were ever asked about the factual details of Proctor's behavior- they were only asked a generic survey question about whether he was professional during the exam.  Taken together, these facts establish University and Beard not only failed to use reasonable care to establish the truth or falsity, but they used malice in their deceit and misrepresentation of evidence cited and withheld from examination by Plaintiff.

4. Evidence disclosed on February 7, 2025 disproves this defamatory statement, as the only thing ever asked of seven (7) unlawfully anonymous witnesses was, "We are conducting a review of our proctoring procedures for exams . . . [c]an you please let me know what your experience was with your Criminal Law midterm Exam? Was the proctor professional? Did you start on time?" A mere seven out of sixty students were asked, not all who replied were able to even answer, and none was ever asked about the factual allegations, as University and Beard state. For this reason, Defendants failed to use reasonable care to determine truth or falsity of Plaintiff's statements, and they used malice when advancing false statements regarding the withheld evidentiary record.

d. "You indicated that these incidents in both professor McDonald's and Professor Goodno's class occurred in front of the class, yet no one other than yourself reported these behaviors."

   i. This statement is false because:

      1. Plaintiff reported and testified that Goodno's comments "yup and those gray hairs" was made privately to her at the front of the room before class. As such, this statement is proven defamatory in the written record.

2. Of McDonald's cruel jokes and insults, Jarvis stated on February 7, 2024, that a student reported that Plaintiff said, "how dare you sexually assault me." This evidence was withheld from Plaintiff and the record, and it corroborates events reported, even if done through false quotes and statements. Further, no one reporting an action happening to Plaintiff is not proof it did not occur. For these reasons, this statement is proven defamatory in the written record, and Defendants failed to take reasonable care to establish truth or falsity and acted with malice by not disclosing all evidence and offering proper examination or witnesses.

274. Other statements made that may support defamation include:

a. "After the first incident with Professor Goodno, you emailed and apologized 'if my behavior was argumentative.'"

1. Goodno was only approached in retaliation for Plaintiff's reporting and opposing McDonald's sex-based harassment and discrimination.

2. University and Beard knew of a video of this argumentative legal discussion about claim preclusion, the role of the Circuit Court, and Final Judgments, and they hid this exculpatory evidence from Plaintiff and the record, punishing Plaintiff for being professional and cordial. Further, Goodno's mischaracterization to

Department of Public Safety that Plaintiff said, "I pay you. You have to answer me" is disproven in the video and was not ever said or implied by Plaintiff in any way. Material evidence was withheld to promulgate this defamatory statement. Plaintiff endured numerous negative and aggressive public behaviors from Goodno showing animus, making defamatory, disparaging statements that Plaintiff has a disease, and discriminating against her for her age, gender, and perceived medical history. For these reasons, University and Beard failed to take reasonable care to determine the truth or falsity and advanced a knowingly defamatory statement about Plaintiff.

b. "Professor Williams indicated you were disruptive in her class."

   i. This statement is false because:

      1. Williams' statement, occurring only when she was contacted by the school in retaliation for Plaintiff's reporting McDonald's sexual harassment, expressly includes, "I was able to give her all possible professionalism points." This is incongruent with a sanction for disruption. Further, the incident Williams references where Plaintiff asked a line of questions is refuted by Plaintiff entirely, and Williams failed to disclose her discrimination in her accounting. Sealed

PEP000613. Plaintiff denies she was ever disruptive or inappropriate in Williams' class, and no facts or details were ever provided. To date, Defendants have not disclosed video of this event even though Williams recorded all lectures. The statement implies Plaintiff was inappropriate and she was not. Williams was not required to attend a hearing and Plaintiff was denied due process in violation of the law.

2. University and Beard failed to use reasonable care to determine truth or falsity of this statement because Williams states she gave all professionalism points and video was not disclosed. University and Beard failed to disclose the written record refuting this account, and failed to disclose Plaintiff's written record of discrimination from Williams, protecting her from punitive action further.

c. "Students reported you were disruptive in Larson's class."

i. This statement is false because Plaintiff was never disruptive in Larson's class. She spoke only a few times and it was always appropriate.

ii. Defendants never even asked Plaintiff or Larson about this, and there are no details or facts to support this false statement. To date, Defendants have refused to produce video or audio recordings of the events. There is nothing to substantiate this

47        FOURTH AMENDED COMPLAINT

statement and defamation occurs not when students make false statements, but rather it occurs when the Defendants make false conclusions that injure Plaintiff's life. Plaintiff was unlawfully denied due process, establishing malice and in persistent violation of the law.

d. "The University directly contacted multiple students, they all denied that the behaviors occurred."

   i. This statement is false because:

      1. Beard stated that she received twelve responses to this inquiry. Plaintiff has only received four. These four responses cannot possibly prove the events did not happen, they can only offer these four individuals did not see it or subjectively did not think it was bad. The statements include not answering any inquiry about McDonald's factual statements and actions. Jones responded only that McDonald and Goodno have been "extremely important and instructive within my law school journey thus far, and I have thoroughly enjoyed my time in both of their classes." Jones then states only that "it is his recollection" this did not occur. These statements are not relevant or factual. The other students also responded with similar nonfactual, irrelevant statements lavishing nonspecific

praise on faculty but never stating facts. All students then add untrue statements and quotes, some of which are directly disproven in the disclosed video from Goodno's class. This evidence was withheld and impeaches the students whose evidence was disclosed. Further, this "popular vote" on factual events is itself discriminatory, as only students cherry-picked by faculty involved were ever polled. And results of such polls are opinion. The students who were asked are Tom Stipanowich's personal assistant and the female who openly benefited from Tom Stipanowich's sexual overtures, and the most they can say is they did not see this occur. McDonald was never required to attend a hearing to answer questions, and that would have resolved any dispute about facts or events reported. Plaintiff was denied due process, including the right to see, read, examine evidence and witnesses. This continues into the present litigation.

2. This false statement made to CSOL, Paul Caron, and others is reasonably understood to mean no corroboration of events here existed, when in fact, a student's own omission is corroboration, and McDonald himself was never even required to answer a direct question about this. It further reasonably means that punitive informal

"popular votes" on discriminatory events is not violative of Title IX and it reasonably means Plaintiff was not protected from retaliation by sanctioning her based solely on the informal, undeposed written answers of three students.

275. It was clear University and Beard were referring to Plaintiff because it states it expressly in the letter.

276. It is clear Caruso School of Law, Paul Caron, and others understood the statements to mean that Plaintiff was dishonest and that she was not protected from punishment in retaliation for reporting and opposing sex-based discrimination. This is false.

277. Because of the facts and circumstances known to CSOL, Paul Caron, and others of the statements contained therein, they caused injury to Plaintiff's occupation by impeding her access to her education and ability to practice the law, exposing her to shame and contempt and discouraging others from dealing with Plaintiff.

278. Further, the University's and Beard's choice to adamantly deny access to witnesses and named parties to all events establishes malice above and beyond that established in above statements. This shows Defendants failed to use reasonable care to establish truth or falsity. Their choice to withhold exculpatory evidence, as well their withholding of evidence that proves another's guilt, establishes malice and oppression. And Hurley's refusal to properly address bias, his failure to prevent Title IX retaliation upon notice

as required by law, and his failure to retract the defamatory statements shows malice and oppression as well.

279. Finally, the pervasive criminal acts reported and discussed during the hearings, and record of Title IX reporting were all left off the sanctions analysis and letter. This omission further proves University's and Beard's malice and oppression.  The express statements listed above show direct evidence of defamation, but taken together with the totality of the circumstances and Defendants' intentional lack of disclosure of pertinent facts and failure to abide by Federal and State law, establishes malice and an intent to oppress. Also, Beard's reference to the CSOL Career Development Office as the "Career Center" establishes how haphazard and irresponsible this sanctions letter was, and it mirrors how Beard executed the entire process, with wanton disregard for the facts or truth in favor of bullying, intimidation, and retaliation, as well as a focus on other defamatory gossip not mentioned in the letter.

280. These false statements were a substantial factor in causing irreparable harm to Plaintiff's life because it is but for the letter and the words and implications contained therein that Plaintiff was separated from her profession, from professional opportunity both in the law and elsewhere, and from her professional community. Plaintiff has had to finance a lengthy litigation, find employment outside her chosen profession due to harm to her reputation, and has thus experienced shame, mortification, and hurt

feelings typically associated with being falsely called dishonest or otherwise unsavory.

281. For purposes of determining punitive damages, and while encompassing all other pleaded elements and facts for this cause of action, Plaintiff offers that all statements suffer the same failure to take reasonable care to establish truth or falsity because Defendants denied proper hearing and examination of witnesses and evidence. Exculpatory evidence that directly disproves the statements was withheld until Plaintiff initiated this lawsuit, and her professional life was damaged in violation of Cal. Civ. Pro. § 1094.5.  Evidence was all in Defendants' purview when they knowingly made false statements in the letter, and this establishes malice and oppression.

282. Should the Court deem all parties who were sent the letter act as one individual and thus Plaintiff was the only other person told the defamatory statements, Plaintiff offers she was placed under strong pressure to communicate Defendants' statements to others because she was separated from her professional life and education in a public, obvious manner. Defendants' thus should have known that Plaintiff would be under this pressure to communicate the letter in order to prove its falsity, explain her separation from her life and education, and disprove its damaging effects.

## COUNT VI – DEFAMATION – Plaintiff against JASON JARVIS

283. Plaintiff adopts and incorporates all other paragraphs set forth herein.

284.  Jason Jarvis made the following false statements and failed to determine the truth or falsity in each:

a.  On February 7, 2024, Jarvis stated in an email to Camila Bonavia that Plaintiff has "dementia." Plaintiff does not have dementia. This statement was made without regard for the truth and was used to discredit serial misdemeanor defacement of her personal property and other harassment on campus.

285.  It was clear Jarvis was referring to Plaintiff because in all communications from him he directly uses her name.

286.  It is clear Camila Bonavia and University reasonably understood the statements to mean that Plaintiff suffers from dementia.

287.  Because of the facts and circumstances known to Bonavia and University, Beard, and others, Jarvis's false statements injured Plaintiff's life when she was unlawfully and dishonestly sanctioned and her professional and personal reputation were irreparably damaged when he spread lies about her health. These statements, taken together, were reasonably understood to mean Plaintiff suffers from dementia, she said things she never said, and she was not to be believed or respected.

288.  Plaintiff has had to pay for a lengthy litigation, medical expenses, relocation expenses, and other costs associated with these damaging statements. Plaintiff has also lost professional standing in her community and lost career opportunities which she is otherwise uniquely qualified.

289.   Plaintiff has suffered irreparable harm to her professional and personal life because Jarvis spread lies to the University and its members that informed its decision to violate Title IX and injure her career. This false statement that she suffers dementia caused shame, mortification, and hurt feelings.

290.   Jarvis acted with malice and oppression by advancing statements that she has dementia that he knew to be false that tended to injure Plaintiff in her daily life and her chosen profession.

291.   Should the Court count all persons included in Jarvis's emails as one individual, Plaintiff offers she was under strong pressure to communicate his false statements to others to disprove them and Jarvis should have known this pressure would exist when he advanced false statements without factual basis or evidence, using his authority and in the manner he did.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Kira Howell, respectfully requests that the Court find and determine, after trial by jury as appropriate, that Plaintiff suffered substantial and continuing injury as a result of deprivation of her civil rights, resulting in loss of wages, earning capacity, damage to her reputation, and other damages, and award the following relief, as appropriate:

(a) GRANT injunctive relief prohibiting Defendant from discrimination and retaliatory actions denying equal access to education against Plaintiff or any other student ever;

(b) DECLARE that Defendant has violated Plaintiff's civil rights;

(c) ENTER JUDGMENT holding Pepperdine University liable to Plaintiff for compensatory damages, punitive damages, and other damages totaling $10,000,000.00 (ten million dollars);

(d) ENTER JUDGMENT holding Sharon Beard liable to Plaintiff for damages totaling $5,000,000.00 (five million dollars);

(e) ENTER JUDGMENT holding Jason Jarvis liable to Plaintiff for damages totaling $5,000,000.00 (five million dollars);

(f) AWARD Plaintiff her costs and fees;

(g) GRANT such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues.

Dated: February 26, 2025          Respectfully submitted,

<u>/s/Kira Howell</u>



Kira.howell8@yahoo.com

## PROOF OF SERVICE

I, Kira Howell, declare the following documents were served on the parties listed below when I filed them with the Court's CM/ECF electronic filing system on February 14, 2025.

**Plaintiff Kira Howell's FOURTH AMENDED COMPLAINT**

**Karen Pazzani**

**700 North Central Avenue**

**Suite 400**

**Glendale, CA 91203**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2025 at Los Angeles, CA.

*/s/Kira Howell*

Kira Howell

Plaintiff In Pro Per

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOURTH AMENDED COMPLAINT